JOYCE R. BRANDA
Acting Assistant Attorney General
Civil Division
MELINDA HAAG
United States Attorney
J. PATRICK GLYNN
Director, Torts Branch
BRIDGET BAILEY LIPSCOMB
Assistant Director
ADAM BAIN
Senior Trial Counsel
IN Bar No. 11134-49
WAGNER JACKSON
MICHELE S. GREIF
KERI L. BERMAN
Trial Attorneys
Civil Division, Torts Branch
P. O. Box 340
Washington, D.C.  20044
Telephone: (202) 616-4209
FAX: (202) 616-4473
Email: adam.bain@usdoj.gov

Attorneys for Defendant United States of America

IN RE: YOSEMITE NATIONAL PARK HANTAVIRUS LITIGATION

_____

THIS DOCUMENT RELATES TO:

ALL CASES

_____

)
)
)
)
)
)
)
)
)
)
)
)

MDL Docket No. 3:14-md-02532-MMC

UNITED STATES' NOTICE OF MOTION, MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION, AND MEMORANDUM OF POINTS AND AUTHORITIES

Hearing:

   Date:   March 27, 2015

   Time:   9:00 a.m.

   Place:  Courtroom 7, 19th Floor

# TABLE OF CONTENTS

**PAGE NO.**

TABLE OF AUTHORTIES ............................................................................... iv

NOTICE OF MOTION AND MOTION ............................................................ 1

RELIEF SOUGHT ........................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITES ..................................... 1

INTRODUCTION ............................................................................................ 1

STATEMENT OF THE ISSUES....................................................................... 2

STATEMENT OF RELEVANT FACTS ........................................................... 2

    1.  Yosemite National Park, the National Park Service,
        and Use of Concessiers ..................................................................... 3

    2.  The NPS Contract with DNC-Yosemite and the Operation of Curry Village, Tuolumne
        Meadows, and Other Areas................................................................ 4

    3.  Addressing Hantavirus in Yosemite Prior to the Outbreak ............... 7

    4.  The 2012 Hantavirus Outbreak ........................................................ 9

    5.  The Plaintiffs' Allegations ............................................................... 10

ARGUMENT .................................................................................................. 12

    I.   *The Standard of Review on a Jurisdictional Motion: the Court Can Resolve Factual
        Issues to Determine Its Jurisdiction and Should Not Delay the Jurisdictional
        Determination* ................................................................................. 12

    II.  *The Discretionary Function Exception Deprives the Court of Jurisdiction Because the
        Plaintiffs' Claims Challenge Discretionary Governmental Conduct that is Susceptible
        to Policy Analysis*........................................................................... 13

        A.  *The Purpose of the Discretionary Function Exception and Establishment of a
            Two-Part Test*............................................................................ 13

        B.  *Considerations in Applying the Two-Part Test*............................. 14

1.   *Part One*........................................................................... 14

2.   *Part Two*........................................................................... 16

C.   *The Discretionary Function Exception Bars any Claims Challenging the Conduct of the NPS in Managing the Hantavirus Risk*....................................... 17

   1.   *No Specific and Mandatory Provision Removed the Discretion of the NPS in Managing the Hantavirus Risk at Yosemite*................................... 17

      a.   *NPS Management Policies and Directors Orders Provide For Discretion in Managing Risks at National Parks* .................................. 18

      b.   *The Provisions that Plaintiffs Cite in Their Master Complaint Do Not Remove Discretion* ................................................................... 20

         i.   *The Rodent Exclusion Manual* .................................... 20

         ii.   *Yosemite National Park Directive #9* ......................... 22

   2.   *The Conduct of the NPS in Managing the Hantavirus Risk at Yosemite Is Susceptible to Policy Analysis*..................................................... 23

D.   *The Discretionary Function Exception Bars any Claims Challenging the Conduct of the NPS in Reviewing DNC-Yosemite's Operation and Maintenance of the Tent-Cabins in Curry Village*................................................. 25

   1.   *No Specific and Mandatory Provision Removed the Discretion of the NPS in Reviewing DNC-Yosemite's Operation and Maintenance of the Tent-Cabins at Curry Village*................................................................ 25

      A.   *The NPS's Periodic Concessioner Evaluations Were Discretionary*................................................................. 26

      B.   *The NPS' Review of the Winterization of the Curry Village Tent-Cabins Was Discretionary*.............................................. 28

   2.   *The Conduct of the NPS in Reviewing DNC-Yosemite's Operation and Maintenance of the Tent-Cabins at Curry Village Is Susceptible to Policy Analysis*........................................................................ 29

E.   *The Discretionary Function Exception Bars any Claims Challenging the Conduct of the NPS in Providing Information to Yosemite Guests regarding Hantavirus* .......................................... 32

1.  *No Specific and Mandatory Provision Removed the Discretion of the NPS in Providing Information to Yosemite Guests Regarding Hantavirus* ....................................................................... 32

2.  *The Conduct of the NPS in Providing Information to Yosemite Guests Regarding Hantavirus Is Susceptible to Policy Analysis* .............................. 33

III. *The Contractor Exception Deprives the Court of Jurisdiction Over Plaintiffs' Claims to the Extent Plaintiffs Seek to Impose Liability on the United States for conduct of DNC-Yosemite Employees* ......................................................................... 37

CONCLUSION .......................................................................................................... 40

# TABLE OF AUTHORITIES

## **FEDERAL CASES**

<u>PAGE NO.</u>

*Aragon v. United States,*
  146 F.3d 819 (10th Cir. 1998) ............................................................. 22

*Augustine v. United States,*
  704 F.2d 1074 (9th Cir. 1983) ............................................................ 13

*Autery v. United States,*
  424 F.3d 944 (9th Cir. 2005) ........................................................ 37, 38

*Bailey v. United States,*
  623 F.3d 855 (9th Cir. 2010) ................................................ 17, 23, 25

*Bear Medicine v. United States,*
  241 F.3d 1208 (9th Cir. 2001) ............................................................ 32

*Berkovitz v. United States,*
  486 U.S. 531 (1988) ............................................................... 13, 14, 22

*Blackburn v. United States,*
  100 F.3d 1426 (9th Cir. 1996) ...................................................... 22, 34, 35

*Childers v. United States,*
  40 F.3d 973 (9th Cir. 1994) ...................................................... 23, 34, 35

*Dalehite v. United States,*
  346 U.S. 15 (1953) ........................................................................... 14

*Dichter-Mad Family Partners, LLP v. United States,*
  709 F.3d 749 (9th Cir. 2013),
  *cert denied,* 134 S. Ct. 117 (U.S. 2013) ......................................... 15

*Doe v. Holy See,*
  557 F.3d 1066 (9th Cir. 2009) ...................................................... 15, 36

*Ducey v. United States,*
  713 F.2d 504 (9th Cir. 1983) ............................................................. 38

*Fisher Bros. Sales, Inc. v. United States,*
  46 F.3d 279 (3d Cir. 1995) ............................................................... 16

*Gager v. United States*,
    149 F.3d 918 (9th Cir. 1998) ............................................................ 30

*GATX/Airlog Co. v. United States*,
    286 F.3d 1168 (9th Cir. 2002) ................................................... 12, 14

*General Dynamics Corp. v. United States,*
    139 F.3d 1280 (9th Cir. 1998) ......................................................... 16

*In re Agent Orange Prod. Liab. Litig.*,
    818 F.2d 194 (2d Cir. 1987).............................................................. 36

*In re Consolidated U.S. Atmospheric Testing Litigation*,
    820 F.2d 982 (9th Cir. 1987) ............................................... 30, 35, 36

*In re Glacier Bay*,
    71 F.3d 1447 (9th Cir. 1995) ...................................................... 14, 21

*Johnson v. United States*,
    132 F. App'x 715 (9th Cir. 2005) .................................................... 38

*Jones v. United States*,
    No. 1:08-CV-01137 AWI DLB,
    2010 WL 5418795 (E.D. Cal. Dec. 23, 2010),
    *aff'd* 509 F. App'x 644 (9th Cir. 2013)........................................... 38

*K.V. v. United States*,
    No. 12-CV-1944 (MKB),
    2013 WL 5447875 (E.D. N.Y. Sept. 30, 2013) .......................... 38, 39

*Kelly v. United States*,
    241 F.3d 755 (9th Cir. 2001) ......................................................... 15

*Kennewick Irr. Dist. v. United States*,
    880 F.2d 1018 (9th Cir. 1989) ....................................................... 15

*Kirchmann v. United States*,
    8 F.3d 1273 (8th Cir. 1993) ........................................................... 30

*Lake Mohave Boat Owners Assoc. v. National Park Service*,
    78 F.3d 1360 (9th Cir. 1995) .................................................. 3, 4, 26

*Land v. Dollar*,
    330 U.S. 731 (1947)................................................................. 12, 13

*Laurence v. Department of Navy*,
   59 F.3d 112 (9th Cir. 1995) ........................................................................ 37

*Lawrence v. United States*,
   340 F.3d 952 (9th Cir. 2003) ...................................................................... 37

*Letnes v. United States*,
   820 F.2d 1517 (9th Cir. 1987) .................................................................... 37

*Logue v. United States*,
   412 U.S. 521 (1973) .................................................................................... 37

*Maas v. United States*,
   94 F.3d 291 (7th Cir. 1996) ........................................................................ 36

*Mansfield, C. & L. M. Ry. Co. v. Swan*,
   111 U.S. 379 (1884) .................................................................................... 13

*Michelson v. United States*,
   No. 4:12CV00913 ERW,
   2013 WL 4666340 (E.D. Mo. Aug. 30, 2013) ...................................... 38, 39

*Miller v. United States*,
   163 F.3d 591 (9th Cir. 1998) ............................................. 15, 17, 21, 22

*Minns v. United States*,
   155 F.3d 445 (4th Cir. 1998) ...................................................................... 36

*Myers v. United States*,
   652 F.3d 1021 (9th Cir. 2011) .................................................................... 31

*Nurse v. United States*,
   226 F.3d 996 (9th Cir. 2000) ............................................................... 17, 30

*O'Toole v. United States*,
   295 F.3d 1029 (9th Cir.  2002) ........................................................... 17, 24

*Prescott v. United States*,
   973 F.2d 696 (9th Cir. 1992) ...................................................................... 14

*Riley v. United States*,
   486 F.3d 1030 (8th Cir. 2007) .................................................................... 21

*Routh v. United States*,
   941 F.2d 853 (9th Cir. 1991) ...................................................................... 14

*Sabow v. United States*,
　　93 F.3d 1445 (9th Cir.1996) ................................................................ 15

*San Francisco v. United States*,
　　615 F.2d 498 (9th Cir. 1980) ............................................................. 37

*Sanchez v. City of Fresno*,
　　No. 1:12-CV-428 LJO
　　2013 WL 2100560 (E.D. Cal. May 14, 2013) ................................... 28

*Sanchez v. United States*,
　　671 F.3d 86 (1st Cir. 2012),
　　cert denied, 133 S. Ct. 1631 (U.S. 2013), .......................................... 15

*Schweiker v. Hansen*,
　　450 U.S. 785(1981)............................................................................... 21

*Shansky v. United States*,
　　164 F.3d 688 (1st Cir. 1999)............................................................... 15

*Steel Co. v. Citizens for a Better Environment*,
　　523 U.S. 83 (1998)............................................................................... 13

*Terbush v. United States*,
　　516 F.3d 1125 (9th Cir. 2008) ................................................... *passim*

*United States v. Gaubert*,
　　499 U.S. 315 (1991)...................................................................... *passim*

*United States v. Orleans*,
　　425 U.S. 807 (1976)............................................................... 12, 37, 38

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*,
　　467 U.S. 797 (1984)...................................................................... *passim*

*Valdez v. United States*,
　　56 F.3d 1177 (9th Cir. 1995) ....................................................... 34, 35

*Vallier v. Jet Propulsion*,
　　*Lab.*, 120 F. Supp. 2d 887(C.D. Cal. 2000),
　　*aff'd*, 2001 WL 1631762 (9th Cir. 2001.............................................. 30

*Whisnant v. United States*,
　　400 F.3d 1177 (9th Cir. 2005) ........................................................... 24

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ........................................................... 13

*Yanez v. United States*,
    63 F.3d 870 (9th Cir. 1995) ............................................................... 39

*Young v. United States*,
    ___F.3d ___, 2014 WL 5293678 (9th Cir. Oct. 17, 2014) ................................... 39

## **FEDERAL STATUTES**

16 U.S.C. § 1 .................................................................................. 3

16 U.S.C. § 5952 ............................................................................... 4

16 U.S.C. § 5955 ............................................................................... 4

16 U.S.C. § 5956 ............................................................................... 4

28 U.S.C. §§ 1330 ............................................................................. 15

28 U.S.C. § 1346(b) ....................................................................... 12, 27

28 U.S.C. § 2671 .......................................................................... 12, 37

28 U.S.C. § 2680(a) ........................................................................... 12

28 U.S.C. § 2680(h) ...................................................................... 36, 37

Act of June 30, 1864 § 1, 13 Stat. 325 ......................................................... 3

Act of Oct. 1, 1890 §§ 1 & 2, 26 Stat. 650-51 .................................................. 3

Act of Aug. 25, 1916, § 1, 39 Stat. 535 ........................................................ 3

Pub. L. No. 89-249, § 2, 79 Stat. 969 .......................................................... 4

## **FEDERAL RULES**

Fed. R. Civ. P. 12(b)(1) ................................................................ 1, 12, 13

Fed. R. Civ. P. 12(b)(6) ...................................................................... 13

Fed. R. Civ. P. 12(h)(3) .................................................................. 1, 12

Fed. R. Civ. P. 56 ........................................................................ 12, 13

## **FEDERAL REGULATIONS**

36 C.F.R. § 51.2 ................................................................................................................. 25

36 C.F.R. § 51.17………………………………………………………………………25, 40

## **STATE CASE**

*Howes v. Reeves,*
    35 Cal.App. 2d 680 (Cal. App. 4 Dist. 1939) ........................................................ 28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on March 27, 2015, at 9:00 a.m. in Courtroom 7, located on the 19th Floor of 450 Golden Gate Avenue, San Francisco, California 94102, defendant United States will move for an order dismissing Plaintiffs' claims against the United States for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(h)(3).  This motion is based on this notice; the following memorandum of points and authorities; the declarations of Don L. Neubacher, William J. Bryan, and Matthew Weinburke, and exhibits[1] filed in support of the motion; the reply; and such oral argument as the Court may permit.

## RELIEF SOUGHT

Defendant United States seeks an order dismissing all claims asserted against the United States in Plaintiffs' Master Complaint, with prejudice.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

In the summer of 2012, an unprecedented outbreak of Hantavirus Pulmonary Syndrome ("Hantavirus") was linked to stays in tent-cabins in Yosemite National Park ("Yosemite") that the concessioner DNC Parks & Resorts at Yosemite, Inc. ("DNC-Yosemite") owned and operated.  Hantavirus is a known, albeit very rare, wilderness risk in California.  Hantavirus can result from breathing the aerosolized waste of deer mice that carry a particular strain of Hantavirus known as the Sin Nombre virus.  Previously, the only two documented cases of Hantavirus in Yosemite had been linked to visits to the High Sierra region of the park, but the 2012 Hantavirus outbreak occurred in Yosemite Valley at Curry Village, which is a different ecological setting and at great distance from the High Sierra region.  Yosemite is a large national park with many risks to visitor health and safety throughout many different areas.  Hantavirus is just one of many risks that the National Park Service ("NPS") must manage in Yosemite.

The NPS's management of the remote Hantavirus risk throughout Yosemite was a matter of discretion that was subject to various policy considerations.  The NPS could balance the

---

[1]  All of the exhibits are sponsored by the Declaration of Adam Bain.

perceived magnitude of the risk with social, political, and economic policies in deciding, what, if any, actions to take.  The same analysis applies to government decisions regarding providing information to guests about Hantavirus both before and after the Hantavirus outbreak in 2012.  Indeed, no relevant specific and mandatory provisions constrained the government's discretion in how to manage the Hantavirus risk or provide information regarding Hantavirus.  NPS regulations actually provided wide latitude for the government's conduct and described policies that underlie government decision-making.

Plaintiffs have filed this tort action against the United States, DNC-Yosemite, and other defendants for injuries and deaths resulting from Hantavirus.  The claims against the United States are pursuant to the Federal Tort Claims Act ("FTCA"), which includes a "discretionary function exception" to the Act's waiver of sovereign immunity to shield discretionary, policy-based conduct from tort liability.  Under this exception, this Court lacks subject-matter jurisdiction over Plaintiffs' claims against the NPS.  Further, to the extent Plaintiffs seek to impose liability on the NPS for any conduct of DNC-Yosemite employees, the United States cannot be liable because DNC-Yosemite's employees are independent contractor employees, not government employees.  Under the FTCA, the United States can only be liable for conduct of employees of federal agencies, and the Act specifically excludes contractors from that definition.

## STATEMENT OF THE ISSUES

1. Was the NPS's conduct in managing the potential Hantavirus risk in different areas of the park, in reviewing the work of its concessioner at Curry Village, and in providing information regarding Hantavirus, conduct that is immunized from tort liability by the FTCA's discretionary function exception?

2. May the United States be liable under the FTCA for contractor DNC-Yosemite's operation of the Curry Village tent-cabins where the United States does not control DNC-Yosemite employees to the extent they are, in essence, employees of the United States?

## STATEMENT OF RELEVANT FACTS

The establishment of Yosemite and the use of a private concessioner to provide accommodations there are important background for understanding the policy considerations

underlying NPS conduct relevant to managing the Hantavirus risk at Yosemite.  Additionally, the relationship between the NPS and its concessioner, and the evolving response to Hantavirus, a relatively new, rare disease, provide a framework for appreciating the competing policy factors.

**1.  Yosemite National Park, the National Park Service, and use of Concessioners**

The origin of Yosemite National Park dates back over 150 years, to June 30, 1864, when the federal government granted Yosemite Valley and the Mariposa Big Tree Grove to California to "be held for public use, resort, and recreation" and to be "inalienable for all time."  Act of June 30, 1864 § 1, 13 Stat. 325.  On October 1, 1890, Congress formally established Yosemite National Park (excluding the specific land granted to California in 1864) as a "forest reservation" to preserve and protect "all timber, mineral deposits, natural curiosities, or wonders" within the park area in order to retain them in their "natural condition."  Act of Oct. 1, 1890 §§ 1 & 2, 26 Stat. 650-51.  In 1906, Congress accepted the transfer of Yosemite Valley and the Mariposa Big Tree Grove from California forming the present Yosemite National Park.  Joint Resolution of June 11, 1906, 34 Stat. 831.  The government's challenge was to preserve the wilderness while allowing public access to it.

Thus, in 1916, Congress established the NPS to promote and regulate the use of the federal areas known as national parks, monuments and reservations and to provide the opportunity for public enjoyment of the areas.  Act of Aug. 25, 1916, §1, 39 Stat. 535.  The Organic Act for the NPS states that the NPS will "promote and regulate the use" of national parks to "conform to [their] fundamental purpose . . . which . . . is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  16 U.S.C. § 1.

Following World War II, an advisory group appointed by the Secretary of the Interior addressed a concern that park accommodations were only available to the wealthy and recommended that park concessioners agree to deliver accommodations and services to park visitors at a reasonable rate.  *See Lake Mohave Boat Owners Assoc. v. National Park Service*, 78 F.3d 1360, 1366 (9th Cir. 1995).  Subsequently, in 1965, Congress enacted the National Park

Service Concessions Policy Act of 1965 ("CPA") to encourage private businesses to provide accommodations and services in national parks to the public.  Pub. L. No. 89-249, § 2, 79 Stat. 969.  The CPA codified practices that the NPS had followed since 1950 in hiring concessioners to provide accommodations and services at national parks; in fact, Congress specifically recognized that the NPS must depend heavily on private entrepreneurs "'to provide visitors to the national park system with necessary facilities and services.'"  78 F.3d at 1366 (quoting S.Rep. No. 765, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.C.C.A.N. 3489, 3490-91).  In a report on the legislation Congress found that "'[p]articularly in the case of the larger parks at which visitors expect to stay overnight, an increased strain in being put on accommodations and other facilities for services to visitors.'"  *Id.*  The CPA, and its successor statute, the National Park Service Concessions Management Improvement Act of 1998, have given the government the authority to use concessions contracts "to provide accommodations, facilities, and services."  16 U.S.C. § 5952.  *See also* Pub. L. No. 89-249, § 2, 79 Stat. 969.  The concessioner pays a franchise fee for the privilege of operating in a national park.  16 U.S.C. § 5956.  In return, the concessioner is permitted a reasonable rate of return on the capital invested.  *See id.* § 5955.

## 2.  The NPS Contract with DNC-Yosemite and the Operation of Curry Village, Tuolumne Meadows, and Other Areas

For over a century, millions of visitors have enjoyed the scenery of Yosemite, which John Muir famously described as a "mountain mansion" where Nature has gathered "her choicest treasures, to draw her lovers into close and confiding communion with her."  John Muir, *The Yosemite* (1912).  Presently, approximately four million people come to the park every year.  Don L. Neubacher Declaration ¶ 3 ("DN Decl.").  Visitors have a variety of options for staying in the park, ranging from backwoods camping to the Ahwahnee Hotel.  One of the most historic sites is Curry Village, at the east end of Yosemite Valley, where David and Jennie Curry established a commercial camping operation in 1899 to provide "inexpensive accommodations" that would allow visitors to "commune with nature."  Ex. 19 at 13 (2010, Camp Curry Historical District Cultural Landscape Report, excerpts).  Throughout the early twentieth century, the site developed as a camp concession for tourists to Yosemite.  *See id.* at 14-15.  The complex, listed

on the National Register of Historic Places, includes wooden visitor cabins, a store, dining facilities, a lodge, and a post office. *Id.* at 14-20, 32-33. Curry Village also has a large number of "tent-cabins," which are wooden-framed structures on post and pier foundations with wooden doors, but double canvas roofs and sides. William J. Bryan Declaration ¶ 5 ("WB Decl."). *See also* Ex. 19 at 32. The tent-cabins are historically significant in that they sit on the same footprint as the original Camp Curry and "represent the longest continuously operating commercial tent accommodations in the NPS and, possibly, the United States." Ex. 19 at 32. Over the years, managing Curry Village and maintaining its historical features has proven challenging for park administrators, particularly given the popularity of the site and rock fall incidents from the nearby cliffs. *See id.* at 15-16. A 2010 report on Curry Village noted that it has been difficult for park planners "to strike a balance between profitability, enjoyment, visitor safety, and resource integrity (both natural and historic)." *Id.* at 16.

There are also tent accommodations in other areas of Yosemite, but they sit in different ecological settings and have other differences that can be significant from a risk-management perspective. *See* WB Decl. ¶ 5. For example, a site in Tuolumne Meadows, in the High Sierra region of the park, has 69 tent-cabins. *Id.* Unlike the Curry Village tent-cabins, the Tuolumne Meadows tent-cabins have stone or concrete foundations and metal frames. *Id.* Whereas the Curry Village tent-cabins have propane heaters, the Tuolumne Meadows tent-cabins are heated by wood burning stoves. *Id.* Another lodging site much closer to Curry Village, known as "Housekeeping Camp," has units that do not have doors. *Id.* The Housekeeping Camp units have three concrete walls, a concrete floor, and a double canvas roof. *Id.* In place of a door, there is a canvas-curtained wall. *Id.* The curtain separates the sleeping area from a covered patio area that is open to the outside. *Id.* Curry Village and Housekeeping Camp are in Yosemite Valley at an elevation of approximately 4,000 feet above sea level. *Id.* Tuolumne Meadows, in the High Sierra region, at an elevation of approximately 8,600 feet, is accessible by Tioga Pass road, which is generally open only about five months of the year, from late May to October. *Id.* Tuolumne Meadows is over 90 minutes away from Curry Village and Housekeeping Camp by car. *Id.*

Since 1993, DNC-Yosemite, or one of its predecessor companies, has had the concessions contract with NPS to provide "accommodations, facilities, and services for the public" at Yosemite.  Ex. 1 at 4 (Concessions Contract, excerpts).  The accommodations covered include the Ahwahnee Hotel and other lodges at Yosemite, as well as the tent-cabins at Curry Village, Tuolumne Meadows, and Housekeeping Camp.  In contrast to the government real property at Yosemite, the tent-cabins "are considered private property of the concessioner." *See* Ex. 19 at 19.

The contract generally describes the operations and maintenance responsibilities of DNC-Yosemite, but leaves the details and decisions concerning implementation to DNC-Yosemite.  For example, under the Operating Plan in the contract, DNC-Yosemite must provide clean, well-maintained overnight accommodations, but the contract provides few details regarding implementation.  *See* Ex. 1 at Exhibit J at 15.  The contract states that DNC-Yosemite is to direct the concessions operation and employ an on-site manager.  *Id.* at Exhibit J at 5.  DNC-Yosemite's on-site manager is to "employ a staff with the expertise to operate all services authorized under the concessions contract," *see id.*, but the contract does not detail how DNC-Yosemite is specifically to perform those services.  With respect to training, the Operating Plan states that DNC-Yosemite is to provide its employees with training regarding "park regulations and requirements" and "[a]dditional orientation pertinent to the developed areas where the employees are assigned."  *Id.* at Exhibit J at 13.  Regarding pest management at concessioner facilities, the contract refers DNC-Yosemite to procedures "outlined in the Park's Integrated Pest Management Plan."  *Id.* at Exhibit J at 41.

Under the contract, DNC-Yosemite is required to physically maintain and repair all facilities. Ex. 1 at 9.  DNC-Yosemite is to comply with all applicable rules, regulations, and requirements governing the property, including applicable requirements associated with visitor safety and health.  *Id.* at 4-5.  Under a Maintenance Plan in the contract, DNC-Yosemite must carry out "general preventative and cyclical maintenance and emergency repair in a timely manner."  *Id.* at Exhibit I at 4.  Further, through a 2006 amendment to the contract, DNC-Yosemite had to install and implement an automated maintenance program and hire an

experienced professional to operate and manage the maintenance program.  *Id.* at Amendment 7 at 1-2.  Under the contract the NPS provides prior written approval for DNC-Yosemite's "construction" work at the park.  Ex. 1 at 8.  Concessioner construction projects are accomplished through a Capital Improvement Fund, which is a fund into which the concessioner contributes money to be used for improvements that directly support concession services outlined in the contract.  DN Decl. ¶ 11; Ex. 1 at 18.  The fund is not used for routine, operational work, such as renovations to the concessioner's personal property.  DN Decl. ¶ 11.

One maintenance issue that arose from time-to-time involved rodent infestation of visitor lodgings.  For example, in April 2008, the NPS received a complaint of rodent infestation in one of the Curry Village hard-sided wooden cabins.  Ex. 2 (April 21, 2008 Memorandum, Rodent Complaint in Curry Village).  This prompted the NPS to contact the DNC-Yosemite employee responsible for the concessioner's integrated pest management and review the concessioner's rodent proofing program.  Ex. 3 (April 18, 2008 e-mail from Roger Farmer to Dave Conway).  The NPS made several recommendations to DNC-Yosemite to improve its maintenance efforts with respect to rodents, including recommendations for rodent proofing, rodent monitoring, and employee training.  Ex. 2 at 3.  Subsequently, DNC-Yosemite developed a rodent abatement plan for Curry Village to address these issues.  Ex. 4 (May 6, 2008 e-mail from Annette Catamec to Vicki McMichael).

### 3.  Addressing Hantavirus in Yosemite Prior to the Outbreak

Hantavirus, a potentially severe disease of the lungs, was first recognized in 1993 in the Four Corners area of the southwestern United States.  Ex. 20 at 5 (CDPH Investigative Summary).  Hantavirus is a "vector borne" disease, meaning it is a type of disease that is transmitted to people by insects, rodents, or other animals.  Declaration of Matthew Weinburke ¶ 3 ("MW Decl.").  Yosemite's Hantavirus outbreak was caused by the Sin Nombre strain of Hantavirus, which is carried by wild deer mice and contracted by exposure to their feces, urine or saliva.  MW Decl. ¶ 3; Ex. 20 at 5.  Prior to 2012, only 587 cases of Hantavirus had been reported nationwide, 56 of which were in California residents.  Ex. 20 at 5-6.

Prior to 2012, there had only been two documented cases of Hantavirus linked to

Yosemite and both involved potential exposures at the Tuolumne Meadows tent-cabins, located in the High Sierra region of Yosemite.  MW Decl. ¶ 4.  The first reported case in September of 2000, involved an individual who visited Yosemite in July of 2000, staying one night at a Tuolumne Meadows tent-cabin and another night at similar High Sierra tent-cabin at the Glen Aulin High Sierra Camp site.  *Id.*  In September of 2000, as a result of this case, the NPS, in conjunction with the California Department of Public Health (CDPH) and local health authorities, began investigating the Hantavirus risk at the High Sierra camps.  *Id.* ¶ 5.  In 2002, Yosemite issued a "Hantavirus Program Policy" to alert employees and supervisors of the presence of Hantavirus carrier rodents in the park, and to provide measures to protect park personnel and others from contact with the virus.  Ex. 5 (July 12, 2002, Yosemite Hantavirus Program Policy).  Over the years, the NPS has had cooperative agreements with CDPH pursuant to which NPS utilized the expertise of the Vector-Borne Disease Section of the CDPH in evaluating risks of vector-borne diseases such as Hantavirus.  MW Decl. ¶ 5.  In September 2007, the NPS and the CDPH performed additional vector-borne disease surveillance in Tuolumne Meadows and other High Sierra locations.  *Id.*  In January 2008, Yosemite issued a "Hantavirus Policy" to protect employees and volunteers who "might be exposed to Hantavirus in the course of their duties."  Ex. 6 (January 2008, Hantavirus Policy).

In September of 2010, the NPS learned that a second visitor of Tuolumne Meadows had been diagnosed with Hantavirus.  DN Decl. ¶ 13; MW Decl. ¶ 6.  The NPS and the CDPH once again investigated the Hantavirus risk at Tuolumne Meadows.  *Id.*  As a result, the NPS, the CDPH, and DNC-Yosemite worked together to develop Hantavirus prevention measures.  *Id.*  Representatives revised the standard operating procedures for daily housekeeping and for mitigating light and heavy mouse infestations.  *Id.*  In December of 2010, DNC-Yosemite submitted an updated formal written Hantavirus policy to the NPS describing its procedures to protect NPS and DNC-Yosemite employees, volunteers, guests and the community from hazards associated with Hantavirus exposure in all lodging locations.  DN Decl. ¶ 13; MW Decl. ¶ 6; Ex. 7 (October 2010, DNC Hantavirus Policy).  In late 2011 and early 2012, Yosemite's Public Health Officer, Cmdr. Matthew Weinburke, undertook a review of the Hantavirus procedures for

Yosemite, during which he consulted with the Vector-Borne Disease Section of the CDPH for its expertise.  DN Decl. ¶ 14; MW Decl. ¶ 7.  In the spring of 2012, Cmdr. Weinburke drafted a Hantavirus Directive for Yosemite with the goal of being consistent with current CDC guidelines.  *Id.*  In April of 2012, the Directive was issued by the Superintendent, and DNC-Yosemite used the Directive for guidance in issuing its own revised Hantavirus procedures.  *Id. See also* Ex. 8 (April 25, 2012, Directive #9, Hantavirus Risk Reduction Program).  In the spring of 2012, Cmdr. Weinburke also conducted training on Hantavirus that NPS and DNC-Yosemite employees were encouraged to attend.  DN Decl. ¶ 14; MW Decl. ¶ 7.

### 4.  The 2012 Hantavirus Outbreak

During the summer of 2012, Yosemite experienced an outbreak of ten Hantavirus cases. MW Decl. ¶ 8.  Tragically, three of the cases resulted in death.  The outbreak was linked to individuals who stayed in Curry Village's "Signature" tent-cabins.  *Id.*  DNC-Yosemite created the Signature tent-cabins by "winterizing" 91 existing employee tent-cabins to make new guest tent-cabins that could replace the winter accommodations that were lost as a result of an October 2008 rock fall in Curry Village.  Ex. 9 at 2 (May 2013, Office of Inspector General Report, NPS Contractor Oversight of Visitor Tent Cabins Involved in the Hantavirus Outbreak).  This "winterizing" of the 91 tent-cabins was accomplished by adding a layer of rigid foam insulation between the canvas exterior and a newly installed drywall interior; these new model "winterized" tent-cabins were called "Signature" tent-cabins.  *Id.*  DNC-Yosemite accomplished these conversions in early 2009 through a contract with Bradley Popp's Yosemite Construction Co. *See* Ex. 10 (December 17, 2008 E-mail from Elexis Mayer to Larry Harris).

Nine individuals who may have contracted Hantavirus in Curry Village stayed in the Signature tent-cabins between June and mid-July 2012.  MW Decl. ¶ 9.  The CDPH notified the NPS of the first confirmed Hantavirus case that might be associated with Yosemite on about July 11, 2012.  DN Decl. ¶ 15; MW Decl. ¶ 9.  Notifications of cases continued through October 29, 2012, as a result of the one to six week Hantavirus incubation period and the protocol of local and state health officials for reporting confirmed cases.  MW Decl. ¶ 9.

Yosemite's response on behalf of the NPS was driven by information and public health

expertise provided by the CDPH and the Center for Disease Control and Prevention (CDC).  DN Decl. ¶ 15.  Yosemite also had support from the NPS regional and headquarters offices as well as the NPS Office of Public Health.  *Id.*  During the next months, the NPS, the CDPH, and the CDC conducted several site investigations of Curry Village and the Signature tent-cabins.  *Id.*  In late August, investigations revealed deer mice infestation in the insulation of several Signature tent-cabins.  *Id.*  On August 28, 2012, the NPS determined that the Signature tent-cabins should be permanently closed based on recommendations from health officials.  DN Decl. ¶ 15; MW Decl. ¶ 8.

From late August through mid-September, the NPS and DNC-Yosemite reached out to notify anyone who had stayed in Yosemite and might have been affected.  DN Decl. ¶ 16.  First, in late August, e-mails were sent to those who had made reservations at the Signature tent-cabins in Curry Village between June 10, 2012 and August 24, 2012.  *Id.*  This was followed up with hard-copy letters and phone calls to individuals who had made reservations but had not provided an e-mail address.  *Id.*  At this time, the NPS also issued press releases, posted information on the internet, and, through the CDC, disseminated information regarding the outbreak to national and international health agencies.  *Id.*  In early September, the notification effort was expanded to reach individuals who had made reservations in the High Sierra camps during the summer of 2012.  *Id.*  Ultimately, on September 12, 2012, notification was sent to over 28,000 e-mail addresses of persons who had stayed in Yosemite during that summer, including lodgings and campgrounds.  *Id.*

### 5.  The Plaintiffs' Allegations

The Judicial Panel on Multi-District Litigation consolidated five lawsuits in this litigation.  On September 3, 2014, the plaintiffs in these lawsuits filed a Master Consolidated Complaint ("Master Complaint") for purposes of pretrial discovery and motions practice.  The Master Complaint contains twelve causes of action, including the following nine causes of action against the United States:  wrongful death, survival, negligence, premises liability, loss of consortium, breach of warranty, failure to warn, negligent infliction of emotional distress, and civil conspiracy.

Plaintiffs allege that the United Sates was aware of the risk of Hantavirus, knew that rodent infestations existed at Curry Village, and knew that rodents carried Hantavirus.  Cmplt. ¶ 85.  Therefore, Plaintiffs claim the United States owed Plaintiffs and their decedents a duty of due care to avoid the risk of harm from Hantavirus.  *Id.* ¶ 85.  Plaintiffs allege that the United States was negligent in failing to properly investigate and take remedial action with regard to the Signature tent-cabins and Curry Village in light of significant and repeated warnings of the risk of Hantavirus.  *Id.* ¶ 87.  In particular, Plaintiffs allege that the NPS did not have an adequate Integrated Pest Management Program providing for control of deer mice and Hantavirus at Curry Village.  *Id.* ¶ 89.  Plaintiffs claim that the NPS breached mandatory duties established by its Rodent Exclusion Manual and Yosemite Directive #9 in the following ways:  (1) by failing to inspect adequately the Curry Village tent-cabins, (2) by failing to close access points to deer mice in the tent-cabins, (3) by allowing poor sanitary conditions to exist at Curry Village that attracted deer mice, (4) by failing to monitor regularly for deer mice, and (5) by failing to properly train park employees.  *Id.* ¶¶ 90, 92, 93.

Plaintiffs also claim that the NPS failed to conduct adequate review of the concessioner that operated Curry Village to ensure that the concessioner maintained rodent proof structures, that the concessioner's employees were properly trained, and that the concessioner maintained clean conditions at Curry Village.  *Id.* ¶ 92.  With respect to the Signature tent-cabins at Curry Village, Plaintiffs claim that the construction of these cabins created a dangerous condition, and that NPS negligently approved the design.  *Id.*  ¶¶ 49, 50.  Plaintiffs further allege that the NPS failed to remedy the dangerous condition in the Signature tent cabins after it knew about the condition.  *Id.* ¶¶ 133, 136.

Finally, Plaintiffs claim that the United States knew about the Hantavirus risk in Curry Village and that the defective condition of the Signature tent-cabins increased the risk of Hantavirus but failed to provide adequate warnings about the risk that would have allowed Plaintiffs to make informed choices about staying in the Signature tent-cabins or seeking appropriate medical care.  *Id.* ¶¶ 147-48.

\\

**ARGUMENT**

This Court does not have jurisdiction over any of Plaintiffs' claims against the United States because the United States has not waived its sovereign immunity to those claims. *See United States v. Orleans*, 425 U.S. 807, 814 (1976) (stating that, as the sovereign, the United States "can be sued only to the extent that it has waived its immunity" to suit). First, the FTCA only waives the government's sovereign immunity for certain types of tort claims, and it specifically reserves immunity with respect to others. Through the "discretionary function exception" of the FTCA, Congress has reserved the United States' sovereign immunity from "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Thus, to the extent that the Plaintiffs' claims against the United States fall within the discretionary function exception, the Court lacks subject-matter jurisdiction over those claims. *See GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1173 (9th Cir. 2002). Second, the FTCA's waiver of sovereign immunity is limited to the acts and omissions of agents or employees of the United States. *See* 28 U.S.C. § 1346(b) (stating that an FTCA plaintiff can only recover damages "caused by the negligent or wrongful act or omission of *any employee* of the Government.") (emphasis added); 28 U.S.C. § 2671 (stating that the definition of "[e]mployee of the government" includes employees of federal agencies and the military, but that "Federal Agency" expressly excludes "any contractor with the United States"). Thus, this Court lacks subject-matter jurisdiction to the extent that Plaintiffs seek to hold the United States liable for acts or omissions of contractor employees.

## I.   The Standard of Review on a Jurisdictional Motion: the Court Can Resolve Factual Issues to Determine Its Jurisdiction and Should Not Delay the Jurisdictional Determination.

The United States moves to dismiss the claims against it for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and 12(h)(3), and relies upon the attached declarations and exhibits to support the motion. The Court may consider these materials without converting the motion into a summary judgment motion under Fed. R. Civ. P. 56. *See Land v.*

*Dollar*, 330 U.S. 731, 735 n.4 (1947) (stating that on a motion to dismiss for lack of jurisdiction, a court "may inquire by affidavits or otherwise, into the facts as they exist"); *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (stating that under 12(b)(1) a court "may look beyond the complaint" without converting the motion into one for summary judgment). *See generally* 2 James Wm. Moore et al., Moore's Federal Practice ¶ 12.30[4], at 12-39 to 12-41 (3d ed. 1999).

Unlike motions to dismiss under Fed. R. Civ. P. 12(b)(6), no presumptive truthfulness attaches to Plaintiffs' allegations, and unlike motions for summary judgment under Fed. R. Civ. P. 56, even the existence of disputed material facts should not preclude this Court from evaluating the merits of the jurisdictional claims. *See White*, 227 F.3d at 1242 (stating that with a factual Rule 12(b)(1) attack, the Court need not presume the truthfulness of the plaintiffs' allegations); *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983) (same). Indeed, the Court should resolve any factual disputes related to jurisdiction at the outset because it has a responsibility to ensure that it has subject-matter jurisdiction before proceeding with the merits. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94-95 (1998) ("[t]he requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception'") (quoting *Mansfield, C. & L. M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884)).

## II.     *The Discretionary Function Exception Deprives the Court of Jurisdiction Because the Plaintiffs' Claims Challenge Discretionary Governmental Conduct that is Susceptible to Policy Analysis.*

### A.     *The Purpose of the Discretionary Function Exception and Establishment of a Two-Part Test.*

The discretionary function exception "'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'" *Berkovitz v. United States*, 486 U.S. 531, 536 (1988) (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984)). When Congress enacted the FTCA, its "thought was centered on granting relief for the run-of-the-mine accidents" as distinguished from

injuries resulting from discretionary governmental activities. *Dalehite v. United States*, 346 U.S. 15, 28 n.19 (1953). "Uppermost in the collective mind of Congress were the ordinary common-law torts." *Id.* at 28. The example that was reiterated most frequently in the legislative history was "'negligence in the operation of vehicles.'" *Id.*

After identifying the relevant conduct upon which the plaintiff's claims are based, courts employ the well-known two-part test that the Supreme Court established to determine whether the discretionary function exception applies. First, for the exception to apply, the allegedly negligent act or failure to act must not have been subject to a statute, regulation, or policy that prescribes a specific course of action for a government employee to follow. *See United States v. Gaubert*, 499 U.S. 315, 322 (1991); *Berkovitz*, 486 U.S. at 536. If such a provision applies, then the alleged negligent act or omission cannot be "discretionary." *GATX/Airlog*, 286 F.3d at 1174. Second, assuming that the government employee had discretion, the discretionary function exception applies if the employee's conduct is "susceptible" to an analysis involving social, economic, or political policy considerations. *Gaubert*, 499 U.S. at 322-23; *Berkovitz*, 486 U.S. at 536-37. The second part of the test ensures that the exception only applies to the type of discretionary conduct that Congress sought to protect through the exception. *In re Glacier Bay*, 71 F.3d 1447, 1450 (9th Cir. 1995). Under the Supreme Court's two-part test, the focus of the discretionary function inquiry must be on "'the nature of the [alleged] conduct'" and not the "'status of the actor.'" *Gaubert*, 499 U.S. at 322 (quoting *Varig*, 467 U.S. at 813). Significantly, the exception can apply regardless of whether the government was negligent because, under the two-part test, issues of negligence are "irrelevant to the discretionary function inquiry." *Routh v. United States*, 941 F.2d 853, 855 (9th Cir. 1991).

**B.      Considerations in Applying the Two-Part Test**

**1.  Part One**

The United States has the initial burden of establishing that the discretionary function exception applies, *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992), but once it has demonstrated that its employees' decisions were discretionary, a plaintiff must identify a failure to comply with a mandatory and specific directive that removed the federal employees'

discretion.  *Kelly v. United States*, 241 F.3d 755, 760 (9th Cir. 2001) (plaintiffs "point to no statute, regulation, or policy that mandates" the particular conduct at issue); *Doe v. Holy See*, 557 F.3d 1066, 1084 (9th Cir. 2009) (concluding that the plaintiff did not allege "the existence of a policy that is 'specific and mandatory' on the [defendant]" in applying the FTCA's discretionary function exception to Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, *et seq*.) (quoting *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1026 (9th Cir. 1989)) (emphasis omitted).

The Ninth Circuit has "repeatedly held that a general regulation or policy . . . does not remove discretion unless it specifically prescribes a course of conduct."  *See Kelly,* 241 F.3d at 761.  For example, in *Miller v. United States*, the Ninth Circuit, in finding that the discretionary function exception shielded the Forest Service's actions in fighting a fire, held that certain standards and procedures outlined requirements for fire suppression, but that those standards and procedures were not specific enough to remove discretion because "they did not tell the Forest Service to suppress the fire in a specific manner and within a specific period of time."  163 F.3d 591, 595 (9th Cir. 1998); *see also Sabow v. United States*, 93 F.3d 1445, 1453 (9th Cir. 1996) ("[T]he presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations.").  As the First Circuit stated, "Without this specificity requirement . . . 'the discretionary function exception would be a dead letter.'"  *Sanchez v. United States*, 671 F.3d 86, 97 (1st Cir. 2012), *cert. denied*, 133 S. Ct. 1631 (U.S. 2013) (quoting *Shansky v. United States*, 164 F.3d 688, 691 (1st Cir. 1999)).

Even if a plaintiff can point to a statute or regulation that is both mandatory and specific, the plaintiff must demonstrate some causal nexus between the regulation and the alleged harm to permit the imposition of liability.  A plaintiff cannot circumvent the discretionary function exception by simply alleging that the government official failed to comply with *any* mandatory and specific statute or regulation.  Only regulations that are relevant to the conduct upon which the tort claim is based preclude application of the discretionary function exception.  *Dichter-Mad Family Partners, LLP v. United States,* 709 F.3d 749, 751 (9th Cir. 2013), *cert. denied,* 134 S. Ct. 117 (U.S. 2013) (alleged violations of SEC policies "lack the causal relationship to the plaintiffs' alleged injuries required to establish jurisdiction, even under a generous reading of the

complaint.").  Similarly, a plaintiff may not plead around the discretionary function exception by characterizing the claim as being based upon the violation of a mandatory, specific directive when the harm actually flowed from a subsequent and independent exercise of discretion.  *Gen. Dynamics Corp. v. United States,* 139 F.3d 1280, 1285 (9th Cir. 1998) ("we cannot wholly ignore causation concepts when a robust exercise of discretion intervenes between an alleged government wrongdoer and the harm suffered by a plaintiff"); *Fisher Bros. Sales, Inc. v. United States,* 46 F.3d 279, 285 (3d Cir. 1995) (*en banc*) (rejecting "attempt to avoid application of the discretionary function exception by looking behind the injury-causing decision").

### 2. *Part Two*

In *Gaubert*, the Supreme Court stated that when a government employee is acting pursuant to a discretionary statute, regulation or guideline there is a "strong presumption" that the employee's conduct is grounded in the policies of that provision.  499 U.S. at 324.  Thus, "[u]nder *Gaubert*, for a complaint to survive a motion to dismiss, it must 'allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be *grounded in* the policy of the regulatory regime.'"  *Terbush v. United States*, 516 F.3d 1125, 1130 (9th Cir. 2008) (quoting *Gaubert*, 499 U.S. at 324-25) (emphasis in *Terbush*)

In *Gaubert*, the Supreme Court rejected a lower court's reasoning that only high-level planning or policy activities were exempt from liability under the discretionary function exception and emphasized that the exception can apply to discretionary activities of government employees regardless of whether those decisions are characterized as "operational" or "planning" decisions, as long as the activities are grounded in policy considerations.  *See* 499 U.S. at 325-26.  The court noted that "day-to-day" conduct "regularly requires judgment as to which of a range of permissible courses is the wisest."  *Id.* at 325.  Therefore, conduct that is protected by the discretionary function exception cannot be "confined to the policy or planning level."  *Id.*

The Supreme Court also held that the second step did not require a showing that an employee actually conducted a policy analysis as part of the challenged action or inaction.  *Id.* at 325.  The Court instructed that the "focus of the inquiry is not on the agent's subjective intent . . . but on the nature of the actions taken and on whether they are susceptible to policy analysis."  *Id.*

(emphasis added).  Thus, Ninth Circuit decisions have repeatedly found that the government

need only show that the challenged conduct was susceptible to an analysis involving protected

policy considerations, not that any government employees actually engaged in public policy.  *See*

*Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000) (stating that the challenged conduct

"'need not ***actually*** be grounded in policy considerations' so long as it is, 'by its nature,

susceptible to a policy analysis'") (quoting *Miller*, 163 F.3d at 593 (emphasis in *Nurse*)).

While budgetary concerns, standing alone, may not justify application of the

discretionary function exception, the exception will apply to the balancing of competing policy

considerations.  *See Bailey v. United States*, 623 F.3d 855, 862 (9th Cir. 2010) (finding that

claims challenging Forest Services' decision regarding when to replace warning signs implicated

balancing of competing safety considerations and were thus barred by the discretionary function

exception).  *Compare O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002) (finding

mere presence of budgetary concerns not sufficient for application of the discretionary function

exception).  Additionally, implementation of a government policy is protected by the

discretionary function exception where the implementation implicates policy concerns "such as

where government officials must consider competing firefighting safety and public safety

considerations in deciding how to fight a forest fire."  *Terbush*, 516 F.3d at 1133 (internal

quotation omitted).  *See also Bailey,* 623 F.3d at 861-62.

C.   ***The Discretionary Function Exception Bars any Claims Challenging the Conduct of the NPS in Managing the Hantavirus Risk.***

Under the Supreme Court's two-part test, the discretionary function exception bars

Plaintiffs' claims challenging the conduct of the NPS in managing the Hantavirus risk at

Yosemite.

1.   ***No Specific and Mandatory Provision Removed the Discretion of the NPS in Managing the Hantavirus Risk at Yosemite.***

The NPS uses a "three-level" directive system to implement policies at its national parks.

*See* "Things to Know" about the National Park Service Policies and Directive System (Dec. 7,

2011) [http://www.nps.gov/policy/DOrders/thingstoknow.htm#7].  The first level consists of

policies that appear in the document entitled NPS Management Policies, which prescribe

parameters for making management decisions.  *Id.*  The second level consists of "Directors

Orders" which provide more detailed interpretation of the NPS Management Policies; these

Orders are to provide Superintendents and other managerial staff summaries of important

policies and procedures.  *Id.*  The third level includes handbooks, reference manuals and other

documents containing comprehensive information in support of field or programmatic

operations.  *Id.*

### a. NPS Management Policies and Directors Orders Provide for Discretion in Managing Risks at National Parks

The NPS directive system provides broad discretionary authority to the NPS in its

management of various health risks to visitors of national parks, including the risk of Hantavirus

in the various areas of Yosemite.  NPS Management Policies addresses visitor safety in Section

8.2.5.1. Ex. 11 § 8.2.5.1 (2006, NPS Management Policies).  This section provides that the NPS

will seek to "protect human life and provide for injury-free visits" within the "very substantial"

constraints of the 1916 Organic Act that "discretionary management activities may be

undertaken only to the extent that they will not impair park resources and values."  *Id.*  Further,

this section of NPS Management Policies states:

> While recognizing that there are limitations on its capability to totally eliminate all hazards, the Service and its concessioners, contractors, and cooperators will seek to provide a safe and healthful environment for visitors and employees. . .
>
> These management policies do not impose park-specific visitor safety prescriptions.  The means by which public safety concerns are to be addressed is left to the *discretion* of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing. *Examples include decisions about whether to install warning signs . . . [or] eliminate potentially dangerous animals . . . .*

*Id.* (emphasis added).

Additionally, Section 4.4.5 of Management Policies provides that park employees and

concessioners are to follow NPS pest management policies that allow the NPS to control native

pests for several reasons, including to "manage a human health hazard when advised to do so by

the U. S. Public Health Service . . . or to otherwise protect against a significant threat to human safety." *Id.* § 4.4.5.1.  The NPS "conducts an integrated pest management (IPM) program to reduce risks to the public, park resources, and the environment from pests . . . ." *Id.* § 4.4.5.2.  Management Policies notes, however, that IPM "is a decision-making process that coordinates knowledge of pest biology, the environment, and available technology to prevent unacceptable levels of pest damage by cost-effective means while posing the least possible risk to people, resources, and the environment." *Id.*

The most relevant Director's Orders referenced in Management Policies are Director's Order #50C (Public Risk Management), and Director's Order #83 (Public Health).  Director's Order #50C states that in executing the NPS mission "to conserve park natural and cultural resources and processes unimpaired . . . the NPS must strive to prevent visitor injuries and fatalities within the limits of available resources."  Ex. 12 at 2 (May 7, 2010, Director's Order #50C).  Order #50C further provides that "Park Superintendents will seek to identify risks within their jurisdiction and to mitigate these risks within the limits of available resources without compromising the integrity of the environments they are charged to protect." *Id.*  Order #50C specifically acknowledges that "Superintendents must make discretionary decisions that balance public recreation and safety with preservation of the protected natural, historic, or cultural setting" and that "NPS superintendents will use their discretion to determine the level of program resources and the types of programs needed to manage visitor risk within their park." *Id.* at 2, 11.  Order #50C also states that the Superintendent's exercise of discretion "will depend on the resources, values, park-specific mission, feasibility of various program levels, activities offered at the park, nature of the park visits, degree of risks to visitors at the park, the history of visitor injury in the park, and available resources." *Id.* at 11.

In a similar vein, Order #83 recognizes that policies for "elimination or control of disease agents" in national parks will "be tempered by Organic Act's requirement that the NPS conserve the scenery and natural and historic objects and the wildlife therein in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  Ex. 13 at 2 (October 21, 2004, Director's Order #83).  In particular, with respect to vector-borne diseases

such as Hantavirus, Order #83 states: "NPS unit managers will reduce the risk of transmission of vector-borne and zoonotic diseases to park visitors and employees through education, surveillance, and control efforts when necessary.  Control procedures will reduce risk while minimizing adverse impact on natural and cultural resources."  *Id.* at 8-9.

For pest management, NPS provides for an integrated pest management (IPM) approach that allows individual parks to develop pest management guidance unique to the park's environment.  The IPM approach encourages coordination with different professionals in the park, including individuals responsible for pest management for the concessioner.  DN Decl. ¶ 12.  One person is appointed as the IPM coordinator, but several people in the park have pest management duties falling within their particular areas of responsibility.  *Id.*  Under the IPM approach the NPS facilitates pest management assistance and training as necessary.  *See* Ex. 14 at 2 (NPS Integrated Pest Management Program 2011-2012 Guidance).  Under the IPM program, "[p]est issues are addressed on a case-by-case basis using the IPM process and appropriate tools for the specific situation."  *Id.*

### b.  The Provisions that Plaintiffs Cite in Their Master Complaint Do Not Remove Discretion.

NPS Management Policies and Director's Orders show that the NPS had great discretion in managing the Hantavirus risk at Yosemite, and Plaintiffs cannot demonstrate that any specific and mandatory provision removed government discretion.  The only provisions that Plaintiffs specifically cite in their Master Complaint are the NPS Rodent Exclusion Manual and Yosemite National Park Directive #9, Cmplt. ¶¶ 90-93, but neither of these documents provides any specific and mandatory requirements that remove government discretion in managing the Hantavirus risk in Yosemite.

### i.      The Rodent Exclusion Manual

First, with respect to the NPS Rodent Exclusion Manual, the introduction to the manual states that it is "designed as a training guide to making rodent control in buildings an attainable goal."  Ex. 15 at 1 (2005, NPS Rodent Exclusion Manual).  Manual guidelines do not rise to the level of specific and mandatory requirements that defeat the discretionary function exception

because they merely provide general guidance in reaching a goal.  *Terbush*, 516 F.3d at 1137 (finding NPS "management guidelines" do not defeat the discretionary function exception given "the document's intended role as a policy guideline"); *Miller*, 163 F.3d at 594 & n.1 (contrasting mandatory "standards" under a Forest Plan with discretionary "guidelines").  *See also Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) (*per curiam*) (ruling a Social Security Claims Manual not binding on the government); *Riley v. United States*, 486 F.3d 1030, 1033-34 (8th Cir. 2007) (finding that Department of Transportation's "Green Book," addressing sight standards at intersections, were guidelines and not mandatory, for purposes of determining whether the discretionary function exception applied).

Moreover, statements in the Manual itself show that it is intended to provide discretionary general guidance rather than mandatory specific requirements.  For example, with respect to inspections, the Manual states "[t]he following descriptions offer *general guidance* as to some of the major deficiencies to look for."  Ex. 15 at 11 (emphasis added).  The Manual also states that it "will discuss *recommendations* for repairs, and specific materials to use for repairs."  *Id.* (emphasis added).  The Manual's provisions are repeatedly stated in terms of what inspectors "should" do rather than what inspectors "must" do – stating, for example, that "inspections of buildings should be conducted at least twice a year," *see id.* – demonstrating that the terms of the manual are discretionary.  *See In re Glacier Bay*, 71 F.3d at 1453 (finding that provisions of manual were discretionary under the discretionary function exception when the manual used the suggestive "should" rather than the mandatory "shall").

The particular provisions that plaintiffs cite in the Master Complaint as examples of "mandatory provisions" in the Rodent Exclusion Manual do not provide the type of specific and mandatory requirements that remove discretion.  Plaintiffs state that the Manual requires "[t]horough inspections of the exterior and interior of buildings to 'identify structural defects that allow rodents to enter buildings;'" "rodent exclusion from buildings 'by closing all possible holes through which they can enter a structure;'" "'[g]ood sanitation practices that eliminate food, water, and shelter for rodents . . .;'" and "'[r]egular checking for new rodent activity'/ monitoring."  Cmplt. ¶ 90.  Even if these provisions were mandatory government obligations

rather than non-mandatory guidance, they are not sufficiently specific to remove discretion.  To defeat the discretionary function exception, a plaintiff must not only show that a provision is mandatory but also that it is so specific that it tells the government employee precisely how to act.  *See Berkovitz*, 486 U.S. at 536.  A general requirement that leaves execution to the discretion of federal employees is not sufficient.  *Miller*, 163 F.3d at 595 (finding that firefighting regulations did not remove discretion because there was no provision requiring government employees to fight a fire in a specific manner); *Blackburn v. United States*, 100 F.3d 1426, 1431 (9th Cir. 1996) (NPS manuals with safety goals and mandated warnings were discretionary because they did not specify how to meet those goals or how to warn the public).

The provisions that Plaintiffs cite fail in any meaningful sense to prescribe the precise conduct of government employees so as to make the exercise of discretion irrelevant.  Precisely how to identify structural defects in buildings that allow rodent entry, close all possible holes through which rodents can enter buildings, and follow good sanitation practices to eliminate food for rodents is left to discretion.  A failure to meet the goal of rodent exclusion cannot be a basis to overcome the discretionary function exception.  *See Aragon v. United States*, 146 F.3d 819, 825-26 (10th Cir. 1998) (holding that statements of "principles rather than practices," cannot overcome the exception, and "an objective cannot equate to a specific, mandatory directive").

### ii.  *Yosemite National Park Directive #9*

Likewise, with respect to Yosemite National Park Directive #9, Plaintiffs' Complaint merely recites the broad responsibilities of the Yosemite Superintendent who is "responsible for the implementation" of the Hantavirus Risk Reduction Program, and the Environmental Health Officer who is "responsible for 'coordinating and implementing the park-wide Hantavirus Directive with park concessioners and other park partners.'"  Cmplt. ¶¶ 92, 93.  Plaintiffs fail to cite any of the particular provisions of the directive that removed discretion.  Many of the provisions are largely irrelevant to Plaintiffs' claims in this case, such as the procedures for assessing exposure in unoccupied buildings.  *See* Ex. 8 at 3-5.  Other provisions such as those for preventing rodent infestation are so broadly worded that they leave ample room for discretion, stating, for example, make "homes and workplaces unattractive to mice," and reduce "the

availability of food sources and nesting sites." *See id.* at 6.

### 2. *The Conduct of the NPS in Managing the Hantavirus Risk at Yosemite Is Susceptible to Policy Analysis.*

Because no specific and mandatory provision directed the management of the Hantavirus risk at Yosemite, the discretionary function exception applies if the NPS's management decisions were susceptible to policy analysis. Given the policies underlying the NPS Organic Act – as well as those embodied in NPS Management Policies, Director's Orders #50C and #83, and other NPS documents – there is a strong presumption that the conduct of NPS employees in managing the Hantavirus risk at Yosemite was grounded in those policies. *Gaubert*, 499 U.S. at 324. The Ninth Circuit has repeatedly recognized that "[m]uch of the NPS's work is 'grounded' in the Organic Act's broad mandate to balance conservation and access." *Terbush*, 516 F.3d at 1130. *See also Childers v. United States*, 40 F.3d 973, 975 (9th Cir. 1994). The NPS Management Policies recognize that in exercising discretion to protect public safety the NPS has to balance the "very substantial" constraint of the Organic Act that it "not impair park resources and values," in addition to considering "limits of funding and staffing." Ex. 11 § 8.2.5.1. Director's Order #50C further recognizes that Park Superintendents must seek to mitigate identified risks "within the limits of available resources and without compromising the integrity of the environments they are charged to protect." Ex. 12 at 2. In particular, with respect to managing the risk of diseases, including a vector-borne disease like Hantavirus, Director's Order #83C recognizes that NPS managers must balance safety concerns with the potential adverse impact on natural and cultural resources. Ex. 13 at 8-9. "[S]o long as a decision involves even two competing interests, it is 'susceptible' to policy analysis and is thus protected by the discretionary function exception." *Bailey*, 623 F.3d at 863.

But the management of the Hantavirus risk at Yosemite was not only susceptible to policy analysis, it was actually grounded in competing policy considerations. Yosemite Superintendent, Don L. Neubacher, periodically reviews accidents and causes of death at Yosemite in managing risks at the park. DN Decl. ¶ 6. The risk of Hantavirus was just one of a number of naturally occurring risks that the park had to manage. *Id.* Figures regarding the

number of accidents at the park demonstrate the greatest risks at Yosemite are deaths from drowning or waterfall accident, motor vehicle fatalities, climber deaths, and deaths from other falls. *Id.* Before the 2012 outbreak, there had never been a known death from Hantavirus at Yosemite, and the only two prior incidents of Hantavirus had been associated with the Tuolumne Meadows tent-cabins located in the High Sierra region. *Id.* In managing risks at Yosemite, the NPS must allocate its resources to managing all of the various wilderness risks at Yosemite, considering the prevalence of the risk, the severity of the risk, and the location of the risk as important factors. *Id.* ¶ 7. Additionally, in determining how to manage the risk, conservation of the park's natural, historical, and cultural resources is a significant concern. *Id.* Thus, in managing the Hantavirus risk and other natural risks at Yosemite, the NPS not only considers the type of risk in comparison with other risks in the park, but also how managing the risk might impact Yosemite's natural, historical, and cultural resources as well as its ability to provide a low-impact and rustic lodging alternative for visitors. *Id.* The actions that the NPS takes to manage risks at Yosemite are also necessarily constrained by limitations on its budget and staffing. *Id.* Allowing courts to second-guess how a national park manages such natural risks would upset the ability of the NPS to balance important policies that allow it to provide public use of the national parks while conserving their resources.

Plaintiffs cannot circumvent the discretionary function exception by arguing that they are merely challenging routine maintenance work. Plaintiffs' claims challenge the conduct of the NPS in failing to exclude rodents from park accommodations only in the context of managing the risk of Hantavirus – which must be evaluated in relation to all of the other wilderness risks at the park in light of competing policy considerations. Thus, Plaintiffs are not challenging mere maintenance or implementation activities such as those that the Ninth Circuit found to be outside the ambit of the discretionary function exception in *Whisnant*. *See Whisnant v. United States*, 400 F.3d 1177, 1182 (9th Cir. 2005). *See also O'Toole*, 295 F.3d at 1035. Instead, Plaintiffs are challenging conduct that clearly implicates competing policy considerations with respect to how the NPS allocates its resources to protecting visitors from all of the various health hazards at the park while conserving the park's natural, historical, and cultural assets. Because of this, even

though Plaintiffs' allegations may challenge conduct that includes implementation of policies and maintenance of facilities, the discretionary function exception bars the claims.  *See Bailey*, 623 F.3d at 862 (finding that claims challenging the Forest Service's implementation decisions regarding when to replace warning signs involved balancing competing safety considerations and were thus barred by the discretionary function exception).  As the Ninth Circuit aptly stated in a recent case (discussed in more detail below) in which the plaintiffs challenged the conduct of the NPS in failing to warn of rockfall hazards at Yosemite, the "process of identifying and responding to hazards in the wild implicates the NPS's broader policy mandates to balance access with conservation and safety."  *Terbush*, 516 F.3d at 1137.

> **D.**     **The Discretionary Function Exception Bars any Claims Challenging the Conduct of the NPS in Reviewing DNC-Yosemite's Operation and Maintenance of the Tent-Cabins in Curry Village.**

Plaintiffs also claim that the NPS failed to conduct adequate review of DNC-Yosemite, the concessioner that operated and maintained Curry Village, including failing appropriately to supervise and train its employees.  As with their claims of negligent risk management, Plaintiffs' claims challenging the conduct of the NPS in reviewing the concessioner's operation and maintenance of Curry Village cannot withstand a discretionary function exception analysis.

> **1.**     **No Specific and Mandatory Provision Removed the Discretion of the NPS in Reviewing DNC-Yosemite's Operation and Maintenance of the Tent-Cabins at Curry Village.**

As described above, Congress made the policy decision through the Concessions Policy Act of 1965 and the Concessions Management Improvement Act of 1998 that private concessioners provide accommodations and services in national parks.  *See* pages 3-4 *supra*.  The regulations implementing the Concessions Management Improvement Act show the important policies involved in concessioner operations.  Visitor services are to "be provided only under carefully controlled safeguards against unregulated and indiscriminate use so that visitation will not unduly impair park values and resources."  36 C.F.R. § 51.2.  Additionally, visitor services are "limited to locations that are consistent to the highest practicable degree with the preservation and conservation of the resources and values of the park area" and to services

1  that "are necessary and appropriate for public use and enjoyment of the park area." *Id.* The

2  primary factors in selecting a concessioner include: the concessioner's ability to protect,

3  conserve, and preserve park resources; the concessioner's ability to provide necessary visitor

4  services at reasonable rates; and the concessioner's experience and related background, including

5  its past performance and expertise in providing the visitor services. *Id.* § 51.17.

###### A. The NPS's Periodic Concessioner Evaluations Were Discretionary.

6

7          A Section of NPS Management Policies addresses NPS's review of its concessioners.

8  Section 10.2.4.2 provides that concession operations will "be regularly evaluated to ensure that

9  park visitors are provided with high-quality services and facilities that are safe and sanitary and

10  meet NPS environmental, health, safety, and operational standards." Ex. 11 § 10.2.4.3. At the

11  time of the conduct relevant to this case, the NPS used a Concessioner Review Program outlined

12  in a document designated NPS-48. WB Decl. ¶ 6. As with the provisions regarding risk

13  management, NPS-48 is not sufficiently mandatory and specific to remove discretion. The Ninth

14  Circuit has stated in the context of a contract claim that "NPS-48 is an agency staff manual . . .

15  rather than a statement of substantive rules or policy. . ." *Lake Mohave Boat Owners Assoc.*, 78

16  F.3d at 1368. Further, the introduction to NPS-48 states that it is a "Guideline" and a

17  "comprehensive reference source." Ex. 16 at xvi. Thus, NPS-48 is an agency guidance manual,

18  and, like the Rodent Exclusion Manual, it does not contain mandatory and specific agency

19  directives that can defeat the discretionary function exception. *See* pages 20-21 *supra*.

20          Even if provisions in NPS-48 were mandatory government obligations rather than non-

21  mandatory guidance, they are not sufficiently specific to remove discretion. NPS-48 includes (1)

22  an Operational Performance Program, which is a "systematic method for determining quality,

23  safety, and sanitation of visitor services on a periodic and annual basis using established

24  standards", and (2) a Contract Compliance Program, involving an annual review of each section

25  of the concessioner's contract "to identify, document and evaluate those performance elements

26  which affect adherence to contract provisions and maintenance or operating plans." Ex. 16 at

27  Chapter 19 at 2-3 (NPS-48, excerpts). NPS concessions management specialists execute these

28  programs in several ways: by conducting "required evaluations and follow-up action as needed;"

by meeting "periodically with the concessioner to discuss goals, services to be rendered and standards to be met;" and by assigning an "Annual Overall Rating, Operational Performance Rating and Contract Compliance Rating." *Id.* at Chapter 19 at 4. *See also* WB Decl. ¶ 6. The contract specifically makes the concessioner responsible for: providing the "highest quality of services/facilities;" conducting "its own quality control program to include frequent self evaluation;" and seeking "public input by means of periodic information gathering." Ex. 16 at Chapter 19 at 4-5.

Under NPS-48, the Operational Performance Standards established general standards for review of concessioner operations, as well as particular standards for each type of facility or service. The standards contain elements that are classified according to priority "based on the degree of their importance, from a visitor['s]. . . well being and enjoyment standpoint." *Id.* at Chapter 20 at 1. A "major" priority is designated "(A)," a secondary priority is designated "(B)" and a minor priority is designated "(C)." *Id. See also* WB Decl. ¶ 7. The general elements are broadly worded. For example, with respect to structures, the standards state, "The exterior of the buildings and other outdoor appurtenances must be in good physical condition, well painted or otherwise treated to protect against deterioration and kept clean and in good repair." Ex. 16 at Chapter 21 at 1. As regards the concessioner's training of its employees, the standards state that "[a]n active training program for the development of the necessary skills and techniques must be provided for all employees." *Id.* at Chapter 21 at 2. The tent-cabins at Yosemite, including those at Curry Village and Tuolumne Meadows, as well as the accommodations at Housekeeping Camp are evaluated under the standards for "primitive/rustic lodging." WB Decl. ¶ 8. One secondary element for primitive/rustic lodging states: "Environment: All units are to be well ventilated, odorless, and free of insects and rodents or evidence thereof." Ex. 16 at Chapter 21, Exhibit 19 at 4. Additionally, it states, "[d]oors and windows, including screens, are to be sufficiently tight to preclude entry of rodents and insects." *Id.* The element does not, however, provide specific procedures to ensure compliance.

In using NPS-48, Concessions Specialist William Bryan performed "spot checks" of various lodgings that DNC-Yosemite operated at Yosemite, including rustic lodgings at Curry

Village, Housekeeping Camp, and Tuolumne Meadows, for purposes of evaluating the visitor experience. WB Decl. ¶¶ 9, 11. He had discretion in determining not only when to conduct evaluations but also how to conduct evaluations, including, in particular, how to apply NPS-48 in evaluating different types of rustic lodgings at Yosemite considering the degree of importance of each element to a visitor's experience at the park. *Id.* ¶ 10. One of the secondary elements regarding the "tightness" of doors and screens can apply differently to different types of lodging. *Id.* For example, it would be largely inapplicable to the rustic lodgings at Housekeeping Camp, which have a curtain entrance, and of lesser importance at the other tent-cabins at Yosemite. *Id.* The elements of NPS-48 are guidelines that do not provide specific and mandatory requirements for a concessions review specialist to necessarily follow in every evaluation, but rather they are criteria for the concessions review specialist to use in his overall evaluation of the concessioner's performance. *See id.*

### B. The NPS' Review of the Winterization of the Curry Village Tent-Cabins Was Discretionary.

With respect to DNC's winterization of the Signature tent-cabins at Curry Village, the contract did not require the NPS to provide formal written approval for the work because the contract only requires written approval for "construction" work on NPS real property at the park. Ex. 1 at 8. *See also* DN Decl. ¶ 11. Concessioner construction projects at Yosemite are accomplished through a Capital Improvement Fund, which is a fund into which the concessioner contributes money to be used for improvements that directly support concession services outlined in the contract. DN Decl. ¶ 11. The Capital Improvement Fund is not used for "routine, operational maintenance of facilities." *Id.* Consistent with the parameters of the Capital Improvement Fund, the NPS interpreted this formal approval process to apply to "new construction" or "significant project work," such as work that would alter real property, but not to "routine, operational maintenance work," such as renovations to the tent-cabins, which were personal property[2] assigned to DNC-Yosemite under the contract. Ex. 9 at 6. *See also* DN Decl.

---

[2] Tents and cabins have been treated as "personal property" under California law. *See, e.g., Sanchez v. City of Fresno,* No. 1:12-CV-428 LJO, 2013 WL 2100560, at *3 (E.D. Cal. May 14, 2013) (tents); *Howes v. Reeves,* 35 Cal.App. 2d 680, 682-83 (Cal. App. 4 Dist. 1939) (cabins).

¶ 11. DNC-Yosemite did not submit the project to "winterize" the Signature tent-cabins for funding through the Capital Improvement Fund, and therefore NPS did not provide written approval for the project as it would for a capital improvement. Because no specific and mandatory requirements dictated how the NPS should evaluate DNC-Yosemite's proposal to winterize the Signature tent-cabins, the NPS had discretion to determine what type of evaluation was important from the NPS perspective. *See* DN Decl. ¶ 11. Upon seeing a model of the proposed tent-cabin, the NPS exercised that discretion by requesting that DNC-Yosemite submit a scope of work and description of materials to the NPS fire marshal to review from a fire safety perspective. *See* Ex. 9 at 6; Ex. 17 (December 19, 2008 e-mail from Vicki McMichael to Elexis Mayer and attached Scope of Work).[3]

### 2. *The Conduct of the NPS in Reviewing DNC-Yosemite's Operation and Maintenance of the Tent-Cabins at Curry Village Is Susceptible to Policy Analysis.*

Under the second part of the discretionary function analysis, the conduct of the NPS in reviewing DNC-Yosemite's operation and maintenance of the tent-cabins at Curry Village – including the creation of the Signature tent-cabins – is susceptible to policy analysis. As with conduct pursuant to policies underlying risk management, there must be a strong presumption that the conduct of NPS employees in reviewing DNC-Yosemite's operation and maintenance of Curry Village was grounded in the policies underlying the use and selection of concessioners for the national parks. *See Gaubert*, 499 U.S. at 324. These policies include the policy decision to rely on the expertise of private concessioners to provide visitor services, given the limitations that the NPS had in its ability to do so itself, and policies balancing the need to conserve park

---

California law generally defines "personal property" as "all property except real estate." Cal. Rev. & Tax. Code §106. *See also* Ex. 19 at 19 (2010 NPS report stating that the Curry Village tent cabins "are considered private property of the concessioner").

[3] That this review was discretionary and policy-based is supported by the Department of Interior's Office of Inspector General ("OIG") evaluation of the NPS's "oversight of the [Yosemite] visitor tent cabins involved in the Hantavirus outbreak" which included a review of the NPS involvement in the tent-cabin conversion. Ex. 9 at 2. After a detailed review, the OIG concluded that the "NPS provided oversight consistent with current NPS and Department [of Interior] policy . . . ." *Id.* at 11.

resources while providing public use and enjoyment of the park as reflected in the Organic Act and the regulations implementing the Concessions Management Improvement Act.

Supreme Court and Ninth Circuit case law shows that the government's discretionary review of the concessioner's activities is protected by the discretionary function exception.  For example, in *Varig Airlines*, the Supreme Court found that the FAA's conduct in monitoring compliance with safety standards through a "spot check" program reflected complex judgments as to the feasibility, practicality, and priorities of the safety program, including a balancing of the agency's objectives against the limitations on staffing and funding.  467 U.S. at 820.  *See also In Re Consol. U.S. Atmos. Testing Litig.*, 820 F.2d 982, 995-96 (9th Cir. 1987); *Vallier v. Jet Propulsion Lab.*, 120 F. Supp. 2d 887, 913-14 (C.D. Cal. 2000), *aff'd*, 2001 WL 1631762 (9th Cir. 2001)  (claims that the government negligently supervised a contractor's compliance with safety regulations were barred by the discretionary function exception).  Similarly, the Ninth Circuit has repeatedly found that the government's conduct with respect to supervision and training are protected by the discretionary function exception.  *Nurse*, 226 F.3d at 1001 (finding that claims of allegedly negligent supervision and training "fall squarely within the discretionary function exception"); *Gager v. United States*, 149 F.3d 918, 921-22 (9th Cir. 1998) (finding that supervision and training programs involved policy balancing with respect to evaluation of risks and allocation of resources).  As another circuit stated, "If arguably based on policy considerations, both negligence in supervising a contractor and the failure to supervise a contractor at all are included in the decisions protected by the discretionary function exception." *Kirchmann v. United States*, 8 F.3d 1273, 1277 (8th Cir. 1993) (citing cases).

In performing evaluations of rustic lodgings and other facilities and services at Yosemite, Concessions Specialist William Bryan could weigh priorities in evaluating the quality, safety, and sanitation of the lodgings and services that the concessioner provided within limitations on staffing and funding in the Concessions Management Branch.  WB Decl. ¶ 11.  Accordingly, Bryan performed "spot checks" of the lodgings, including the tent cabins that he evaluated, rather than evaluating each accommodation individually.  *Id.* ¶¶ 9, 11.  Bryan also had discretion to give greater importance to "major" elements under NPS-48 which were considered of highest

importance to the visitor's experience at the park.  *Id.* ¶¶ 10, 11.  Bryan could exercise discretion in determining how different elements of NPS-48 applied to different types of lodgings and services that the concessioner provided, considering how such elements might affect a visitor's enjoyment of the park from a point of view of aesthetics as well as sanitation and safety.  *Id.* ¶ 10.  In exercising discretion in performing evaluations, Bryan also considered DNC-Yosemite's expertise in hospitality and concessions with respect to their daily operations in determining the degree of review necessary in the context of all of the other accommodations and services provided in Yosemite.  *Id.* ¶ 11.  Similar policy considerations apply to the conduct of the NPS in evaluating DNC-Yosemite's proposal to create the Signature tent-cabins.  NPS could determine the most important park interest for its evaluation – namely fire safety – and consider other policy factors including the expertise of the concessioner, the need to replace accommodations lost as a result of the rockfall, the desire to supply affordable rustic lodging, and the potential impact to the park's natural, historical, and cultural resources – including the historical features of Curry Village – in determining how to evaluate the proposal.

Thus, in reviewing DNC's Yosemite's maintenance of Curry Village and conversion of the tent-cabins, the NPS could balance social policy considerations (visitor enjoyment and safety, conservation of park resources) with economic considerations (need to provide affordable visitor accommodations, limits on NPS staffing and funding) against the backdrop of the political determination of Congress, as reflected most recently in the Concessions Management Improvement Act, that the NPS rely upon concessioners who are experts in hospitality to provide lodgings and services.  Given these considerations, the NPS's review of DNC-Yosemite's operation and maintenance of the Curry Village tent-cabins – including its creation of the Signature tent-cabins – involved precisely the type of policy-based conduct that the discretionary function exception was designed to shield from tort suit.

This is not a situation in which the government retained certain discrete safety responsibilities in its review of a contractor's work that did not involve policy balancing protected by the exception.  *See Myers v. United States*, 652 F.3d 1021, 1032-33 (9th Cir. 2011) (finding that the discretionary function exception did not apply to implementation of retained

safety responsibilities in reviewing contractor work where no policy balancing involved); *Bear Medicine v. United States*, 241 F.3d 1208, 1214-15 (9th Cir. 2001) (same). Rather, the NPS's review of the concessioner's work at Curry Village was much like the role of the FAA inspectors in *Varig Airlines*. Like the FAA inspectors in *Varig Airlines*, the NPS performed evaluations of DNC-Yosemite's work through "spot checks," given its limited resources. In *Varig Airlines*, the Supreme Court explained "FAA employees who conducted compliance reviews of the aircraft involved in this case were specifically empowered to make policy judgments regarding the degree of confidence that might reasonably be placed in a given manufacturer, the need to maximize compliance with FAA regulations, and the efficient allocation of agency resources." 467 U.S. at 820. Likewise, here, the contract and NPS-48 empowered the NPS to make policy judgments in considering factors that might affect visitor enjoyment and safety; in weighing the need to conserve park resources, maintain the historical aspect of Curry Village, and provide visitors affordable rustic lodging; and in determining the degree of confidence to place in the concessioner given limited NPS resources.

### E. The Discretionary Function Exception Bars any Claims Challenging the Conduct of the NPS in Providing Information to Yosemite Guests regarding Hantavirus.

Finally, under the Supreme Court's two-part test, the discretionary function exception bars Plaintiffs' claims challenging the conduct of the NPS in providing information to Yosemite guests regarding Hantavirus, both before and after the outbreak.

#### 1. No Specific and Mandatory Provision Removed the Discretion of the NPS in Providing Information to Yosemite Guests Regarding Hantavirus.

Decisions concerning what information to provide to park visitors regarding risks at the park are governed by the same Management Policies and Director's Orders discussed above regarding management of risks at the park generally. The provisions list warnings and education as means of mitigating risks at the park. *See* Ex. 11 § 8.2.5.1 (warnings); Ex. 13 at 8-9 (education). These provisions leave room for discretion and show that there are important policy considerations that underlie any decisions to manage risks by providing information to the public

of natural hazards at the park.  Similarly, no specific and mandatory provisions controlled the government's conduct in determining how and when to provide information regarding a potential outbreak.  Thus, the conduct of the NPS in providing information regarding Hantavirus to park guests, both before and after the outbreak, was discretionary.

### 2. *The Conduct of the NPS in Providing Information to Yosemite Guests Regarding Hantavirus Is Susceptible to Policy Analysis.*

Decisions regarding providing information regarding health and safety risks are also grounded in important policy considerations.  As with managing risks generally, decisions concerning what information to provide to the public about Hantavirus are susceptible to an analysis involving competing policy considerations.  One way to mitigate a risk is to provide information about a risk so that a park guest can make informed decisions regarding the risk. DN Decl. ¶ 8.  But, many different factors can impact whether to provide information concerning risks at the park and how that information should be provided.  *Id.*  The NPS must determine which risks in which areas of park are great enough to justify a warning.  *Id.*  As the park provides more warnings, it becomes less likely that any particular warning will have an impact. *Id.*  Additionally, warnings can detract from the aesthetics of the park.  *Id.*  Warnings can also potentially create undue anxiety, affecting the number of visitors to the park, with social and economic consequences.  *Id.*  The potential impact from providing information regarding Hantavirus at Yosemite was illustrated by a letter from Mariposa County Supervisor following the outbreak.  The Supervisor argued that a broad notification to all Yosemite guests would be an "extreme over reaction" that could "create an unnecessary hysteria" and "devastate the regional economy."  Ex. 18 (September 9, 2012 Letter from Kevin Cann, Mariposa County Supervisor). Nevertheless, in a decision that was clearly susceptible to competing policy considerations, the NPS engaged in an extensive outreach program contacting over 28,000 guests.  DN Decl. ¶ 16. As with managing wilderness risks at Yosemite generally, the discretion of the NPS in deciding whether, when, and how to provide warnings about wilderness risks and information to park guests after their stay has ended can involve considerations of policy regarding "values, park-specific mission, feasibility of various program levels, activities offered at the park, nature of the

park visits, degree of risks to visitors at the park, the history of visitor injury in the park, and available resources." Ex. 12 at 11.  Thus, decisions regarding what information to provide about Hantavirus at Yosemite involve more than just safety; they involve safety considerations balanced with considerations of access, conservation, and resources.

A recent Ninth Circuit case involving Yosemite also shows why Plaintiffs' failure to warn claims are barred by the discretionary function exception.  In *Terbush v. United States*, the Ninth Circuit acknowledged that "[m]ost of our cases in the post-*Gaubert* era have held that fulfilling the NPS's decision to warn the public of hazards in the national parks entails the kind of policy weighing decision protected from judicial review by the discretionary function exception" 516 F.3d at 1135.  In that case, the plaintiffs, whose decedent was killed in a rock slide at Yosemite, alleged that the United States was liable for failing to warn of a rockfall hazard.  *Id.* at 1128.  The Ninth Circuit extensively reviewed its prior case law concerning failure to warn claims at national parks and national forests and found that most of its prior cases had held that failure to warn claims challenge policy-weighing decisions that the discretionary function exception shielded from tort liability.  *Id.* at 1135-36.  For example, in *Childers*, 40 F.3d at 976, the Ninth Circuit found that decisions regarding warnings at national parks were "precisely the kind [of decisions] the discretionary function exception was intended to immunize from suit."  Likewise, in *Blackburn*, 100 F.3d at 1431 (citing *Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir. 1995)), the Ninth Circuit specifically stated that a "broad mandate to warn the public of and protect it from special hazards involves the exercise of discretion in identifying such hazards, in determining which hazards require an explicit warning and in determining the precise manner in which to warn it of those hazards."  The *Terbush* court concluded that the prior decisions of the Ninth Circuit showed that warning decisions on public lands were the "ultimate policy-driven discretionary exercise."  516 F.3d at 1136. The court agreed with the district court that a decision to warn could not be "boiled down" to mere recognition of a hazard, specifically concurring with the district court's statement that  "'[t]he entire process, including identifying hazards, determining which hazards require a warning, and determining how and when and where the warning should proceed, involves discretion.'"  *Id.* at 1137.  The court concluded "[a]s

in *Childers*, *Valdez* and *Blackburn*, this process of identifying and responding to hazards in the wild implicates the NPS's broader policy mandates to balance access with conservation and safety." *Id.*  Thus, the court found that the plaintiffs' failure to warn claims were barred by the discretionary function exception.  *See id.* at 1135-40.

Likewise, here, any decision regarding whether to warn about Hantavirus implicates the NPS's broad policy mandates in managing national parks.  This is not a situation in which the NPS failed to warn of a known hazard that it created, implicating just safety concerns.  In *Young v. United States*, ___F.3d ___, 2014 WL 5293678 (9th Cir. Oct. 17, 2014), the Ninth Circuit found that an NPS failure to warn of a transformer located in a snowfield that formed a cavity, causing the plaintiff's injury from a fall, was not protected by the discretionary function exception.  The court repeatedly emphasized that the hazard was not a natural or wilderness risk, but rather a hazard that the NPS created and allegedly knew about.  *See id.* at **1-5, 8-9.  As such, the court found that the failure to warn implicated safety concerns only and not broader NPS policies.  *Id.* at *9.  The court reaffirmed that when "the NPS decides whether to warn of dangers that exist naturally in its national parks, those decisions generally are guided by considerations of policy," because they implicate the NPS's broader policy concerns.  *Id.* at *7.

Further, to the extent Plaintiffs claim that the Signature tent-cabins themselves were somehow the risk, not Hantavirus, the NPS did not create the Signature tent-cabins and had no reason to know of any hazard associated with the tent-cabins prior to the outbreak.  In fact, the Signature tent-cabins were used by the public for three years without a single case of Hantavirus. Thus, there was no NPS-created, NPS-known hazard associated with the Signature tent-cabins.

For the same reasons that Plaintiffs' pre-outbreak failure to warn claims are barred, Plaintiffs' claims challenging how and when the government informed them of the Hantavirus outbreak at Yosemite clearly implicates policy concerns.  For example, the Ninth Circuit has held that decisions regarding informing civilians and soldiers of hazards they may have encountered as a result of nuclear testing were barred by the discretionary function exception.  *In Re Consol. U.S. Atmos. Testing Litig.*, 820 F.2d at 997-98.  In *Atmospheric Testing Litigation*, the Ninth Circuit acknowledged that "the difficulty of such decisions is illustrated simply by the

problem of how to phrase such a warning where the degree of exposure of any particular

participant and the consequent risk is not known." *Id.* at 997.  The court stated that

"[f]ormulating and issuing warnings requires the government 'to establish priorities for the

accomplishment of its policy objectives by balancing the objectives sought to be obtained against

such practical considerations as staffing and funding.'" *Id.* at 998 (quoting *Varig Airlines*, 467

U.S. at 820).  The court concluded that it was "inescapable that every aspect of [such] a warning

program is a matter that falls within the discretionary function exception."  820 F.2d at 998.

Analogous claims challenging government conduct regarding notifications to service

members of hazards they may have encountered while in the military are routinely barred by the

discretionary function exception.  *See*, *e.g.*, *Maas v. United States*, 94 F.3d 291, 295-98 (7th Cir.

1996) (alleged post-discharge failure to warn of radiation exposure hazards); *In re Agent Orange*

*Prod. Liab. Litig.*, 818 F.2d 194, 200-01 (2d Cir. 1987) (alleged post-discharge failure to warn of

Agent Orange exposure).  *See also Minns v. United States*, 155 F.3d 445, 452 (4th Cir. 1998)

(alleged failure to warn soldiers and their families of potential effects of inoculations and

pesticides falls within the "core of the discretionary function exception").  As the Seventh Circuit

stated, "[i]n ascertaining the need for a warning and its cost, and in determining the group to be

alerted, as well as the content and procedure of such notice, the government would balance

safety with economic concerns."  *Maas*, 94 F.3d at 297.  The court correctly decided that

determining "whether health risks justify the cost of a notification program, and balancing the

cost and the effectiveness of a type of warning, are discretionary decisions covered by [the

discretionary function exception]."  *Id.*  Consequently, as with Plaintiffs' other claims, any

failure to warn claim must be barred by the discretionary function exception because it

challenges discretionary policy-based conduct.[4]

---

[4]  In addition to the discretionary function exception, the Plaintiffs' failure to warn claims are
independently barred by 28 U.S.C. § 2680(h).  Section 2680(h) excepts from the FTCA' waiver
of sovereign immunity "[a]ny claim arising out of . . . misrepresentation, deceit . . . ."  The Ninth
Circuit has held that "[t]he misrepresentation exclusion covers both acts of affirmative
misrepresentation and failure to warn."  *Doe*, 557 F.3d at 1084 n.10 (9th Cir. 2009) (applying
FTCA misrepresentation analysis to a failure to warn claim arising under the Foreign Sovereign
Immunities Act).  Thus, "a negligent failure to inform, without more, is misrepresentation within

### III.    The Contractor Exception Deprives the Court of Jurisdiction Over Plaintiffs' Claims to the Extent Plaintiffs Seek to Impose Liability on the United States for conduct of DNC-Yosemite Employees.

Where Plaintiffs do not challenge the government's actions directly – implicating the discretionary function exception – they seek to impose liability on the United States for the actions of DNC-Yosemite. Because of the contractor exception of the FTCA, however, the United States cannot be held responsible for the conduct of DNC-Yosemite employees at Yosemite. The FTCA subjects the United States to liability in tort only for the negligence of employees of federal agencies. 28 U.S.C. §§ 1346(b), 2671. The definition of "federal agency" expressly *excludes* any "contractor with the United States." 28 U.S.C. § 2671. Thus, the United States is not liable for the negligence of employees of its contractors. *United States v. Orleans*, 425 U.S. 807, 813-814 (1976); *Logue v. United States*, 412 U.S. 521, 525-26 (1973).

The Supreme Court has explained that a critical element in distinguishing an independent contractor from an agent is control of "the detailed physical performance of the contractor." *Logue*, 412 U.S. at 527-28. *See also Laurence v. Department of Navy*, 59 F.3d 112, 113 (9th Cir. 1995). Further, the Court has ruled that the United States is not liable for the actions of a contractor, even when the contractor receives federal money and must comply with federal regulations, as long as United States employees do not engage in substantial supervision of the day-to-day operations of the contractor. *See Orleans*, 425 U.S. at 815. *See also Laurence*, 59 F.3d at 113-14 (requiring authority to control detailed physical performance and substantial supervision to vitiate contractor exception); *Letnes v. United States*, 820 F.2d 1517, 1519 (9th Cir. 1987) (stating that there must be "substantial supervision over the day-to-day operations of the contractor" to find that contractor employee is a government employee under the FTCA). The Ninth Circuit has stated that "[c]ontractual provisions directing detailed performance generally do not abrogate the contractor exception." *Autery v. United States*, 424 F.3d 944, 957

---

the meaning of 28 U.S.C. § 2680(h)." *San Francisco v. United States*, 615 F.2d 498, 505 (9th Cir. 1980); *see also Lawrence v. United States*, 340 F.3d 952, 958 (9th Cir. 2003) ("The misrepresentation exception shields government employees from tort liability for failure to communicate information, whether negligent, or intentional.")

(9th Cir. 2005).  Indeed, the United States may even "'fix specific and precise conditions to implement federal objectives' without becoming liable for an independent contractor's negligence." *Id.* (quoting *Orleans*, 425 U.S. at 816).

Thus, the test of whether a contractor is an agent of the government is not the right to supervise the contractor employees, or even detailed contractual provisions governing performance, but, rather, actual control of the detailed performance of the contractor's work. The Ninth Circuit has indicated the type of control that might overcome the exception, finding the exception inapplicable where the government "dictated every aspect of a [contract employee's] employment activities," including listing duties on a chart so that the employee had "virtually no discretion as to how she was to perform her job." *Johnson v. United States*, 132 F. App'x 715, 715 (9th Cir. 2005).  This list of duties included directions "so detailed as to direct how many times to turn a mop over, as well as when and how to place safety signs." *Id.*

Here, the NPS did not exercise that type of control over DNC-Yosemite at the park. Indeed, a federal court has previously had no trouble finding that DNC-Yosemite was an independent contractor at Yosemite, and that the United States was not responsible for the conduct of DNC-Yosemite employees under the FTCA.  *Jones v. United States*, No. 1:08-CV-01137 AWI DLB, 2010 WL 5418795, at *2 (E.D. Cal. Dec. 23, 2010), *aff'd on other grounds,* 509 F. App'x 644 (9th Cir. 2013).  Likewise, other federal courts, including the Ninth Circuit, have routinely found that NPS concessioners were independent contractors under the FTCA. *See*, *e.g.*, *Ducey v. United States*, 713 F.2d 504, 516-17 (9th Cir. 1983) (finding that the terms in a "standard" NPS concessions agreement did not convert the concessions contractor into an agent of the government under the FTCA because the contractual terms did not give the NPS the authority to regulate the detailed physical performance of the concessioner); *K.V. v. United States*,  No. 12-CV-1944 (MKB), 2013 WL 5447875, at **3-6 (E.D. N.Y. Sept. 30, 2013) (finding that a concessioner for a recreation field within the NPS Gateway National Recreation Area was an independent contractor for purposes of the FTCA, considering, among other factors, contractual provisions requiring procurement of liability insurance and creating indemnification obligations); *Michelson v. United States*, No. 4:12CV00913 ERW, 2013 WL 4666340, at **3-5

(E.D. Mo. Aug. 30, 2013) (finding that an NPS concessioner at the St. Louis Gateway Arch Museum was an independent contractor under the FTCA).

With respect to the claims in this case, it is clear that DNC-Yosemite employees, not NPS employees, supervised and performed the detailed physical work of operating and maintaining the tent-cabins at Curry Village.  The concessions contract generally describes the operations and maintenance responsibilities of DNC-Yosemite and leaves the details of implementation to DNC-Yosemite.  For example, DNC-Yosemite is contractually required to provide clean, well-maintained overnight accommodations, but the contract provides few details regarding implementation.  Ex. 1 at Exhibit J at 15.  DNC-Yosemite's on-site manager is to "employ a staff with the expertise to operate all services authorized under the concessions contract."  *Id.* at Exhibit J at 5.  The contract does not specify how DNC-Yosemite is specifically to perform the services.  With respect to maintenance, in particular, the contract simply provides that DNC-Yosemite is to physically maintain and repair all facilities designated under the contract in order to maintain a "high standard of physical appearance, operations, repair, and maintenance.  *Id.* at 9.  Further, as in *K.V. v. United States*, the contract shows that DNC-Yosemite is in independent contractor, not an agent, by providing that DNC-Yosemite is to "hold harmless, defend and indemnify the United States . . . for losses, damages or judgments and expenses on account of . . . bodily injury [or] death . . . arising out of the activities of the Concessioner" under the contract.  Ex. 1 at 24.

Naturally, the NPS retained some right to evaluate DNC-Yosemite's work under the contract to see that park visitors were "provided with high-quality services and facilities that are safe and sanitary and meet NPS environmental, health, safety and operational standards."  Ex. 13 § 10.2.4.3.  The NPS's involvement consisted of periodically evaluating DNC-Yosemite's operation and maintenance of Curry Village pursuant to NPS-48.  WB Decl. ¶ 6.  The fact that the United States retained a broad right to evaluate, or even supervise, work does not negate the independent contractor exception.  As the Ninth Circuit recognized in *Yanez v. United States*, 63 F.3d 870 (9th Cir. 1995), "a principal may retain a broad general power of control to inspect, to

make recommendations, and to prescribe alterations and modifications without altering the relationship of principal and contractor." *Id.* at 875 (citing cases).

NPS employees did not give direction to DNC-Yosemite or its employees on how to perform work. WB Decl. ¶ 12. For example, Concessions Specialist Bryan simply pointed out deficiencies that he saw in reference to NPS-48 and the contract, and asked the concessioner to remedy the deficiencies. *Id. See also* DN Decl. ¶ 10. The means and methods of the operation were left to the concessioner who had expertise in hospitality. WB Decl. ¶ 12; DN Decl. ¶ 10. In fact, one of the reasons that the NPS had hired DNC-Yosemite was for its expertise in hospitality services. *See* 36 C.F.R. § 51.17; WB Decl. ¶ 11. Further, the NPS did not have the resources to control DNC-Yosemite's day-to-day operations. WB Decl. ¶ 12. DNC-Yosemite had over one hundred employees at Curry Village alone, yet Bryan was the only NPS employee with responsibility to evaluate periodically DNC-Yosemite's operations there along with all of the other accommodations and services that Bryan was responsible for evaluating. *Id.* In fact, DNC-Yosemite was required to have its own quality control and self-evaluation system to manage the work of its employees. Ex. 1 at 4; Ex. 16 at Chapter 19 at 4-5. Additionally, while DNC-Yosemite was contractually required to make its facilities reasonably accessible to the NPS, Bryan needed to give DNC-Yosemite notice before performing an evaluation of the tent-cabins, and DNC-Yosemite needed to unlock the doors for him to do so. WB Decl. ¶ 12.

For these reasons, the government cannot be held liable for any negligence of the concessioner's employees even though the United States retained the right to evaluate that concessioner's work. Accordingly, the FTCA's contractor exception, as interpreted by the Supreme Court, the Ninth Circuit, and other courts, precludes jurisdiction over Plaintiffs' claims seeking to impose liability on the United States for conduct of employees of DNC-Yosemite at Yosemite National Park.

## CONCLUSION

For the all of the foregoing reasons, this Court should grant the United States' Motion to Dismiss.

Dated:  October 31, 2014

Respectfully submitted,

JOYCE R. BRANDA
Acting Assistant Attorney General
Civil Division

MELINDA HAAG
United States Attorney

J. PATRICK GLYNN
Director, Torts Branch

BRIDGET BAILEY LIPSCOMB
Assistant Director

_____/s/ Adam Bain_____

KENNETH C. WARD                ADAM BAIN
JOHN L. KORTUM                 Senior Trial Counsel
MATTHEW D. BARNETTE            IN Bar No. 11134-49
Archer Norris                  WAGNER JACKSON
2033 N. Main St., Suite 800    MICHELE S. GREIF
Walnut Creek, CA 94596         KERI L. BERMAN
(925) 930-6600                 Trial Attorneys
                               Civil Division, Torts Branch
JOHN J. SNYDER                 U.S. Department of Justice
TARA NALENCZ                   P. O. Box 340
MARY ANN CAPRIOTTI             Washington, D.C. 20044
Rawle & Henderson, LLP         Telephone: (202) 616-4209
The Widener Building           FAX: (202) 616-4473
One South Penn Square          e-mail: adam.bain@usdoj.gov
Philadelphia, PA 19107
(215) 575-4200

Attorneys for the United States

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document, and the supporting declarations, exhibits and proposed order were all served on all counsel of record by operation of the court's electronic filing system and can be accessed through that system.

DATED:  October 31, 2014

       /s/ Adam Bain
ADAM BAIN
Senior Trial Counsel
IN Bar No. 11134-49
United States Department of Justice
P. O. Box 340
Washington, D.C.  20044
Telephone: (202) 616-4209
FAX: (202) 616-4473
Email: adam.bain@usdoj.gov