Joseph E. Addiego III (CA State Bar No. 169522)
Sanjay M. Nangia (CA State Bar No. 264986)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111
Telephone:    (415) 276-6500
Facsimile:    (415) 276-6599
Email:        joeaddiego@dwt.com

Michael B. Powers (admitted *pro hac vice*)
Kevin J. English (admitted *pro hac vice*)
Jennifer A. Shah (admitted *pro hac vice*)
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY 14203-2887
Telephone:    (716) 847-8400
Facsimile:    (716) 852-6100
Email:        kenglish@phillipslytle.com
              jshah@phillipslytle.com

Attorneys for Defendants
DELAWARE NORTH COMPANIES, INC.;
DELAWARE NORTH  COMPANIES PARKS & RESORTS, INC.;
DNC PARKS & RESORTS AT YOSEMITE, INC.; AND
DNC PARKS & RESORTS RESERVATIONS, INC.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: YOSEMITE NATIONAL PARK HANTAVIRUS LITIGATION | Docket No. C 14-MD-02532 MMC |
| THIS DOCUMENT RELATES TO: <br><br> ALL CASES | **DNC DEFENDANTS' OPPOSITION TO THE UNITED STATES' MOTION TO DISMISS** <br><br> Date:   July 24, 2015 <br> Time:  9:00 a.m. <br> Place:  Courtroom 7, 19th Floor <br> The Hon. Maxine Chesney |

PHILLIPS LYTLE LLP

# **TABLE OF CONTENTS**

Page

INTRODUCTION ...........................................................................................................1

FACTUAL BACKGROUND ..........................................................................................2

I.   The Relationship Between NPS and DNCY ..........................................................2

    A.  NPS controls DNCY's day-to-day operations. ......................................................3

    B.  NPS controls DNCY's actions relevant to this case.............................................4

        1.  NPS controls DNCY's dissemination of hantavirus warnings
           to the public. ....................................................................................................4

        2.  NPS must approve all improvements to overnight accommodations
           such as the STCs. ............................................................................................6

        3.  NPS must approve DNCY's IPM activities. ....................................................6

II.  The Signature Tent Cabins ....................................................................................6

    A.  NPS was required to prevent and reduce conditions conducive to
        pests, including deer mice, in directing and approving the design of
        the STCs. ...............................................................................................................7

    B.  NPS directed and approved the design of the STCs.............................................7

    C.  NPS admits it failed to consider pests in directing and approving
        the design of the STCs. .......................................................................................11

III. NPS failed to have either an IPM plan or an IPM coordinator at Yosemite
    before the outbreak, as required. ...........................................................................12

    A.  NPS had no IPM plan at Yosemite before the outbreak. .....................................12

    B.  NPS had no IPM coordinator at Yosemite before the outbreak. .........................13

    C.  Even with no IPM plan or coordinator at Yosemite, NPS controlled
        DNCY's attempts to manage mice. ....................................................................15

IV.  Before the outbreak, NPS failed to continuously trap mice within 100 feet
    around buildings, as required by Yosemite's own hantavirus policy.........................15

V.   NPS failed to perform required inspections of the STCs. ...........................................16

VI.  Before the outbreak, NPS failed to do anything to educate visitors about
    hantavirus, as required. ..........................................................................................17

PHILLIPS LYTLE LLP

i

VII.  NPS failed to timely notify DNCY of the investigation into the first
hantavirus case in 2012, and it delayed its on-site investigation based on
an investigator's vacation. ........................................................................ 17

ARGUMENT ............................................................................................ 19

POINT I       STANDARD OF REVIEW ........................................................ 19

POINT II      THE DISCRETIONARY FUNCTION EXCEPTION DOES NOT APPLY
BECAUSE NPS VIOLATED A SERIES OF MANDATORY, SPECIFIC
FEDERAL POLICIES AND ENGAGED IN CONDUCT NOT
SUSCEPTIBLE TO POLICY ANALYSIS.................................... 21

              A. Burden of Proof. ...................................................................... 21

              B. NPS admits it violated mandatory policy by failing to consider
ways to prevent and reduce conditions conducive to pests in the
redesigned STCs. ..................................................................... 22

              C. NPS violated mandatory provisions of the Contract and NPS
policy by failing to have in place an IPM plan and coordinator
at Yosemite. ............................................................................. 27

                  1.  NPS violated a mandatory Contract provision requiring it to
have an IPM plan at Yosemite. .......................................... 27

                  2.  NPS violated the Contract and mandatory NPS policy by
failing to have an IPM coordinator at Yosemite. ............... 28

              D. NPS violated its own Yosemite hantavirus directive by failing
to continuously trap mice within 100 feet of buildings before the
outbreak. ................................................................................. 30

              E. NPS violated mandatory policy by not conducting the required
number of inspections of the STCs. ......................................... 31

              F. NPS violated a mandatory policy by failing to educate visitors
about the hantavirus risk. ........................................................ 33

              G. NPS violated mandatory policy by failing to notify DNCY it was conducting
an investigation into the first hantavirus case, and its
delays in conducting the investigation and providing notification to
campers are not susceptible to policy analysis. ......................... 35

POINT III     NPS TIGHTLY CONTROLS DNCY AND IS NOT ENTITLED
TO IMMUNITY UNDER THE CONTRACTOR EXCEPTION................ 38

CONCLUSION ........................................................................................ 40

PHILLIPS LYTLE LLP

ii

# TABLE OF AUTHORITIES

Page

**Cases**

*Augustine v. United States,*
  704 F.2d 1074 (9th Cir. 1983) ................................................................ 19

*B & A Marine Co., Inc. v. American Foreign Shipping Co., Inc.,*
  23 F.3d 709 (2d Cir. 1994) ..................................................................... 39

*Barnhart v. Thomas,*
  540 U.S. 20 (2003) ................................................................................ 34

*Berkovitz v. United States,*
  486 U.S. 531 (1988) ............................................................................... 21

*Camozzi v. Roland/Miller and Hope Consulting Grp.,*
  866 F.2d 287 (9th Cir. 1989) .................................................................. 27

*In re Consol. U.S. Atmospheric Testing Litig.,*
  820 F.2d 982 h.17 (9th Cir. 1987) .......................................................... 37

*Ducey v. United States,*
  713 F.2d 504 (9th Cir. 1983) .................................................................. 40

*Faber v. United States,*
  56 F.3d 1122 (9th Cir. 1995) ........................................................ 25, 26, 34

*In re FEMA Trailer Formaldehyde Prods. Liab. Litig. (FEMA Trailer),*
  583 F. Supp. 2d 758 (E.D. La. 2008), *aff'd in part,* 713 F.3d 807
  (5th Cir. 2013) ............................................................................. 22, 36, 37

*Jones v. United States,*
  No. 08-cv-01137 2010 WL 5418795 (E.D. Cal. Dec. 23, 2010) .................... 40

*Kennewick Irrigation Dist. v. United States,*
  880 F.2d 1018 (9th Cir. 1989) ................................................................ 27

*Lake Mohave Boat Owners Ass'n v. NPS,*
  78 F.3d 20 (9th Cir. 1996) ..................................................................... 32

*Laurence v. Dep't of Navy,*
  59 F.3d 112 (9th Cir. 1995) .............................................................. 2, 38, 40

*Letnes v. United States,*
  820 F.2d 1517 (9th Cir. 1987) ................................................................ 38

*Myers v. United States,*
  652 F.3d 1021 (9th Cir. 2011) ............................................................ 25, 26

PHILLIPS LYTLE LLP

iii

PHILLIPS LYTLE LLP

*Navarette v. United States,*
    500 F.3d 914 (9th Cir. 2007) ....................................................... 26, 32, 34

*O'Toole v. United States,*
    295 F.3d 1029 (9th Cir. 2002) ................................................................ 33

*Prescott v. United States,*
    973 F.2d 696 (9th Cir. 1992) ........................................................ 1, 20, 21

*Routh v. United States,*
    941 F.2d 853 (9th Cir. 1991) ................................................................. 27

*Sanko Steamship Co., Ltd. v. United States,*
    2002 WL 1880745 (N.D. Cal. 2002) ...................................................... 37

*Terbush v. United States,*
    516 F.3d 1125 (9th Cir. 2008) .............................................................. 21

*United States v. Gaubert,*
    499 U.S. 315 (1991) ...................................................................... 1, 20, 21

*United States v. Orleans,*
    425 U.S. 807 (1976) ............................................................................. 38

*United States v. Pritchett,*
    470 F.2d 455 (D.C. Cir. 1972) ............................................................... 34

*Vickers v. United States,*
    228 F.3d 944 (9th Cir. 2000) ................................................................ 20

*Whisnant v. United States,*
    400 F.3d 1177 (9th Cir. 2005) .............................................................. 37

*Young v. United States,*
    769 F.3d 1047 (9th Cir. 2014) .................................................... 19, 21, 26

**Statutes**

28 U.S.C. 2680(a) ........................................................................................ 1

28 U.S.C § 1346(b), .................................................................................... 1

28 U.S.C § 2671 ....................................................................................... 1, 2

28 U.S.C. § 2680 ......................................................................................... 1

iv

Federal Tort Claims Act ("FTCA")..................................................................... 1, 32, 38, 40

Freedom of Information Act ("FOIA") ....................................................................32, 33

PHILLIPS LYTLE LLP

PHILLIPS LYTLE LLP

1    Defendants Delaware North Companies, Inc., Delaware North Companies Parks &

2   Resorts, Inc., DNC Parks & Resorts at Yosemite, Inc. and DNC Parks & Resorts

3   Reservations, Inc. (the "DNC Defendants"), submit the following Opposition to the United

4   States' Motion to Dismiss (Dkt. No. 68), and request that this Court deny the motion in its

5   entirety.

6                              **INTRODUCTION**

7        The National Park Service ("NPS") is charged with the safety of the four million

8   people who visit Yosemite National Park ("Yosemite" or the "Park") on an annual basis.  *See*

9   Appendix to DNC Defendants' Opposition to the United States' Motion to Dismiss

10   ("Appx."), Ex. 1 at 40, 73.  This includes managing the risk of hantavirus, a rare disease

11   carried by deer mice that allegedly caused an unprecedented outbreak of illness in the

12   Yosemite Valley region of the Park in 2012.[1]

13        Although the government seeks to avoid this Court's jurisdiction by arguing, among

14   other things, that NPS's management of the hantavirus risk at Yosemite was discretionary,

15   *see, e.g.*, Motion to Dismiss ("Mot. Dismiss") at 1-2, the government has failed to prove its

16   alleged acts and omissions fall within an exception to the Federal Tort Claims Act ("FTCA"),

17   codified at 28 U.S.C § 1346(b), §§ 2671-2680.  The FTCA's "discretionary function"

18   exception shields the government only where it proves its allegedly wrongful acts both (1)

19   involved a matter of choice for the acting employees and (2) are susceptible to analysis under

20   the policies NPS is charged with implementing.  *See* 28 U.S.C. 2680(a); *see also United States v.*

21   *Gaubert*, 499 U.S. 315, 322-23 (1991); *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir.

22   1992).  Here, the evidence – including NPS's own admissions – shows that NPS's conduct

23   did not involve a matter of choice and was not grounded in policy.  For one thing, NPS

24   violated a number of relevant mandatory policies and contractual obligations:

25        • With respect to the redesign and conversion of the cabins that ultimately
26          became the Signature Tent Cabins ("STCs"), which Plaintiffs allege were

27   [1] Hantavirus can present in humans as Hantavirus cardiopulmonary syndrome ("HCPS").
     For simplicity, in this brief the virus and the medical syndrome are both referred to as
28   "hantavirus."

1

the source of the outbreak, NPS violated a mandatory federal policy by failing to consider rodent control in requiring and approving a canvas tent design with insulation;

- NPS violated a mandatory requirement of its Concession Contract ("Contract") with DNC Parks & Resorts at Yosemite, Inc. ("DNCY") by failing to have in place an Integrated Pest Management ("IPM") plan for Yosemite for management of pests such as deer mice;

- NPS violated a mandatory federal policy and a mandatory provision of the Contract by failing to have an IPM coordinator at Yosemite before the outbreak;

- NPS violated a mandatory provision of its own hantavirus directive by failing to engage in continuous mouse trapping within 100 feet around the STCs before the outbreak;

- NPS violated a mandatory federal policy by failing to conduct required inspections of the STCs before the outbreak;

- NPS violated a mandatory federal policy by failing to educate visitors about the risk of hantavirus before the outbreak; and

- NPS violated a mandatory federal policy by failing to notify DNCY of NPS's investigation into the first hantavirus case.

Additionally, NPS's conduct in this case is not susceptible to analysis under the policies NPS is charged with implementing.  In fact, the evidence shows NPS's failures and delays resulted from government inaction or issues of convenience, not policy balancing.

With respect to the FTCA's "contractor exception," the government similarly has failed to carry its burden of proof.  *See* 28 U.S.C § 2671. The evidence shows NPS had authority to control DNCY's day-to-day operations and exercised that control, including with respect to the design of the STCs, the provision of hantavirus-related warnings to visitors and attempts to manage mice at Yosemite.  This control renders the contractor exception inapplicable.  *See Laurence v. Dep't of Navy*, 59 F.3d 112, 113 (9th Cir. 1995).

## FACTUAL BACKGROUND

### I.    The Relationship Between NPS and DNCY

The contractual and working relationship between NPS and DNCY provides important context for understanding the events of this case.

2

PHILLIPS LYTLE LLP

**A.      NPS controls DNCY's day-to-day operations.**

DNCY has been the primary concessioner at Yosemite since 1993.  Appx. Ex. 2, ¶ 2.
It manages overnight accommodations, food and beverage facilities, retail outlets and
interpretive activities in the Park under NPS's authorization and control.  *Id.*

As Yosemite Superintendent Donald Neubacher acknowledged, the Contract between
NPS and DNCY was drafted by the government and presented to DNCY in a take-it-or-
leave-it manner.  Appx. Ex. 1 at 229-30.  The Contract provides NPS substantial control over
the concessioner.  Its plain wording makes clear that DNCY operates "under the supervision
and regulation of the Secretary[.]"  Appx. Ex. 3 at 3; Appx. Ex 1 at 230-31.  NPS controls the
nature, type and quality of services provided, and all rates charged by DNCY.  Appx. Ex. 3,
§§ 2(b)(1) & (3)(a)(2); Appx. Ex. 1 at 231-32.  Additionally, the Contract authorizes and
requires NPS to "review and coordinate the Concessioner's day-to-day activities" and
"provide day-to-day supervision over all [concessioner] maintenance activities and
operations."  Appx. Ex. 3, Ex. J, at 6, 7-8; Appx. Ex. 1 at 244-46.

This supervisory authority is real and extensive.  NPS requires DNCY to obtain
approval for numerous actions ranging from mundane to complex.  Even the simple act of
changing a restaurant menu item requires DNCY to submit the full proposed menu to NPS,
including planned "design, art work, layout, and selection of items."  Appx. Ex. 3, Ex. J, at 9-
10.  DNCY was also required to secure the Superintendent's approval before it could move
beverage dispensers from their present location to a nearby interior wall within the Curry
Village Buffet.  Appx. Ex. 1 at 306-07.  NPS approval is required as to the type of refrigerator
DNCY purchases for the Yosemite Lodge, or to change the color of a door from green to
yellow.  Appx. Ex. 4 at 533, 451.

NPS's control over more significant concessioner activities is even tighter.  For
example, in 2008, in response to a complaint about mice in hard-sided cabins (not the cabins
at issue here), NPS directed DNCY to modify its rodent-proofing, monitoring, trapping and
training practices.  *See* Appx. Ex. 4 at 459-61.  DNCY developed a rodent abatement plan,

submitted it to NPS for approval (as required) and implemented it.  *See* Appx. Ex. 4 at 465-69; 461-62.

NPS conducts formal inspections of DNCY's visitor accommodations and other operations to determine compliance with NPS's operational, public health and occupational health and safety standards.  *See* Appx. Ex. 4 at 288.  NPS also conducts informal inspections of DNCY's operations.  For instance, after NPS was notified of the first hantavirus case in 2012, NPS's public health officer, Matthew Weinburke, arrived unannounced and conducted an assessment of several structures operated by DNCY.  Appx. Ex. 5 at 157-58.  Mr. Weinburke concealed from DNCY that he was assessing the structures because of a potential hantavirus case associated with Curry Village.  *Id.* at 194.

NPS has authority to review DNCY's books and records at any time.  Appx. Ex. 3, § 8(i).  DNCY is required to make its computerized database of maintenance records accessible to NPS and to provide NPS with detailed annual summaries of maintenance work done and planned.  Appx. Ex. 4 at 32, 37.

As Bradley Popp, owner of Defendant Yosemite Construction, Inc., summed up his lengthy experience working in Yosemite:  "[I]t's a lot of red tape. . . . NPS pretty much rides herd on everything that happens in the park."  Appx. Ex. 6 at 244-45.

**B.     NPS controls DNCY's actions relevant to this case.**

In addition to its supervisory control over DNCY's daily operations, NPS exerts contractual and practical control over DNCY in specific ways critical to this case.

**1.     NPS controls DNCY's dissemination of hantavirus warnings to the public.**

Under the Contract, "[a]ll printed material given to the public [by DNCY] including promotional material must be approved in writing by the Secretary prior to use."  Appx. Ex. 3, § 2(e).  Thus, DNCY could not provide a written hantavirus advisory to campers without NPS's prior approval.  As Supt. Neubacher testified:

> **Q:**  "[A warning] could not be disseminated by Delaware North Yosemite without you or a -- a superintendent approving it?"
> **A:**  "That's correct."

4

1    Appx. Ex. 1 at 232.

2         NPS's control over DNCY in this regard was demonstrated in 2010, after a camper

3    contracted hantavirus after staying in a tent cabin in Tuolumne Meadows, a high-elevation

4    area in the Park.  At that time, Supt. Neubacher told DNCY's President, Dan Jensen, that

5    DNCY must "develop and implement a written Hantavirus policy[.]"  *See* Appx. Ex. 7.  Mr.

6    Jensen replied on December 15, 2010, submitting DNCY's draft hantavirus policy, which

7    NPS reviewed for accuracy.  Appx. Ex. 8; Appx. Ex. 1 at 309-10.  Along with the draft

8    policy, Mr. Jensen submitted to Supt. Neubacher a hantavirus advisory drafted by DNCY

9    entitled "For Your Education and Protection -- Canvas Tent Cabin."  Appx. Ex. 8, at 11;

10   Appx. Ex. 2, ¶ 6.  As Supt. Neubacher acknowledged, because the "For Your Education"

11   hantavirus advisory was written material for distribution to the visiting public, DNCY was

12   not allowed under the Contract to disseminate it without NPS's prior approval.  Appx. Ex. 1

13   at 312-13.

14        At first, Supt. Neubacher testified he could not recall receiving or reviewing the "For

15   Your Education" advisory until after the 2012 outbreak  and claimed he *would* have approved

16   it had it been submitted.  *Id.* at 311, 314.  Under further questioning, however, he changed his

17   testimony:

18            **A:**  I understood [the advisory] was a document that was . . .
             previously available to the NPS. . . .
19            **Q:**  All right.  So [the advisory] was previously available to the
             NPS prior to the events of 2012?
20            **A:**  That's correct.

21   Appx. Ex. 1 at 315-16; *see also* Appx. Ex. 2, ¶ 6.  Despite having the "For Your Education"

22   advisory before the outbreak, NPS did not approve DNCY to post or distribute it anywhere

23   in the Park, including Curry Village (the site of the STCs).  Appx. Ex. 2, ¶ 7.  The only

24   posting NPS allowed DNCY to make in 2010 was of general hantavirus information in the

25   Tuolumne Meadows common areas.  Appx. Ex. 1 at 145-46, 312.

26        NPS also controlled the dissemination of information during the 2012 outbreak.  Supt.

27   Neubacher testified that DNCY could not issue a public advisory regarding the outbreak

28

5

PHILLIPS LYTLE LLP

1    without NPS's approval.  Appx. Ex. 1 at 354 (**Q:** "Could . . . [DNCY] at that time make any

2    public pronouncement without the approval of someone from NPS?" **A:** "They could have

3    asked for approval, but it would have been required. That's correct.").

> **2.      NPS must approve all improvements to overnight accommodations such as the STCs.**

6    As discussed more fully below, NPS is contractually required to pre-approve any

7    improvements to overnight accommodations, including the STCs, the alleged source of the

8    2012 hantavirus outbreak.  Appx. Ex. 3, Ex. J, at 15; Appx. Ex. 1 at 246-47.  NPS approval is

9    also required for any project that will "change the nature or appearance of any facility in an

10   historic structure or that is located in an historic district" such as Curry Village.  Appx. Ex. 3,

11   Ex. I, at 5; Appx. Ex. 1 at 234.

> **3.      NPS must approve DNCY's IPM activities.**

13   Also as discussed below, NPS controls and is responsible for managing pests (such as

14   deer mice) in the Park.  Appx. Ex. 3, Ex. J, at 41.  NPS is required to have an IPM plan and

15   an IPM coordinator at Yosemite.  *Id.*  Further, under the Contract, DNCY's "control of pests

16   by chemical and other means is subject to park approval."  *Id.*

17   **II.    The Signature Tent Cabins**

18   Each of the five individuals in this case who allegedly contracted hantavirus allegedly

19   were exposed while camping in an STC in June 2012.  Master Compl. ¶¶ 56-60.  The STCs

20   were created in response to NPS's decision to close accommodations after a large rock fall

21   from one of Yosemite's granite cliff faces in October 2008.  Appx. Ex. 2, ¶ 3.  The STCs were

22   sited in Boystown, which is located in the Curry Village section of the Yosemite Valley.

23   Appx. Ex. 2, ¶ 4.  Approximately 250,000 individuals stayed in the 91 STCs during the 3½

24   years they were in operation, with no reported cases of hantavirus before the 2012 outbreak.

25   Appx. Ex. 2, ¶ 10.  Still, Plaintiffs allege the STCs' double-walled design allowed hantavirus-

26   carrying deer mice to infest the tents without detection, leading to the outbreak.  Master

27   Compl. ¶ 88.

28

**A.      NPS was required to prevent and reduce conditions conducive to pests, including deer mice, in directing and approving the design of the STCs.**

Mandatory federal policy obligated NPS to prevent and reduce conditions conducive to pests such as deer mice (the carriers of hantavirus) in directing and approving of the design of the STCs.  Department of the Interior Departmental Manual 517 DM 1 ("517 DM 1") sets forth mandatory "policy and requirements for [DOI] bureaus and offices to incorporate Integrated Pest Management (IPM) into their pest management activities."  Appx. Ex. 9 at 1.  In the section entitled "Policy," 517 DM 1 states:

> [I]t is the Department's policy to . . . Design and maintain the stability of structures, developed landscapes, and natural areas to prevent and reduce conditions conducive to pests.

Appx. Ex. 9 at 3-4.  Supt. Neubacher admitted this provision "requires" NPS to design and maintain the stability of structures, including the STCs, to prevent and reduce conditions conducive to pests.  Appx. Ex. 1 at 344-46; *id.* at 57 (referring to the STCs as a "structure").

**B.      NPS directed and approved the design of the STCs.**

Contrary to the government's position in its motion, NPS directed and approved the design of the STCs and, in fact, dictated key elements of the design.  *See* Mot. Dismiss at 28-29.

As noted, the STCs were created after a rock fall in Yosemite in October 2008.  Government geologists determined that an area surrounding the fallen rocks was unsafe, and then-Superintendent Mike Tollefson ordered DNCY to close facilities in that area.  Appx. Ex. 10.  NPS's decision to close facilities resulted in a loss of accommodations used by Yosemite Institute ("YI"), a non-profit children's nature education organization whose students stayed in the Park each winter.  Appx. Ex. 2, ¶ 3.  As such, Supt. Tollefson called a meeting to discuss, among other things, how "to accommodate Yosemite Institute and find a location for them to continue with their campus."  Appx. Ex. 4 at 52-53, 55-56.

NPS decided to relocate the YI students to the Boystown section of Curry Village, an employee housing area that contained mostly canvas-covered tent cabins.  Appx. Ex. 11, ¶ 2.  However, the existing canvas tent cabins in Boystown were not suitable for winter use, as

PHILLIPS LYTLE LLP

7

1   they had only a single canvas wall; nor were they suitable for accommodating guests.  Appx.

2   Ex. 2, ¶ 4.  Thus, the tent cabins either needed to be replaced or converted to winter

3   accommodations for YI.  *Id.*

4       The tent cabins in Boystown are part of the historic district of Curry Village and are

5   "historically significant."  *See* Mot. Dismiss at 5.  Accordingly, DNCY could not change the

6   exterior of those tent cabins without NPS approval.  Appx. Ex. 1 at 235 ("…[T]he exteriors of

7   [the tent cabins] are critical to the historic landscape."); *id.* at 236 (**Q:** "So the change in the

8   exterior appearance. . .would that be considered a major change?" **A:** "Yes.").  Additionally,

9   the Contract required DNCY to secure NPS approval before making any improvements to

10  overnight accommodations.  Appx. Ex. 3, Ex. J, at 15.  NPS confirmed its approval

11  responsibility in a memorandum stating that all decisions relating to the tent cabins in

12  Boystown "will be made and issued by the park Superintendent."  Appx. Ex. 12 at 1, 2.

13      At a meeting with NPS, DNCY proposed that the existing canvas tent cabins in

14  Boystown be replaced either with hard-sided cabins from another location in Yosemite, or

15  with new hard-sided cabins, to provide the warm accommodations needed by YI.  Appx. Ex.

16  4 at 57; Appx. Ex. 11, ¶ 3.  Critically, NPS rejected DNCY's proposal because it "believed it

17  . . . wouldn't get approved because it was not typical of that landscape area," and/or would

18  constitute impermissible new construction in Yosemite.  Appx. Ex. 4 at 57; Appx. Ex. 11, ¶ 4.

19      DNCY then proposed another alternative -- a hard-sided cabin draped in canvas -- but

20  NPS rejected that proposal as well because the canvas "wouldn't drape like a normal tent" in

21  the historic area.  Appx. Ex. 4 at 57; Appx. Ex. 11, ¶ 5.  After NPS rejected DNCY's

22  proposals, DNCY had no choice but to convert the existing canvas tent cabins in Boystown

23  to winter accommodations by using insulation to provide warmth without altering the cabins'

24  exteriors.  Appx. Ex. 11, ¶ 6.

25

26

27

28

PHILLIPS LYTLE LLP

8

Because the conversion of the tent cabins to winter quarters involved improvements to overnight accommodations, DNCY needed NPS approval under the Contract.[2]  Appx. Ex. 3, Ex. J, at 15.  One way in which DNCY requests such approval is through an "Operations Proposal" submitted to NPS's Bureau of Revenue Management ("BRM"), which is the division that manages concessioners in the Park.  Appx. Ex. 4 at 62-64.  If NPS approves, it will provide DNCY with a "notice to proceed."  *Id.* at 102.  In this case, NPS directed DNCY to submit an Operations Proposal describing the conversion of the tent cabins in Boystown as a "winterization" of DNCY's personal property.  *See id.* at 96.  Accordingly, on November 26, 2008, DNCY emailed a draft Operations Proposal to Marty Nielson, Chief of BRM (NPS), and BRM's Elexis Mayer (NPS).  Appx. Ex. 13.[3]

The Operations Proposal provided that "[t]he purpose of this project is to convert Boystown employee housing located near Curry Village to overnight accommodations to house Yosemite Institute (YI) participants and other Park guests."  Appx. Ex. 13 at 3.  It advised NPS that "DNC[Y] will clean and insulate tents, perform minor upgrades to tents . . . as approved by NPS."  *Id.* at 4.  The proposal stated that the work would begin "[i]mmediately upon NPS approval."  *Id.* at 3.

DNCY worked to get the project "shovel ready" so that, once NPS approval was secured, the conversion project could start.  Appx. Ex. 4 at 178.  As part of that approval process, DNCY created a prototype insulated tent cabin for NPS's inspection which had an interior wall made of plywood and a layer of foam insulation between the plywood and the exterior canvas wall.  *Id.* at 134-36; 154.

On or about December 17, 2008, DNCY's project manager, Don Evans, called NPS's fire marshal, Don Coffman, to inspect the proposed design and materials.  Appx. Ex. 14 at

---

[2] Supt. Neubacher acknowledged that improvements were made to the tent cabins in Boystown and that they were converted to overnight guest accommodations.  Appx. Ex. 1 at 165, 247.

[3] In the email, Ms. McMichael noted the draft had already been reviewed by Supt. Tollefson, who had instructed DNCY to refrain from submitting a final proposal until the following week.  Appx. Ex. 13 at 1.

PHILLIPS LYTLE LLP

9

51.  Mr. Coffman was charged with inspecting visitor accommodations for fire safety and was authorized to halt work on the project if he had safety concerns.  *Id.* at 11, 42.

Mr. Coffman came to the Boystown site, observed and photographed the foam insulation DNCY had on site and inspected the prototype.  Appx. Ex. 14 at 65, 67.  BRM's Elexis Mayer (NPS) was also on site.  *Id.* at 20.  Mr. Coffman approved the foam insulation along with the re-use of the tent cabins' existing canvas exteriors.  *Id.* at 74; 129-30.  However, Mr. Coffman rejected the plywood proposed for the interior walls of the cabins as not fire safe.  *Id.* at 75; *see also* Appx. Ex. 6 at 73-74.  He directed DNCY to substitute drywall for the plywood.  Appx. Ex. 14 at 80.

Later that day, NPS's Ms. Mayer sent an email to BRM Chief Marty Nielson (NPS), project managers Larry Harris (NPS) and Don McClarty (NPS), Mr. Coffman (NPS) and DNCY.  The email's subject was "Solution for winterization of Boystown Tents reached."  Appx. Ex. 15.

> Larry/Marty:
>
> . . . . Per Don Coffman's verbal agreement, the winterization method will consist of foam insulation and greenboard (drywall) on the interior of the tents. . . .
>
> DNC will be providing Don Coffman with materials specifications and description of work to be performed by this afternoon and we expect email confirmation from Don this afternoon to proceed as agreed.

*Id.*  DNCY understood this email to be NPS's "notice to proceed" with the conversion of the tent cabins.  Appx. Ex. 4 at 103.

Mr. Evans (DNCY) then drafted a memorandum describing in detail the materials and scope of work.  Appx. Ex. 16.  DNCY emailed the memorandum to NPS's Mr. Nielson, Ms. Mayer and Mr. Coffman on December 19, 2008.  The memorandum advised NPS, *inter alia*, that "Molded Expanded Polystyrene ridged foam" would be used as insulation and would be "fitted and blocked between the wooden structural components to leave an air gap between the canvas tent fabric and the insulation," and that "Glass Mat Gypsum panels,

PHILLIPS LYTLE LLP

10

PHILLIPS LYTLE LLP

1  commonly called green board, will be attached to the rafters and studs for a finished wall

2  covering." *Id.* at 1-2.

3        Although NPS did not respond to DNCY's memorandum, Mr. Coffman apparently

4  had no objection to any aspect of the proposed scope of work because, if he had, he would

5  have advised DNCY and been authorized to halt the project.  Appx. Ex. 14 at 132; *see also id*.

6  at 40-42.

7        DNCY hired Defendant Yosemite Construction, Inc., to convert the tent cabins into

8  what later became known as the STCs.  *See* Appx. Ex. 6 at 240.  Although the insulation and

9  drywall were added (as approved by NPS), the cabins retained their original canvas exteriors,

10  doors, frames and platforms. *Id.* at 249-52.

11        Before the STCs were occupied, NPS's Mr. Coffman returned to inspect the

12  completed STCs and approved the work. *See* Appx. Ex. 4 at 191-93.  The STCs were first

13  occupied in February 2009 and accommodated about 250,000 visitors during their 3½ years

14  of operation, with no reported cases of hantavirus before the 2012 outbreak.  Appx. Ex. 4 at

15  180; Appx. Ex. 2, ¶ 10.

16        **C.     NPS admits it failed to consider pests in directing and approving the design
          of the STCs.**

17

18        In directing and approving the design of the STCs, NPS failed to consider how to

19  prevent and reduce conditions conducive to pests (including deer mice), as required by 517

20  DM 1.  As Supt. Neubacher conceded:

21              **Q:**  "When the signature tent cabins were redesigned after the
                rock slide, did anyone from NPS look at that design to prevent

22              and reduce conditions conducive to pests?"
                **A:**  "My understanding, it was -- at least according to the IG

23              report, it was field designed according to Dan Jensen, CEO of
                Delaware North.  And we made a consultation on fire, but ***there

24              was no park official that went over to take a look to see if it met a
                rodent-proof design***."

25              **Q:**  "So the answer to my question is there was none?"
                **A:**  "That's correct."

26

27  Appx. Ex. 1 at 347-48 (emphasis added).  Supt. Neubacher admitted this several more times:

28

11

PHILLIPS LYTLE LLP

1

**Q:** "You had made an analysis of the ways in which the signature tent cabins, because of their construction, could harbor Hantavirus mice?  Had you not?"

2

**A:** "No. there was no assessment." *Id.* at 154.

3

**Q:** "Is there anywhere . . . where any written record reflects that

4

at the time the construction and addition of the heaters and the installation of the sheetrock and the installation of the insulation

5

was completed, that there was any inspection made by an NPS person to determine if the newly converted individual cabins were adequately rodent proofed?"

6

**A:** "Not to my knowledge." *Id.* at 384.

7

In sum, (1) NPS was contractually required to approve the conversion and design of

8

the STCs; (2) NPS required the use of the existing canvas tent cabins in Boystown,

9

necessitating that the cabins' interiors be warmed with insulation; (3) NPS required DNCY to

10

substitute drywall for plywood in the cabins' interior walls and (4) NPS's BRM (including the

11

Chief), NPS project managers and the NPS fire marshal approved the design with full

12

knowledge of the materials and methods to be used.  Yet NPS admits it made no effort to

13

assure that the design would prevent and reduce conditions conducive to pests, as required by

14

517 DM 1.

15

**III.    NPS failed to have either an IPM plan or an IPM coordinator at Yosemite before the outbreak, as required.**

16

17

In Yosemite, NPS is responsible for and controls the methods by which pests such as

18

deer mice are managed.  The Contract provides:

19

INTEGRATED PEST MANAGEMENT

20

The control of pests by chemical and other means is subject to park approval.  Procedures are outlined in the Park's Integrated Pest Management Plan.  Specific problems can be referred to the

21

park's Integrated Pest Management Coordinator.

22

Appx. Ex. 3, Ex. J, at 41.  The government's witnesses acknowledged that NPS is obligated

23

to have both an IPM plan and an IPM coordinator at Yosemite.  *See* Appx. Ex. 1 at 295;

24

Appx. Ex. 17 at 159.

25

**A.    NPS had no IPM plan at Yosemite before the outbreak.**

26

Despite this acknowledged requirement, Supt. Neubacher testified that NPS had no

27

IPM plan in place at Yosemite:

28

12

"We didn't have a [P]ark-specific plan. . . ."  Appx. Ex. 1 at 82.

"So as we discussed before, the [P]ark didn't have an integrated pest management plan."  *Id.* at 248.

"There was no NPS document . . . that was an integrated pest management plan."  *Id.* at 108.

**Q:**  "Is it true that before she completed it, there was not a written document on that topic in compliance with director's order 77 and NPS . . . 48 for Yosemite?"
**A:**  "We were using the general guidance as our plan in concert with policy.  Did we have a specific document?  No."  *Id.* at 153.

When DNCY's resource manager, Mark Gallagher, asked NPS whether Yosemite had developed an IPM plan, he was always told "no."  Appx. Ex. 18, ¶ 3.  Notably, after the outbreak, Supt. Neubacher urged his staff to quickly draft an interim IPM plan because the Department of the Interior's Office of Inspector General ("OIG") was investigating NPS.  *See* Appx. Ex. 1 at 352-53.

**B.    NPS had no IPM coordinator at Yosemite before the outbreak.**

In addition to the Contract provision cited above, the NPS policy governing IPM activities, NPS-77,[4] places the "[t]he ultimate responsibility for all pest management issues" on the superintendent.  Appx. Ex. 19 at 238.  NPS-77 also requires the designation of a park IPM coordinator and that he or she attend the 40-hour NPS IPM training course.  *Id.* at 238, 239.

Supt. Neubacher testified:

> **Q:**  "[I]n your park, you understand it's a requirement that you have an integrated pest manager?"
> **A:**  "Yes."

Appx. Ex. 1 at 295.  He also testified that IPM coordinators were required to take the 40-hour training course, Appx. Ex. 19 at 239, but that he had discretion to appoint an untrained

---

[4] NPS's Management Policies, which set forth servicewide policy, require each park to use an "IPM approach" and follow the process "prescribed" in NPS Director's Order 77-7 ("DO 77-7") in conducting IPM activities.  *See* Appx. Ex. 20.  DO 77-7, however, did not even exist in final form at any time relevant to this case.  Appx. Ex. 1 at 84.  Instead, as Supt. Neubacher testified, NPS's IPM activities were governed by NPS-77.  *Id.* at 91-92.

PHILLIPS LYTLE LLP

PHILLIPS LYTLE LLP

1   coordinator so long as that person received the training *at some point* during his or her tenure.

2   Appx. Ex. 1 at 291, 300-01.

3    Despite these requirements, NPS did not have an IPM coordinator in the Park in the

4   years before the outbreak, much less a properly trained one.  When Mr. Gallagher had

5   questions regarding DNCY's pest management activities, he had no NPS contact in the field

6   at Yosemite.  Appx. Ex. 18, ¶ 4.  Instead, Mr. Gallagher had to consult Carol DiSalvo, NPS's

7   lead IPM person in Washington, D.C., or Bruce Badzik, the IPM coordinator at Golden

8   Gate National Recreational Area.  *Id.* ¶ 5.

9    NPS's Linda Mazzu prepared a memorandum for Supt. Neubacher two weeks before

10  his deposition to assist him with his testimony.  The memorandum confirms that there was

11  no IPM coordinator at Yosemite between 2009 and August 2012.  Appx. Ex. 1 at 252; Appx.

12  Ex. 21.  Further, although the memorandum states that Ms. Mazzu became IPM coordinator

13  in August 2012, Ms. Mazzu told a different story to the OIG when interviewed as part of its

14  investigation, reporting (inaccurately) that she had been IPM coordinator since 2011.  *See*

15  Appx. 1 at 262-63.  She told yet another story in September 2012, telling Supt. Neubacher she

16  would be taking on the IPM coordinator role at that time.  *See id.* at 270-71.

17   Other NPS officials were unaware of who, if anyone, was serving as IPM coordinator

18  at any given time.  An email after the outbreak revealed that NPS geologist Greg Stock

19  believed NPS's Joe Meyer, not Ms. Mazzu, had that title in 2012.  *See* Appx. Ex. 1 at 266.

20  NPS public health officer Matthew Weinburke believed Mr. Meyer (not Ms. Mazzu) was

21  IPM coordinator in 2011, and NPS concessions specialist Billy Bryan did not know who

22  Yosemite's IPM coordinator was in 2012.  Appx. Ex. 5 at 31; Appx. Ex. 17 at 162.  Even

23  Supt. Neubacher could not independently recall the identity of anyone allegedly serving as

24  IPM coordinator in Yosemite prior to the outbreak, even though he claimed to be involved in

25  appointing them.  Appx. Ex. 1 at 256-57; 263-64.  Of course, this is consistent with Ms.

26  Mazzu's memorandum, which shows there was no IPM coordinator at Yosemite in the years

27  before the outbreak.

28

Unsurprisingly, NPS's Joe Meyer, who allegedly served as IPM coordinator for part of 2008, described Yosemite's IPM program as "moribund." Appx. Ex. 33 at 2; se*e* Appx. Ex. 1 at 130. Despite the Park's significant pest issues, Mr. Meyer said he spent *no* time on pest management issues as the IPM coordinator. App. Ex. 1 at 129-30. In 2012, Mr. Meyer advised Ms. Mazzu that "we have never made IPM a priority at Yosemite, at least during the time I've been here[.]" *See* Appx. Ex. 1 at 134.

**C.**   **Even with no IPM plan or coordinator at Yosemite, NPS controlled DNCY's attempts to manage mice.**

As noted, the Contract gives NPS control over pest management activities: "The control of pests by chemical and other means is subject to park approval." Appx. Ex. 3, Operating Plan at 41. In practice, although it was unguided by an IPM plan or coordinator, NPS still controlled DNCY's efforts to eradicate mice. NPS wildlife biologists refused to allow DNCY to trap mice outdoors before the outbreak, and they even remained resistant afterward. Appx. Ex. 18, ¶¶ 7-8. NPS has never allowed DNCY to use rodenticide to exterminate mice. *Id.* ¶ 9.

**IV.**   **Before the outbreak, NPS failed to continuously trap mice within 100 feet around buildings, as required by Yosemite's own hantavirus policy.**

NPS's public health officer, Matthew Weinburke, was the lead author of Yosemite's hantavirus directive, which was approved by the Superintendent in April 2012, several months before the hantavirus outbreak. Appx. Ex. 5 at 82-83. Under "Program Requirements," the directive provided that NPS was to "[p]lace spring-loaded rodent traps in likely areas of rodent shelter within 100 feet around buildings, and use continuously." Appx. Ex. 22 at 7; Appx. Ex. 5 at 113, 116. Mr. Weinburke admitted this was a "requirement." Appx. Ex. 5 at 116.

NPS failed to "continuously" conduct mouse trapping within 100 feet around buildings (including the STCs) before the outbreak, and in fact, as noted, refused to allow DNCY to trap mice outdoors. Appx. Ex. 18, ¶ 7. Mr. Weinburke unconvincingly attempted

PHILLIPS LYTLE LLP

PHILLIPS LYTLE LLP

1  to explain NPS's violation of its own requirement by claiming that the use of traps *inside*

2  buildings qualified as trapping within 100 feet *around* buildings.  Appx. Ex. 5 at 114.

3  **V.     NPS failed to perform required inspections of the STCs.**

4       NPS-48, the policy governing management of concessioners in the national parks,

5  mandates that the Superintendent or his or her authorized representative "is to conduct"

6  comprehensive evaluations of each concessioner activity.  Appx. Ex. 23 at Ch. 20, p. 5.  As

7  amended by a 1995 "field memorandum," NPS-48 requires at least two periodic evaluations

8  of the Curry Village canvas tent cabins (including the STCs) each year:

9       **Q:** And does [NPS-48, as modified by the 1995 memorandum]
            require two yearly periodic evaluations?
10      . . . .
        **A:** Yes.
11

12  Appx. Ex. 17 at 201-02; *see also* Appx. Ex. 23 at Ch. 20, p. 5.

13       At Yosemite, concessions specialist Billy Bryan was assigned to inspect the STCs.

14  Appx. Ex. 17 at 42.  In order to be qualified to perform the inspections, Mr. Bryan was

15  required to attend a formal, week-long NPS training course.  *Id.* at 183-84.  During the

16  training, NPS instructed that NPS-48 was an NPS "Level 2" Director's Order and a "legal

17  requirement."  Appx. Ex. 24 at 2, 6; Appx. Ex. 17 at 186, 189.  Consistent with this, Mr.

18  Bryan characterized NPS-48 as a Director's Order.  Appx. Ex. 17 at 176.

19       Mr. Bryan conceded that, in violation of NPS-48, only ***one*** periodic evaluation of the

20  STCs was conducted in 2011 -- on June 24, 2011.  Appx. Ex. 17 at 203. The next periodic

21  evaluation was not conducted until fourteen months later, on August 15, 2012, after the 2012

22  hantavirus outbreak.  *Id.* at 203-04.  In fact, NPS's own computerized concessions

23  management tracking system confirms that NPS completed only 50% of the "required"

24  evaluations of the STCs in both 2011 *and*  2009 (one of two in each year).  Appx. Ex. 26 at

25  NPS-16_00012; NPS-16_00002.

26

27

28

16

PHILLIPS LYTLE LLP

## VI.   Before the outbreak, NPS failed to do anything to educate visitors about hantavirus, as required.

Mandatory public health policy requires NPS to use education to reduce the risk of transmission of vector-borne diseases (such as hantavirus) to park visitors.  NPS Director's Order #83: Public Health ("DO 83"), states:

> NPS unit managers *will* reduce the risk of transmission of vector-borne and zoonotic diseases *to park visitors* and employees *through education*, surveillance, and control efforts when necessary.

Appx. Ex. 27 § G.1 (emphasis added).  NPS's public health officer at Yosemite, Mr. Weinburke, admitted that this provision is "a requirement."  Appx. Ex. 5 at 93.

Since 2000, NPS and the California Department of Public Health ("CDPH") have had a contractual relationship under which CDPH provides its public health expertise to NPS.  Appx. Ex. 28; *see also* Appx. Ex. 29, ¶ 5.  Pursuant to this arrangement, CDPH made periodic recommendations to NPS for hantavirus risk reduction, including that NPS provide hantavirus information to Park visitors.  *See generally* Appx. Ex. 28.

Although it allowed DNCY to post general hantavirus information in Tuolumne Meadows common areas after a hantavirus case was reported in Tuolumne Meadows in 2010, NPS itself did nothing before the 2012 outbreak to educate visitors about hantavirus (including visitors staying in the STCs).  Appx. Ex. 1 at 145 (**Q:** "Did you give the people individually, the visitors to the park facilities, including the tent cabins at Curry Village, [hantavirus] prevention information in 2011?" **A:** "No."); *id.* at 312.  Mr. Weinburke's only explanation was that NPS satisfied its requirement to educate *visitors* by training *DNCY*.  Appx. Ex. 5 at 76.  In truth, as discussed above, despite having the "For Your Education" hantavirus advisory from DNCY in 2010, NPS did not approve DNCY to post or distribute it before the outbreak.  Appx. Ex. 2, ¶ 7.

## VII.   NPS failed to timely notify DNCY of the investigation into the first hantavirus case in 2012, and it delayed its on-site investigation based on an investigator's vacation.

The hantavirus outbreak that occurred in Yosemite in the summer of 2012 was unprecedented.  Of the tens of millions of people who visit and work at Yosemite, only two

17

had contracted hantavirus in the Park before 2012, and those cases occurred ten years apart and in high-elevation areas far removed from the STCs' location in the Yosemite Valley. Appx. Ex. 2 ¶ 10.  To DNCY's knowledge, before 2012 no one had ever contracted hantavirus in the Yosemite Valley.  *Id.*

On July 12, 2012, NPS's Matthew Weinburke was notified by the California Department of Public Health ("CDPH") of the first hantavirus case.  Appx. Ex. 5 at 184.  By July 19, 2012, Mr. Weinburke and others at NPS knew that person had stayed in Curry Village, and NPS had decided to conduct an investigation of the case in conjunction with the CDPH.  *Id.* at 188.

NPS's public health policy, DO 83, provides that "[t]he park concession office will be notified when an illness investigation is conducted in a concessioner's facility."  Appx. Ex. 27, § E.5.  Mr. Weinburke admitted that Section E.5 of DO 83 is mandatory, but claimed it does not specify *when* the notification of the concessioner must take place.  Appx. Ex. 5 at 199.  Regardless, Mr. Weinburke conceded that he did not inform DNCY of a potential hantavirus case associated with Yosemite until July 30, 2012, 18 days after NPS learned the case was confirmed, not merely potential.  *Id.* at 195.

NPS admits it withheld this information intentionally.  On July 18, 2012, NPS public health officer David Wong told Mr. Weinburke to hold off on communicating to others in the Park, except for Park leadership, that there was a hantavirus investigation.  Appx. Ex. 5 at 193.  Mr. Weinburke also admitted that, when he made an unannounced visit to Curry Village to assess several tent cabins on July 27, 2012, DNCY was not informed that the assessment was related to hantavirus.  *Id.* at 194.

With respect to the on-site investigation, although NPS had decided on July 19, 2012 to conduct it, NPS delayed it for three weeks, until August 9, 2012.  Appx. Ex. 5 at 190.  The only identified reason for this delay was that one of the CDPH's investigators had "scheduling issues" -- namely, a vacation.  *Id.* at 190-91.  DNCY was not advised of the reason for the delay.  Appx. Ex. 2, ¶ 8.

18

1    DNCY cooperated fully and followed NPS's direction in responding to the outbreak.

2    Appx. Ex. 2, ¶ 9.  On or about August 25, 2012, Supt. Neubacher told DNCY to directly

3    notify visitors who had stayed in STCs during a specified date range in the summer of 2012 of

4    their potential exposure to hantavirus, because those visitors might not yet be symptomatic

5    due to the disease's long incubation period.  *Id.*  DNCY immediately drafted an advisory and

6    submitted it to NPS for approval for dissemination (as DNCY was required to do under the

7    Contract).  *Id.*; Appx. Ex. 3, § 2(e).  DNCY then mounted an extensive outreach effort, with

8    NPS's approval, sending the advisory to more than 10,500 visitors over five days.  Appx. Ex.

9    2, ¶ 9.

10   **ARGUMENT**

11   **POINT I**

12   **STANDARD OF REVIEW**

13   In considering a motion to dismiss for lack of subject matter jurisdiction, a court may

14   look behind the factual allegations and weigh evidence.  However,

15   > [w]hen the jurisdictional motion "involv[es] factual issues which
   > also go to the merits," a court should employ the standard
16   > applicable to a motion for summary judgment because
   > "resolution of [those] jurisdictional facts is akin to a decision on
17   > the merits."  In that posture, the moving party "should prevail
   > only if the material jurisdictional facts are not in dispute and the
18   > moving party is entitled to prevail as a matter of law."

19   *Young v. United States*, 769 F.3d 1047, 1052 (9th Cir. 2014) (alterations in original) (citation

20   omitted) (quoting *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983)).

21   Here, the factual issues raised by the government's jurisdictional motion are

22   intertwined with liability.  As discussed more fully below, to prevail on a motion to dismiss

23   based on the FTCA's discretionary function exception, the government must prove that its

24   allegedly wrongful acts (1) involved a matter of choice for the acting employees and (2) are

25   susceptible to analysis under the policies NPS is charged with implementing.  *See United States*

26   *v. Gaubert*, 499 U.S. 315, 322-23 (1991); *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir.

27   1992).  Here, the question of whether the government violated mandatory policies and

28

PHILLIPS LYTLE LLP

19

provisions by failing to consider the STCs' design's attractiveness to pests; failing to have an IPM plan or coordinator at Yosemite; failing to conduct continuous mouse trapping within 100 feet around buildings; failing to conduct required inspections of the STCs; failing to warn visitors of the hantavirus risk; failing to provide timely notice to DNCY of the investigation into the first hantavirus case in 2012; and delaying the on-site investigation and notification to campers; also goes to the heart of whether the government is liable for the alleged injuries in this case.  For example, NPS's failure to consider pest control when directing and approving the redesign of the STCs violated a mandatory federal policy, *see* 517 DM 1, and also relates to Plaintiffs' claim that NPS was negligent in directing and approving the design.  *See* Master Compl. ¶ 88; *see also* DNC Defs.' Cross-Claim (*Garisto*) ¶ 306 (Dkt. No. 33).

Whether the Court employs a summary judgment standard or weighs the evidence and resolves factual disputes relating to alleged sovereign immunity, the Court should deny the government's motion, because (1) the credible evidence, including NPS's admissions, shows NPS violated a series of relevant, mandatory and specific federal policies and provisions and engaged in conduct not susceptible to policy analysis and (2) the evidence demonstrates that NPS exercised tight control over DNCY's operations and conduct, defeating the contractor exception.

Moreover, all factual disputes relating to issues other than sovereign immunity must be reserved until after the close of general discovery or trial.  This includes the question of whether the government's violations of mandatory policies and provisions, as enumerated below, caused Plaintiffs' alleged injuries.  *See, e.g.*, *Vickers v. United States*, 228 F.3d 944, 953, 956 (9th Cir. 2000) (noting that, under California law, causation is a question of fact; reversing grant of summary judgment that was based on a finding that the government's conduct was not a legal cause of the injury).

**POINT II**

**THE DISCRETIONARY FUNCTION EXCEPTION DOES NOT APPLY BECAUSE NPS VIOLATED A SERIES OF MANDATORY, SPECIFIC FEDERAL POLICIES AND ENGAGED IN CONDUCT NOT SUSCEPTIBLE TO POLICY ANALYSIS**

**A.    Burden of Proof.**

In the Ninth Circuit, "the United States bears the burden of proving the applicability of one of the exceptions to the FTCA's general waiver of immunity." *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992).  To immunize itself under the FTCA's discretionary function exception, the government must satisfy a two-part test.  First, the government must establish that its allegedly negligent acts involved a matter of choice for the acting employees. *United States v. Gaubert*, 499 U.S. 315, 322 (1991).  Where a statute, regulation, policy or contract term prescribes a specific course of action for a federal employee, "'the employee has no rightful option but to adhere to the directive,'" and the employee's failure to do so will defeat the discretionary function exception.  *Id*. at 323 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).

Second, if the government proves its conduct was discretionary, it must then demonstrate the act in question was susceptible to policy analysis. *Young*, 769 F.3d at 1053. "The decision must be one that is 'grounded in social, economic, and political policy.'"  *Id.* (quoting *Berkovitz*, 486 U.S. at 536).  "[I]t is not sufficient for the government merely to [wave] the flag of policy as a cover for anything and everything it does that is discretionary." *Id.* at 1057 (second alteration in original).  Instead, the Ninth Circuit has "demanded 'some support in the record' that the particular decision the NPS made was actually susceptible to analysis under the policies the government identified."  *Id.* (quoting *Terbush v. United States*, 516 F.3d 1125, 1134 (9th Cir. 2008)).

Conversely, where the evidence shows federal employees acted or failed to act for reasons other than the furtherance of policy objectives, the conduct is not susceptible to policy analysis and the discretionary function exception will not apply.  *See In re FEMA Trailer Formaldehyde Prods. Liab. Litig.* (*FEMA Trailer*), 583 F. Supp. 2d 758, 783-84 (E.D. La. 2008)

21

(FEMA's decision not to take action in response to knowledge of a formaldehyde hazard in its trailers was based on liability concerns, not policy considerations; as such, the decision was not conduct "of the sort that the discretionary function exception was designed to protect"), *aff'd in part*, 713 F.3d 807 (5th Cir. 2013).

Here, the government has failed to meet its burden of proving either prong of the discretionary function test. The evidence, including NPS's admissions, demonstrates that NPS violated a number of mandatory federal policies and contract provisions and engaged in conduct not susceptible to policy analysis.

**B.     NPS admits it violated mandatory policy by failing to consider ways to prevent and reduce conditions conducive to pests in the redesigned STCs.**

The Master Complaint alleges that the government was

> negligent in the designing, assembling, fabricating, inspecting, testing, and providing instructions and warnings on the use of the Signature Tent Cabins in that the interior wall created a rodent harborage allowing rodent feces, urine and saliva to accumulate undetected, needlessly exposing occupants to an increased risk of exposure to rodent and pest borne diseases.

Master Compl. ¶ 88. The cross-claims make similar allegations. *See, e.g.*, DNC Defs.' Cross-Cl. (*Garisto*) (Dkt. No. 33), ¶ 306. The discretionary function exception does not apply to this alleged conduct.

In its motion, the government alleges that NPS was not contractually required to provide written approval of the STCs' design, because the winterization of the cabins was "routine, operational maintenance" work done to DNCY's "personal property." Mot. Dismiss at 28. As such, the government claims "NPS did not provide written approval for the project as it would for a capital improvement." *Id.* at 29. The government then asserts that "no specific and mandatory requirements dictated how the NPS should evaluate DNCY's proposal to winterize the Signature tent-cabins." *Id.*

These contentions have no support in the record. In fact, they are refuted by NPS's own admissions. First, Supt. Neubacher admitted that the Contract expressly requires NPS

to approve any improvements to overnight accommodations before DNCY can implement them.  Appx. Ex. 1 at 246.  Supt. Neubacher also admitted that the STCs were being converted to overnight visitor accommodations and that improvements were being made, triggering this obligation.  *Id.* at 165, 247.

Second, the record clearly refutes the assertion that "NPS did not provide written approval for the project."  Mot. Dismiss at 29.  To the contrary, NPS directed DNCY to submit an Operations Proposal to NPS (including the Superintendent) seeking approval to "insulate" the tent cabins in Boystown.  Appx. Ex. 4 at 96; Appx. Ex. 13.  DNCY did so and, among other things, advised multiple NPS officials -- including the BRM Chief, two NPS project managers and the fire marshal -- of the specific materials and methods to be used in the redesigned cabins.  Appx. Exs. 15, 16.  The fire marshal, Don Coffman, inspected and approved the foam insulation and the canvas exteriors.  Appx. Ex. 14 at 65, 67, 129-30.  On December 17, 2008, BRM provided DNCY with an email "notice to proceed," confirming NPS's approval of the new design.  Appx. Ex. 15; Appx. Ex. 4 at 103.  Further, Mr. Coffman inspected the STCs again before they were occupied, without objection.  Appx. Ex. 4 at 191-92.

Indeed, not only did NPS approve the design; it *dictated* key elements of it.  NPS rejected DNCY's proposals to substitute hard-sided cabins for the existing canvas tent cabins or to drape canvas over hard-sided cabins.  Appx. Ex. 4 at 57; Appx. Ex. 11, ¶¶ 4-5.  NPS thereby effectively required the cabins to have canvas outer walls and left DNCY no choice but to use insulation to warm the cabins.  *See* Appx. Ex. 11, ¶ 6.  Also, NPS required DNCY to use drywall for the cabins' inner walls.  Appx. Ex. 14 at 80; *see* Appx. Ex. 15.

Third, in directing and approving the redesign of the tent cabins, NPS was obligated, but failed, to follow the mandates of 517 DM 1.  Appx. Ex. 9.  That policy "applies to all DOI bureau and office activities involving the prevention, detection, and management of native and nonnative pest species, including invasive species, on DOI properties."  *Id.* § 1.2.

PHILLIPS LYTLE LLP

23

PHILLIPS LYTLE LLP

1   Supt. Neubacher admitted it governs the actions of NPS at Yosemite.  Appx. Ex. 1 at 345.

2   As noted, the policy provides:

> [I]t is the Department's policy to . . . Design and maintain the
> stability of structures, developed landscapes, and natural areas *to*
> *prevent and reduce conditions conducive to pests.*

5   Appx. Ex. 9, §§ 1.5 & 1.5(E) (emphasis added).  As Supt. Neubacher admitted, this sets forth

6   a course of action that must be followed; there is no discretionary language:

> **Q:**  [I]n item No. E on the next page, does it require that you
> design and maintain the stability of structures . . . to prevent and
> reduce conditions to -- conducive to pests?
> **A:**  That is what the document states.

10   Appx. Ex. 1 at 346.  Moreover, by its terms, this policy applies whether the project is

11   characterized as "design" or "maintenance," and regardless of whether the "structure" is the

12   concessioner's "personal property."[5]  Thus, under 517 DM1's clear, mandatory language and

13   as conceded by Supt. Neubacher, NPS was required to design and maintain the STCs to

14   prevent and reduce conditions conducive to pests.

15        Yet the undisputed proof demonstrates that NPS entirely ignored pest considerations

16   when it directed and approved the design of the STCs.  Supt. Neubacher testified more than

17   once that no one from NPS even considered whether the proposed design would prevent and

18   reduce conditions conducive to pests:

> **Q:**  When the signature tent cabins were redesigned after the
> rock slide, did anyone from NPS look at that design to prevent
> and reduce conditions conducive to pests?
> **A:**  My understanding, it was -- at least according to the IG
> report, it was field designed according to Dan Jensen, CEO of
> Delaware North.  And we made a consultation on fire, but ***there***
> ***was no park official that went over to take a look to see if it met a***
> ***rodent-proof design.***
> **Q:**  So the answer to my question is there was none?

[5] In its motion, the government contends that NPS was not required to formally approve the
redesign of the STCs because the cabins were the concessioner's "personal property."  Mot.
Dismiss at 28-29.  However, there is no evidence that NPS reviewed or inspected DNCY's
personal property differently than other property in the Park (nor is there any reason it
would).  NPS's Matthew Weinburke testified he performed public health inspections of
DNCY's personal property, Appx. Ex. 5 at 180, and NPS's Billy Bryan conducted inspections
of the tent cabins at Curry Village, which also were DNCY's personal property. Appx. Ex. 17
at 38.

**A:** That's correct.  Appx. Ex. 1 at 347-48 (emphasis added).

**Q:** You had made an analysis of the ways in which the signature tent cabins, because of their construction, could harbor Hantavirus mice.  Had you not?
**A:** No.  There was no assessment.  *Id.* at 154.

*See also id.* at 58, 384.

The government might argue that 517 DM 1 does not remove discretion because it does not define precisely *how* NPS is to design or maintain structures to reduce attractiveness to pests.  But even where a mandatory provision vests a federal actor with discretion as to how the provision is to be implemented, the actor may not simply choose to ignore the provision and do *nothing*.  *Faber v. United States*, 56 F.3d 1122 (9th Cir. 1995), is on point.  There, the U.S. Forest Service promulgated a management plan to address the risk of accidents at Tanque Verde Falls.  *Id.* at 1126.  The management plan required the Forest Service to "develop a sign plan, formulate an on-going media program to inform the public, and provide a presence at the Falls to verbally warn the public[.]"  *Id.* at 1123-24.  Despite these requirements, it was "undisputed that from 1985 through the time of Faber's accident in 1991, the Forest Service failed to put up any new signs" and failed to create a media program or a verbal warning system.  *Id.* at 1126.  The Ninth Circuit reversed the lower court's grant of summary judgment in favor of the government, concluding that the Forest Service's plan "did not give the Forest Service the option to do nothing in response to the new hazards enumerated in the May 1986 site management plan."  *Id.* at 1123, 1126.  Because the Forest Service's failure to do anything to implement the plan violated a "specifically prescribed federal policy," the government "failed to prove the applicability of the discretionary function exception."  *Id.* at 1126, 1128.

Similarly, in *Myers v. United States*, 652 F.3d 1021 (9th Cir. 2011), a Navy manual required that "[a]ll HASPs (health and safety plans) shall be reviewed prior to initiating site work by a competent person."  *Id.* at 1024 (second alteration in original).  The court found that although this provision "required the Navy to approve the HASP before work was to

begin," "there is no evidence" that it did so for the project at issue. *Id.* at 1026. In finding the discretionary function exception inapplicable, the court stated:

> Even supposing that the Navy had some discretion in the fulfillment of its duty to review HASPs, it had no discretion under the policy expressed in the Manual about whether or not to review the HASP *at all.*

*Id.* at 1030.

*Navarette v. United States*, 500 F.3d 914 (9th Cir. 2007), is also on point. There, an Army Corps of Engineers safety plan required that "[d]angerous terrain conditions, such as drop-offs, etc[.], will be properly marked or fenced." *Id.* at 917 (first alteration (in original) (emphasis added). As in *Faber* and *Myers*, the Ninth Circuit held that the plan afforded the Corps discretion regarding *how* to mark or fence drop-offs, but not *whether* to do so. *Id.* at 918. Accordingly, the discretionary function exception did not apply to the Corps' failure to mark or fence a 30-foot drop-off. *Id.* at 919.

Here, too, by its own admissions, NPS violated the mandatory terms of 517 DM 1 by failing even to consider pests in directing and approving the design of the STCs. As such, the government has failed to prove the first prong of the discretionary function test.

Nor can the government meet the second prong of the test, for it has not shown that NPS's failure to consider the design's attractiveness to pests was susceptible to analysis under any relevant policy. *See Young*, 769 F.3d at 1057 (the government must put proof in the record that its decision was "actually susceptible to analysis under the policies [it] identified"). The government has identified conservation of resources, visitor safety, access to and enjoyment of the Park, the need for affordable accommodations, and NPS staffing limitations as the policy considerations underlying NPS's conduct. Mot. Dismiss at 31. None of these are relevant to the failure to consider pest control (as required) when reviewing the proposed redesign of the interior of a tent cabin. *See id.* at 1058 (NPS's decision not to warn of a submerged transformer not susceptible to policy analysis, where the hazard was not linked to visitor enjoyment or protection of park wildlife or environmental resources).

26

1   As such, the discretionary function exception is inapplicable.

2   **C.    NPS violated mandatory provisions of the Contract and NPS policy by failing to
       have in place an IPM plan and coordinator at Yosemite.**

3
4   The Master Complaint alleges that NPS was negligent because it

5           did not ensure that Yosemite National Park had an adequate
            Integrated Pest Management Program providing for the control
6           of deer mice and the Hantavirus, allowing deer mice access to
            locations they should not have had access to in Curry
7           Village/Camp Curry, including the "tent cabins," increasing the
            risk of infection by Hantavirus.

8   Master Compl. ¶ 89.  The cross-claims make similar allegations. *See, e.g.*, DNC Defs.' Cross-

9   Cl. (*Garisto*) ¶ 306.  Again, the government cannot prove the discretionary function exception

10  applies to this alleged conduct because the proof establishes that NPS violated a mandatory

11  contractual provision and a mandatory policy requiring NPS to have a written IPM plan and

12  an IPM coordinator at Yosemite.

13          **1.    NPS violated a mandatory Contract provision requiring it to have an IPM
               plan at Yosemite.**

14

15  Under the Contract, NPS was required to have an IPM plan at Yosemite to address

16  pests such as deer mice.  By its own admissions, NPS failed to comply with this requirement.

17  A federal actor's violation of a specific, mandatory contract term will defeat the

18  discretionary function exception. *See Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018,

19  1026 (9th Cir. 1989) (discretion may be removed by the incorporation into a contract of

20  specific standards imposing duties on federal actors) (citing *Camozzi v. Roland/Miller and Hope*

21  *Consulting Grp.*, 866 F.2d 287, 290 (9th Cir. 1989)); *Routh v. United States*, 941 F.2d 853, 855

22  (9th Cir. 1991) (same).  Here, the Contract states:

23          INTEGRATED PEST MANAGEMENT
            The control of pests by chemical and other means is subject to
24          park approval.  Procedures are outlined in the Park's Integrated
            Pest Management Plan.  Specific problems can be referred to the
25          park's Integrated Pest Management Coordinator.

26

27

28

PHILLIPS LYTLE LLP

Appx. Ex. 3, Operating Plan at 41.  Because this provision expressly directs the concessioner

to the "procedures" "outlined" in the "Park's Integrated Pest Management Plan," it

necessarily requires the Park to *have* a written IPM plan describing those procedures.

NPS concessions specialist Billy Bryan conceded this.  After insisting that DNCY had

this contractual duty, Mr. Bryan was asked to re-read the Contract.  He then changed his

testimony:

> **Q:** So you read that to require the *park* to have an integrated pest
> management plan.  Am I correct?
>
> **A:** As I read that sentence now, I do.

Appx. Ex. 17 at 159 (emphasis added).

Supt. Neubacher contradicted Mr. Bryan (and the Contract) by testifying that NPS

was *not* required to have an IPM plan at Yosemite, even though he admitted that the

Contract (which was drafted by NPS) represented that there was such a plan.  Appx. Ex. 1 at

249-50.  Supt. Neubacher claimed the Contract permitted NPS to rely on other "guidance"

documents for "overall strategy for implementing pest management at Yosemite."  *Id.*

However, Supt. Neubacher revealed his recognition that Yosemite was obligated to have an

IPM plan when, in 2013, he directed NPS's Linda Mazzu to finish a draft IPM plan "ASAP"

because OIG was investigating the outbreak.  *See* Appx. Ex. 30 at 1-2.

As noted, Supt. Neubacher testified several times that NPS did not have an IPM plan

at Yosemite before the outbreak.  *See* Appx. Ex. 1 at 82 ("We didn't have a [P]ark-specific

plan."); *see also id.* at 108, 153, 248.  Mr. Bryan also admitted this.  Appx. Ex. 17 at 159 ("**Q:**

Prior to summer of 2012, did the park have . . . a written integrated pest management plan?

**A:** To my knowledge, no, sir.").

### 2. NPS violated the Contract and mandatory NPS policy by failing to have an IPM coordinator at Yosemite.

As with the IPM plan, the Contract refers questions related to pest management "to

the park's Integrated Pest Management Coordinator."  This necessarily assumes that NPS

28

must have an IPM coordinator at the Park.  In addition, NPS-77, the service-wide policy

governing IPM in the national parks, *see supra*, fn. 4, requires for the appointment of a Park

IPM coordinator and that he or she attend the 40-hour NPS IPM training course.  Appx. Ex.

19 at 238, 239.

Supt. Neubacher admitted that NPS was required to have an IPM coordinator at

Yosemite:

> **Q:** But in your park, you understand it's a requirement that you
> have an integrated pest manager?
> **A:** Yes.

Appx. Ex. 1 at 295.  The credible proof, however, establishes that there was none.

In the years before the outbreak, DNCY had no contact in the field at Yosemite to

whom it could refer problems relating to IPM.  Appx. Ex. 18, ¶5; *see also* Appx. Ex. 4 at 217.

This is confirmed by the memorandum created by Ms. Mazzu before Supt. Neubacher's

deposition, which reveals that there was no IPM coordinator at Yosemite between 2009 and

August 2012.  Appx. Ex. 21.  Consistently, NPS's own employees did not know who the

alleged IPM coordinator was at any given time.  *See* Appx. Ex. 17 at 162; Appx. Ex. 5 at 31;

Appx. Ex. 1 at 266, 271.  Even Supt. Neubacher could not independently recall the Park's

alleged IPM coordinators before the outbreak, although he claimed to be involved in

appointing them.  Appx. Ex. 1 at 131-32; 257.

Thus, evidence, including NPS's own admissions, shows that NPS violated

mandatory terms of the Contract and NPS-77 by failing to have an IPM plan and coordinator

at Yosemite before the outbreak.

Further, the government has failed to carry its burden of proving the second prong of

the discretionary function test, because NPS's failures to have an IPM plan and coordinator

are not susceptible to analysis under the policy considerations identified by the government,

such as visitor access and conservation of natural and cultural resources.  *See* Mot. Dismiss at

23-25.  Indeed, the proof shows these failures resulted from simple government inaction on

the issue of pest management.  *See*, *e.g.*, Appx. Ex. 33 at 2 (NPS's Joe Meyer describing Yosemite's IPM program as "moribund").

Accordingly, the discretionary function exception does not shield the government from liability for its inadequate (or non-existent) IPM activities.

**D.  NPS violated its own Yosemite hantavirus directive by failing to continuously trap mice within 100 feet of buildings before the outbreak.**

As noted, Plaintiffs allege that the government was negligent because it "did not ensure that Yosemite National Park had an adequate Integrated Pest Management Program providing for the control of deer mice and the Hantavirus, allowing deer mice access to locations they should not have had access to in Curry Village/Camp Curry, including the 'tent cabins,' increasing the risk of infection by Hantavirus."  Master Compl. ¶ 89.

Mr. Weinburke testified that he was the lead author of Yosemite's Hantavirus Directive No. 9.  Appx. Ex. 5 at 82-83.  Contrary to the government's assertion in its motion, Hantavirus Directive No. 9 contains specific mandates, including that NPS "[p]lace spring-loaded rodent traps in likely areas of rodent shelter within 100 feet around buildings, and use continuously."  Appx. Ex. 22, at 7; Appx. Ex. 5 at 113; *see* Mot. Dismiss at 22-23.  Mr. Weinburke admitted this was a "requirement."  Appx. Ex. 5 at 116.

Along with failing to have either the required IPM plan or coordinator at Yosemite, NPS also failed to comply with this specific trapping requirement.  The undisputed proof is that NPS did not permit DNCY to conduct outdoor mouse trapping before the outbreak, including within 100 feet around the STCs.  Appx. Ex. 18, ¶ 7.  Mr. Weinburke's claim that trapping *inside* buildings constitutes trapping within 100 feet "around" them is not credible.  Appx. Ex. 5 at 114.

Again, the government has also failed to meet its burden on the second prong of the discretionary function test.  NPS's violation of its own hantavirus directive, which Supt. Neubacher adopted a few months before the outbreak, cannot be susceptible to analysis under any relevant policy.

PHILLIPS LYTLE LLP

30

**E.    NPS violated mandatory policy by not conducting the required number of inspections of the STCs.**

Plaintiffs allege that NPS was negligent because it failed to conduct adequate inspections of the STCs, "increasing the risk of infection by the Hantavirus."  Master Compl. ¶ 91.  Again, the discretionary function exception does not shield the government because, by its own admissions, NPS failed to perform the required number of inspections of the STCs before the outbreak.

NPS-48, which sets forth NPS's concession review program, declares that NPS "is to conduct" comprehensive operational evaluations in accordance with the designated schedule.  Appx. Ex. 23, Ch. 20, p. 3.  Mr. Bryan acknowledged the words "is to" are mandatory.  *See* Appx. Ex. 17 at 199-200 (calling the language "active tense").  After significant equivocation, Mr. Bryan finally admitted that NPS-48 requires NPS to inspect the Curry Village tent cabins (including the STCs) twice annually:

> **Q:**  And does [NPS-48] require two yearly periodic evaluations?
> . . . .
> **A:**  Yes.

Appx. Ex. 17 at 201-02.

It is undisputed that NPS did not comply with this requirement.  Mr. Bryan admitted that in 2011, NPS conducted only one periodic evaluation of the STCs, not two as required by NPS-48:

> **Q:**  Okay.  So is it fair to say that in 2011 the only formal evaluation that was done for the facility and service identified for the Curry canvas tents was June 24, 2011?
> **A:**  Yes, sir.

Appx. Ex. 17 at 203.  The next inspection was not performed until August 15, 2012.  *Id.* at 204.  This violation was confirmed by one of NPS's own reports, which stated that NPS performed only 50% of the "required" inspections of the Curry Village canvas tent cabins in 2011 *and* 2009. Appx. Ex. 26.

Despite these admissions and records, the government argues that NPS-48 is only a "guidance manual" and does not create non-discretionary obligations.  Mot. Dismiss at 26.

PHILLIPS LYTLE LLP

31

1   This argument fails for several reasons.  First, NPS's own employees confirmed that NPS-48

2   is not mere guidance.  For example, when Mr. Bryan underwent NPS's formal concessions

3   specialist training, he was told that NPS-48 was a "Level 2" Director's Order[6] and that the

4   periodic evaluations were a "legal requirement."  Appx. Ex. 24 at 2, 6; Appx. Ex. 17 at 186.

5   Consistently, Mr. Bryan characterized the policy as a "Director's Order".  Appx. Ex. 17 at

6   174-76.

7        Second, although NPS-48 is stamped with the word "Guideline," it uses mandatory

8   language in various specific provisions.  Even NPS's Office of Policy states on its website that

9   NPS's "Level 3" directives might look like the "old 'Guideline' series . . . [b]ut . . . will be

10  more carefully crafted to *clearly distinguish between what is mandatory or required, and what is*

11  *merely recommended.*"  Appx. Ex. 31 at 2 (emphasis added).  The Office of Policy also explains

12  that "[a] clear understanding of what is or is not mandatory can be obtained from key words

13  contained in the various guidance documents (*regardless of whether those documents are* policy

14  statements, Director's Orders, *guidelines*, manuals, memoranda, etc.)."  *Id.* at 1 (emphasis

15  added).[7]

16       Notably, NPS-48's "Program Responsibilities" section assigns the Park the duty to

17  "[c]onduct *required* evaluations and follow-up actions as needed."  *Id.*, Ch. 19, p. 4 (emphasis

18  added).  As the Ninth Circuit stated in *Navarette v. United States*, "prefatory language

19  introducing flexibility into the government's duties does not trump the government's

20  imposition of specific duties on itself."  500 F.3d at 917.

21       Finally, *Lake Mohave Boat Owners Ass'n v. NPS*, 78 F.3d 20 (9th Cir. 1996) (as

22  amended), cited by the government, *see* Mot. Dismiss at 26, was not even decided under the

23  FTCA and does not address whether NPS-48 is "guidance" for purposes of the discretionary

24  function exception.  *Lake Mohave* concerned only whether the Freedom of Information Act

25  ("FOIA") required NPS to publish NPS-48 in the Federal Register to notify the public of its

26

27  ───────────────
    [6] The government has not argued that NPS Director's Orders are non-mandatory.
    [7] This explanation also applies to NPS-77, which is similarly stamped with the word

28  "Guideline" but also contains mandatory provisions.  *See supra* at Argument Point II (C)(2).

PHILLIPS LYTLE LLP

content.  *Id.* at 1367, 1368.  The court held NPS-48 was an "administrative staff manual" under FOIA that did not require publication.  *Id.* at 1368.  Nowhere did the court state that NPS-48 provides only "guidance" to NPS.

NPS's own admissions and documents establish that it violated a specific requirement by failing to conduct the mandated number of inspections in both the year before the outbreak (2011) and in 2009.

The government also cannot carry its burden with regard to the second prong of the discretionary function test.  Even if the government argues NPS had insufficient staff to conduct the required inspections, staffing or budgetary concerns do not bring a governmental failure to act within the discretionary function exception.  *See O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002) ("Were we to view inadequate funding alone as sufficient to garner the protection of the discretionary function exception, we would read the rule too narrowly and the exception too broadly.").  Moreover, even under NPS-48, staffing limitations are not a legitimate basis for shirking the mandatory inspections:  NPS-48 requires the Superintendent to seek assistance from the NPS regional office if the Park cannot perform the required inspections with existing staff.  Appx. Ex. 17 at 246.

Accordingly, the discretionary function exception is inapplicable.

**F.    NPS violated a mandatory policy by failing to educate visitors about the hantavirus risk.**

Plaintiffs allege that NPS was negligent in failing "to provide adequate warnings of the existence of the [hantavirus] risk to enable Plaintiffs to make decisions and choices about staying in the Signature Tents in Curry Village or seeking appropriate medical care."  Master Compl. ¶ 147.  Again, the discretionary function exception is inapplicable because NPS violated a mandatory policy requiring it to educate visitors about the risk of hantavirus.

As noted, DO 83, the NPS's public health policy, states:

> NPS unit managers *will* reduce the risk of transmission of vector-borne and zoonotic diseases to park visitors and employees through education, surveillance, and control efforts when necessary.

PHILLIPS LYTLE LLP

33

PHILLIPS LYTLE LLP

1    Appx. Ex. 27, § G.1.  By using the mandatory word "will," DO 83 requires NPS to use

2    "education" to reduce the risk of transmission of "vector-borne diseases" to "visitors."[8]

3    Mr. Weinburke admitted this is "a requirement."  Appx. Ex. 5 at p. 93.

4         Although the government might argue that DO 83 affords discretion as to which

5    vector-borne diseases must be addressed and how it should educate visitors about them, the

6    policy does not give NPS discretion to nothing to educate visitors about hantavirus, as it did

7    here.  As discussed above, the Ninth Circuit in *Navarette* found that the Army Corps "retained

8    discretion as to *how* to mark or fence drop-offs, but that does not mean it retained discretion

9    *whether* to do so":

10             [a]lthough the Corps may have had discretion to decide what
               constituted a drop-off, or to identify other types of "dangerous
11             terrain," there is no dispute here that the 30-foot drop from the
               path to the rocks below was in fact a drop-off.  As such, *it had to*
12             *be* "properly marked or fenced" according to the plain terms of
               the Safety Plan.
13

14   500 F.3d at 918.  *See also Faber*, 56 F.3d at 1126 (the Forest Service's site plan "did not give

15   the Forest Service the option to do nothing in response to the new hazards enumerated").

16        Similarly, in this case, DO 83 might leave NPS discretion regarding *how* to educate

17   visitors about vector-borne diseases, but not *whether* to do so.  The proof shows that, although

18   it approved *DNCY's* posting of hantavirus information in Tuolumne Meadows common areas

19   in 2010, NPS itself did nothing before the outbreak to educate visitors about hantavirus

20   (including visitors to Curry Village).  Appx. Ex. 1 at 145, 312.  In fact, NPS prevented DNCY

21

22   [8] The government might argue that the words "when necessary" make its education efforts
     discretionary.  There is, however, no comma between the words "control efforts" and "when
23   necessary," so the correct reading is that "when necessary" modifies only "control efforts,"
     not "education" or "surveillance."  *See Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (in
24   interpreting a provision of the Social Security Act, applying the grammatical rule of the "last
     antecedent," under which a limiting clause or phrase should ordinarily be read as modifying
25   only the noun or phrase that it immediately follows); *United States v. Pritchett*, 470 F.2d 455,
     459 (D.C. Cir. 1972) (concluding that the phrase "when on duty" did not modify officials
26   listed at the beginning of the statutory provision, where there was no comma separating
     "when on duty" from the clause immediately preceding it).  This is also a commonsense
27   interpretation:  while education and surveillance are ongoing activities, control efforts to
     reduce disease are implemented when they are needed (the need would be revealed by the
28   ongoing surveillance).

34

PHILLIPS LYTLE LLP

1  from educating tent cabin visitors by failing to approve the "For Your Education" advisory

2  drafted by DNCY in response to the 2010 Tuolumne Meadows hantavirus case.  Appx. Ex.

3  2, ¶ 7.  When questioned about NPS's failure, Supt. Neubacher waffled, first testifying that

4  NPS did not receive the advisory before the 2012 outbreak, and then admitting that it did.

5  Appx. Ex. 1 at 314, 315-16.  Further, Mr. Weinburke's testimony that the training NPS

6  provided to *DNCY* constituted education *by NPS* of *visitors*, Appx. Ex. 5 at 76, is simply not

7  credible (but it shows Mr. Weinburke understood that NPS was required to educate visitors). [9]

8      Accordingly, the discretionary function exception does not apply to the failure to warn

9  claim against the government.

10  **G.    NPS violated mandatory policy by failing to notify DNCY it was conducting an
11        investigation into the first hantavirus case, and its delays in conducting the
        investigation and providing notification to campers are not susceptible to policy
12        analysis.**

13      Plaintiffs allege NPS negligently delayed providing notice to potentially exposed

14  campers until August 28, 2012 (after being informed of the first hantavirus case on July 12,

15  2012).  *See*  Master Compl. ¶ 66.  NPS's acts and omissions in investigating the outbreak and

16  notifying campers (and DNCY) are not shielded by the discretionary function exception.

17      First, NPS violated a mandatory policy by failing to provide timely notice to DNCY.

18  DO 83 provides that "The park concession office *will* be notified when an illness investigation

19  is conducted in a concessioner's facility."  Appx. Ex. 27, § E.5 (emphasis added).  This is a

20  mandatory requirement, as NPS concedes.  Appx. Ex. 5 at 199 ("I agree that it states that

21  they [DNCY] will be notified[.]"). [10]

22  ─────────────────

23  [9] Again, the government has also failed to carry its burden of proving NPS's failure to educate
    visitors about hantavirus -- as required by federal public health policy --  meets the second
    prong of the discretionary function test.  There is no proof that NPS made a conscious policy

24  determination not to educate visitors or not to approve DNCY's proposed "For Your
    Education" advisory.  Nor could there be any relevant policy decision underlying the failure

25  to comply with a mandatory public health policy requiring education of visitors about
    hantavirus.

26  [10] Although Mr. Weinburke claimed that NPS had discretion to decide *when* notice had to be
    given, *id.*, that is not a plausible interpretation of its plain terms, particularly given NPS's

27  stated view that "*prompt* reporting of communicable diseases enables appropriate public
    health follow-up and can limit disease transmission."  Appx. Ex. 32 at 1 (emphasis added).

28  Section E.5 of DO 83 requires immediate notice to the concessioner when an illness

1    Mr. Weinburke admitted that NPS had notice of the first confirmed hantavirus case

2    on July 12, 2012, and began conducting an investigation on July 19, 2012.  Appx. Ex. 5 at

3    184, 188.  He further admitted he did not inform DNCY of even a potential case until

4    July 30, 2012, and, worse, that he concealed from DNCY the purpose of his July 27, 2012

5    assessment of Curry Village structures.  *Id.* at 195, 194.  This notification delay to DNCY

6    violated the mandatory terms of DO 83.

7    Moreover, the government cannot show that the delay was susceptible to policy

8    analysis under any of the considerations it has identified.  Specifically, any concerns about

9    confusing or alarming visitors are irrelevant to a decision regarding whether to notify the

10   concessioner.

11   Second, the undisputed testimony shows that NPS did not visit Curry Village to

12   conduct its on-site investigation into the first hantavirus case until August 9, 2012, four weeks

13   after NPS received confirmation of the case.  Appx. Ex. 5 at 189.  As Mr. Weinburke

14   acknowledged, the reason the investigation was postponed until that date was because of

15   "scheduling issues."  *Id.* at p. 191.  Specifically, Mr. Weinburke admitted that the delay

16   resulted from one of the state's investigators being on vacation.  *Id.*

17   NPS's delay in conducting the on-site investigation also falls outside the discretionary

18   function exception because it is not susceptible to policy analysis.  This case is similar to *In re*

19   *FEMA Trailer Formaldehyde Products Liability Litigation (FEMA Trailer)*, 583 F. Supp. 2d 758,

20   783-84 (E.D. La. 2008), *aff'd in part*, 713 F.39 807 (5th Cir. 2013).  The evidence there showed

21   that FEMA became aware of concerns about formaldehyde in the trailers it provided to

22   hurricane victims, but

23   　　　　　FEMA initially ignored the potential formaldehyde problem and
         neglected to conduct testing in fear that such testing would
24   　　　　　"imply FEMA's ownership of the issue."

25   583 F. Supp. 2d at 782.  FEMA's decision was made to avoid liability, not in furtherance of

26   policy.  *Id.*  Because "[s]uch conduct is not grounded in considerations of public policy, and

27   _____

28   investigation is commenced; otherwise, notice could be given at any time, rendering the
     requirement meaningless.

PHILLIPS LYTLE LLP

cannot be analyzed as such, as it clearly falls outside the long-standing FEMA policies that exist relative to emergency housing," *id.*, the discretionary function exception did not apply. *Id.* at 784.  Here, too, the undisputed evidence shows policy considerations played no role in NPS's decision not to hold the on-site investigation until August 9, 2012.  That decision was based on a vacation schedule.

Third, NPS's failure until late August 2012 to direct DNCY to notify prior campers of their potential exposure is similarly not susceptible to policy analysis. *See* Appx. Ex. 2, ¶ 9. As this Court has noted, "[t]he discretionary function defense rarely applies when the Government fails to war[n] of a known potential danger because the decision usually 'involves considerations of safety, not public policy.'"  *Sanko Steamship Co., Ltd. v. United States*, 2002 WL 1880745, *4 (N.D. Cal. 2002).  *Whisnant v. United States*, 400 F.3d 1177 (9th Cir. 2005), is also on point.  The plaintiff there became ill after a military agency failed to address a known mold problem in a military commissary. *Id.* at 1179-80.  The Ninth Circuit refused to apply the discretionary function exception because the government's failure to act "concerned technical and professional judgments about safety rather than broad questions of social, economic, or political policy." *Id.* at 1185.  Similarly, in this case NPS's delay in notifying prior campers of their potential exposure to hantavirus concerned public health and safety, not broader issues of social, economic or political policy.  The government has not shown otherwise.  *See Sanko Steamship,* 2002 WL 1880745, *4 (decision by Coast Guard Captain not to warn of shoal was a matter of safety and practicality, not policy); *FEMA Trailer,* 583 F. Supp. 2d at 784 ("FEMA, once it had adequate notice of a potential hazard, has not shown how failing to warn occupants . . . of potentially dangerous formaldehyde levels implicated political, social, or economic decisions of the sort that the discretionary function exception was designed to protect.").  The cases cited by the government in support of its contrary argument are inapplicable, because they concerned notification decisions implicating national security and/or military policy, which is not relevant here.  *See, e.g., In re Consol. U.S. Atmospheric Testing Litig.*, 820 F.2d 982, 997-98 h.17 (9th Cir. 1987) (finding the

1   decision not to warn of potential nuclear exposure shielded by the exception because it

2   concerned military policy relating to nuclear testing, including the military's goal of studying

3   the psychological reactions of troops to nuclear weapons).

4       For these reasons, the discretionary function exception does not shield the government

5   from the claim that NPS's conduct after it was notified of the first hantavirus case resulted in

6   untimely notice to campers.

### POINT III

### NPS TIGHTLY CONTROLS DNCY AND IS NOT ENTITLED TO IMMUNITY UNDER THE CONTRACTOR EXCEPTION

10      Under the FTCA, the government is subject to liability for the acts of a contractor if

11  "the government had authority to control the detailed physical performance of the contractor

12  and exercised substantial supervision over its day-to-day activities." *Laurence v. Dep't of Navy*,

13  59 F.3d 112, 113 (9th Cir. 1995) (citing *United States v. Orleans*, 425 U.S. 807, 814-15 (1976));

14  *Letnes v. United States*, 820 F.2d 1517, 1519 (9th Cir. 1987) (same).  The government has failed

15  to establish that FTCA's contractor exception applies.

16      Here, the proof shows that NPS has authority to supervise and tightly controls

17  DNCY's daily operations, both generally and in ways critical to this case.  That control

18  begins with the Contract, which expressly *obligates* NPS to supervise DNCY's "day-to-day

19  activities," including maintenance operations.  Appx. Ex. 3, Operating Plan, at 6, 7-8.

20  During the life of the Contract, NPS has regularly and pervasively exercised that authority:

21  (1) it requires DNCY to obtain approval even for mundane actions; (2) it orders DNCY to

22  change its practices and procedures, such as after the 2008 rodent complaint relating to hard-

23  sided cabins; (3) it conducts both formal and unannounced inspections of DNCY's

24  operations, including the STCs and (4) it accesses DNCY's books and records, including the

25  maintenance work DNCY does at the Park.  *See supra* at Factual Background Point I(A).

26      Critical to this case, the undisputed proof shows that DNCY could not disseminate

27  any hantavirus advisory to the public without NPS's approval.  In fact, NPS did not approve

28

PHILLIPS LYTLE LLP

38

DNCY to post or distribute the "For Your Education" advisory DNCY created in 2010. Appx. Ex. 2, ¶ 7.  The Contract also obligates NPS to approve DNCY's proposed improvements to overnight accommodations, such as the STCs.  Appx. Ex. 3, Ex. J, at 15.  Not only did NPS authorize and approve the redesign of the STCs, it participated in and controlled the project by rejecting the hard-sided cabins proposed by DNCY and requiring that the cabins have canvas exteriors and drywall interior walls.  *See* Appx. Ex. 11, ¶¶ 4-6; Appx. Ex. 14 at 80.  The Contract also gives NPS control over DNCY's pest management measures.  Even without its required IPM plan and coordinator, NPS controlled DNCY's efforts to exterminate mice.  Appx. Ex. 3, Ex. J, at 41.  In that regard, NPS refused until *after* the outbreak to allow DNCY to conduct outdoor trapping (despite its own policy requiring it to trap continuously within 100 feet around buildings).  Appx. Ex. 18, ¶ 8.

NPS's control over DNCY goes well beyond the mere right to supervise or inspect. *B & A Marine Co., Inc. v. American Foreign Shipping Co., Inc.*, 23 F.3d 709 (2d Cir. 1994), is instructive.  There, the contract provided that the contractor, AFS, was to conduct its business "*in accordance with such directions, orders* or regulations . . . *as the United States* may from time to time *prescribe*" and stated that the government would monitor AFS's performance.  *Id.* at 713 (ellipsis in original).  Evidence of the working relationship between the government and AFS further confirmed the government's control, revealing that the government instructed AFS in detail in relation to the allegedly tortious conduct.  *Id.* at 714.  Given this, the court found the district court was "completely justified" in finding the contractor exception inapplicable as a matter of law.  *Id.; compare* Appx. Ex. 3 at 3 (DNCY operates "under the supervision and regulation of the Secretary[.]"); *and* Appx. Ex. 3, Ex. J, at 6, 7-8 (NPS is required to "review and coordinate the Concessioner's day-to-day activities" and "provide day-to-day supervision over all [concessioner] maintenance activities and operations").  Here, too, in addition to its general, day-to-day control over the concessioner, NPS dictated DNCY's conduct with regard to the redesign of the STCs, its pest management efforts and its attempted dissemination of warnings.

PHILLIPS LYTLE LLP

39

1   The government's reliance on *Jones v. United States*, No. 08-cv-01137 2010 WL

2   5418795 (E.D. Cal. Dec. 23, 2010), is misplaced.  Mot. Dismiss at 38.  The plaintiff in that

3   case conceded the issue, so the court did not analyze the contract or other facts.  *Id.* at *2.

4   *Ducey v. United States*, 713 F.2d 504 (9th Cir. 1983), is also distinguishable.  There, unlike

5   here, NPS failed to exercise control over the concessioner's daily operations.  *Id.* at 517

6   ("[T]he only federal employee who conceivably could have executed any supervisory

7   authority . . . over the day-to-day operations of ECR did not in fact exercise any substantial

8   control over ECR activities.")

9        In sum, the evidence shows NPS had authority to control DNCY's operations and

10  exerted substantial control over its activities, particularly in respects critical to this case.  The

11  government has failed to satisfy its burden of proving the applicability of the contractor

12  exception to the FTCA.  *See Laurence*, 59 F.3d at 113.

13                              **<u>CONCLUSION</u>**

14       For the foregoing reasons, the Court should deny the government's motion in its

15  entirety.

16  Dated:  May 8, 2015                    PHILLIPS LYTLE LLP

17

18                                   By:___/s/ Jennifer A. Shah_____
                                         Michael B. Powers, Esq.
19                                       Kevin J. English, Esq.
                                         Jennifer A. Shah, Esq.
20                                   *Attorneys for Defendants Delaware North Companies,*
                                     *Inc., Delaware North Companies Parks & Resorts,*
21                                   *Inc., DNC Parks & Resorts at Yosemite, Inc. and*
                                     *DNC Parks & Resorts Reservations, Inc.*
22                                   One Canalside
                                     125 Main Street
23                                   Buffalo, New York  14203
                                     (716) 847-8400
24  Doc #01-2858255

25

26

27

28

                                     40

PHILLIPS LYTLE LLP