BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division
MELINDA HAAG
United States Attorney
J. PATRICK GLYNN
Director, Torts Branch
BRIDGET BAILEY LIPSCOMB
Assistant Director
ADAM BAIN
Senior Trial Counsel
IN Bar No. 11134-49
WAGNER JACKSON
MICHELE S. GREIF
KERI L. BERMAN
Trial Attorneys
Civil Division, Torts Branch
P. O. Box 340
Washington, D.C.  20044
Telephone: (202) 616-4209
FAX: (202) 616-4473
Email: adam.bain@usdoj.gov

Attorneys for Defendant United States of America

| | |
|---|---|
| IN RE: YOSEMITE NATIONAL PARK HANTAVIRUS LITIGATION<br><br>_____<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL CASES<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | MDL Docket No. 3:14-md-02532-MMC<br><br>UNITED STATES' REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION<br><br>Hearing:<br><br>    Date:  July 24, 2015<br><br>    Time:  9:00 a.m.<br><br>    Place:  Courtroom 7, 19th Floor |

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORTIES ..................................................................................................iii

I.      Negligence Is Irrelevant to the Jurisdictional Inquiry and a
        Determination of Whether the Discretionary Function and
        Independent Contractor Exceptions Apply Is Not Intertwined
        with a Determination of the Merits of the Case ...............................................2

II.     The Discretionary Function Exception Bars Each Claim
        Against the United States ...................................................................................3

        A.  The United States Had Policy-Based Discretion in Its
            Review of the Insulation of the Tent-Cabins in Curry Village ..................3

            1.  Provisions Plaintiffs Cite Using "Construction" and
                Similar Terms Are Not Sufficiently Specific to Remove
                Discretion With Respect to the Insulation of the Tent-Cabins .......4

            2.  The Provision DNC Cites Regarding Preventing and Reducing
                Conditions Conducive to Pests Does Not Apply to the
                NPS's Review of DNC's Insulation of the Tent-Cabins
                and Is Not Sufficiently Specific to Remove Discretion..................6

            3.  Neither Plaintiff nor DNC Has Rebutted the United States'
                Showing that NPS's Review of DNC's Insulation of the
                Tent-Cabins Was Susceptible to Policy Analysis...........................7

        B.  The United States Had Policy-Based Discretion in its
            Evaluations of DNC's Operations and Facilities .........................................9

            1.  NPS-48 Is Not a Mandatory Document that
                Removes Government Discretion..................................................9

            2.  NPS-48 Is Not a Relevant Provision Because There Is an
                Independent Exercise of Discretion Following
                an NPS-48 Evaluation.................................................................12

            3.  Neither Plaintiff nor DNC Has Rebutted the United States'
                Showing that NPS's Evaluations of DNC's Operations
                and Facilities Was Susceptible to Policy Analysis .......................14

        C.  The United States Had Policy-Based Discretion in its
            Integrated Pest Management Program ......................................................15

1.  The NPS Policies Regarding Integrated Pest Management
that Plaintiffs Cite Do Not Contain any Specific Requirements
Related to Plaintiffs' Injuries ......................................................................... 15

2.  The Contractual Provision Regarding Integrated Pest Management
that DNC Cites Does Not Direct the NPS to take any Specific
Action Related to Plaintiffs' Injuries ............................................................. 17

3.  Neither Plaintiff nor DNC Has Rebutted the United States'
Showing that NPS's Management of Risks at Yosemite
Was Susceptible to Policy Analysis ................................................................ 19

D.  The United States Had Policy-Based Discretion in
Providing Hantavirus Warnings to Visitors at Yosemite ............................................ 20

E.  The United States Had Policy-Based Discretion in
Responding to Recommendations of the California Department
of Public Health ...................................................................................................... 22

F.  The Provision that DNC Cites Regarding Rodent Trapping
Does Not Defeat the Discretionary Function Exception.............................................. 23

G.  The Provision that DNC Cites Regarding Notification of
an Investigation Does Not Defeat the Discretionary
Function Exception .................................................................................................. 23

III.  Under the Independent Contractor Exception DNC
Employees Are Not Employees of the United States for
Purposes of FTCA Liability....................................................................................... 24

CONCLUSION................................................................................................................ 25

# TABLE OF AUTHORITIES

**PAGE**

## Federal Cases

*Bailey v. United States*,
    623 F.3d 855 (9th Cir. 2010) ............................................................................... 2, 7

*Berkovitz v. United States*,
    486 U.S. 531 (1988) .............................................................................................. 4

*Camozzi v. Roland/Miller and Hope Consulting*,
    866 F.2d 287 (9th Cir. 1989) ............................................................................... 15

*Dichter-Mad Family Partners, LLP v. United States*,
    707 F. Supp. 2d 1016 (C.D. Cal. 2010) ......................................................... 12, 13

*Dichter-Mad Family Partners, LLP v. United States*,
    709 F.3d 749 (9th Cir. 2013) ......................................................................... 10, 12

*GATX/Airlog v. United States*,
    286 F.3d 1168 (9th Cir. 2002) ............................................................................... 4

*General Dynamics Corp. v. United States*,
    139 F.3d 1280 (9th Cir. 1998) ............................................................................. 13

*Green v. United States*,
    630 F.3d 1245 (9th Cir. 2011) ............................................................................... 7

*In re Consol. U.S. Atmos. Testing Litig.*,
    820 F.2d 982 (9th Cir. 1987) ............................................................................... 8

*In re Glacier Bay*,
    71 F.3d 1447 (9th Cir. 1995) ............................................................................... 18

*Irving v. United States*,
    162 F.3d 154 (1st Cir. 1998) ............................................................................... 17

*Jackson Hole Conservation Alliance v. Babbitt,*
   96 F. Supp. 2d 1288 (D. Wyo. 2000)..................................................................... 11

*Kennewick v. Irr. Dist. v. United States,*
   880 F.2d 1018 (9th Cir. 1989) .............................................................................. 8

*Kirchmann v. United States,*
   8 F.3d 1273 (8th Cir. 1993) ................................................................................. 8

*Lake Mohave Boat Owners Ass'n v. National Park Service,*
   78 F.3d 1360 (9th Cir. 1995) ................................................................ 10, 11, 13

*Miller v. United States,*
   163 F.3d 591 (9th Cir. 1998) .............................................................................. 1, 7

*Navarette v. United States,*
   500 F.3d 914 (9th Cir. 2007) ............................................................................... 10

*Nurse v. United States,*
   226 F.3d 996 (9th Cir. 2000) ............................................................................... 19

*Routh v. United States,*
   941 F.2d 853 (9th Cir. 1991) ................................................................................ 2

*Sabow v. United States,*
   93 F.3d 1445 (9th Cir. 1996) ............................................................................... 10

*Sanchez v. United States,*
   671 F.3d 86 (1st Cir. 2012)........................................................................... 15, 16

*Terbush v. United States,*
   516 F.3d 1125 (9th Cir. 2008) ............................................................... 10, 11, 21

*Tobar v. United States,*
   731 F.3d 938 (9th Cir. 2013) ................................................................................ 6

*United States v. Gaubert*,
   499 U.S. 315 (1991)..............................................................................9, 19, 21

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*,
   467 U.S. 797 (1984)..................................................................................14, 15

*Valdez v. United States*,
   56 F.3d 1177 (9th Cir. 1995) ............................................................................4

*Whisnant v. United States*,
   400 F.3d 1177 (9th Cir. 2005) ...............................................................8, 21, 23

## **Federal Rules**

Fed. R. Civ. P. 12(b)(1)............................................................................................3

Fed. R. Civ. P. 56....................................................................................................3

## **Federal Regulations**

48 C.F.R. § 2.101 (2015) .........................................................................................5

Having had six months of discovery, which resulted in the production of over 1.2 million pages of documents from the United States and six lengthy depositions – including a ten hour deposition of the Superintendent of Yosemite National Park – Plaintiffs and DNC had ample opportunity to discover evidence to address the government's motion.  However, rather than rebutting the United States' showing that their claims are barred by the discretionary function and independent contractor exceptions, Plaintiffs and DNC use the information developed in discovery to make irrelevant and misleading arguments, often mischaracterizing the record and ignoring or obscuring factors that are critical to application of the jurisdictional defenses.

The responses of Plaintiffs and DNC are inconsistent in many ways, revealing weaknesses in their respective arguments.  The responses are consistent, however, in failing to address key factors of the discretionary function exception analysis that determine whether the United States had policy-based discretion in the conduct that forms the basis of Plaintiffs' claims and DNC's cross claims.  At the first step of the analysis, the United States' lacks discretion only if a duty: (1) comes from a mandatory document; (2) uses mandatory language; (3) applies to the *government*, in that it directs the *government* to do something; (4) is sufficiently specific, in that it leaves no room for policy-based discretion in application or implementation; and (5) is directly relevant to the conduct at issue.  Each of the provisions that Plaintiffs and DNC cite fails to meet one or more of these criteria.  The fact that one criterion is met – for example, that a provision uses mandatory language – does not defeat application of the discretionary function exception if any of the other criteria are not satisfied.  *See, e.g., Miller v. United States*, 163 F.3d 591, 595 (9th Cir. 1998) (mandatory firefighting requirements did not defeat the discretionary function exception because they were not sufficiently specific).  For ease of reference, the United States has compiled all of the provisions that Plaintiffs and DNC have cited in Appendix A.

Further, Plaintiffs and DNC employ their respective skewed versions of the facts to argue at the second step of the analysis that decisions were not actually based in public policy.  These factual arguments are irrelevant to the only pertinent question: whether the challenged conduct is *susceptible* to policy analysis.  The United States offered record evidence of policy susceptibility – and even actual policy analyses – that neither Plaintiffs nor DNC has fairly rebutted.

With respect to the independent contractor exception, Plaintiffs in effect concede that DNC is an independent contractor and that the United States is not vicariously liable for actions of DNC employees.  Conversely, DNC relies upon contractual provisions and isolated incidences of government involvement to argue that the United States is responsible for all of the conduct of DNC's employees without showing the detailed physical control of the day-to-day operations that is necessary to overcome the exception.  DNC largely ignores and fails to rebut the consistent case law holding that NPS concessioners are independent contractors under the FTCA.

I.     **Negligence Is Irrelevant to the Jurisdictional Inquiry and a Determination of Whether the Discretionary Function and Independent Contractor Exceptions Apply Is Not Intertwined with a Determination of the Merits of the Case.**

Large parts of the responses are factual arguments that the United States had notice of a hazardous condition and violated some duty that arguably applied to it.  These factual arguments are littered with mischaracterizations, out-of-context statements, and demonstrably incorrect representations.[1]  Given that these factual arguments form much of their responses, it is not surprising that neither Plaintiffs nor DNC acknowledges that issues of negligence are irrelevant to determining application of the discretionary function or independent contractor exception.  *See*, *e.g.*, *Bailey v. United States*, 623 F.3d 855, 860 n.2 (9th Cir. 2010); *Routh v. United States*, 941 F.2d 853, 855 (9th Cir. 1991).

The narrow questions for application of the discretionary function exception are: (1) whether any mandatory and specific statute, regulation, or policy circumscribed the government's discretion with respect to conduct at issue; and (2) whether the challenged government conduct was susceptible to policy analysis.  These questions, which are primarily legal, do not require the Court to address any issues that impact the merits inquiry, i.e., duty,

---

[1] One blatant example is Plaintiffs' representation that the NPS was to perform three evaluations in Curry Village annually when a 1995 NPS policy memorandum changed the number of evaluations from three to two.  *See* attached Appendix B at 3.  Another example is Plaintiffs' representation that Sarah Flint stayed in a Signature tent-cabin when she did not.  *See id.* at 4. Plaintiffs also rely on completely inapposite factual arguments, such as presenting the declaration of a purported building codes expert regarding whether the Signature tent-cabins complied with certain building codes.  This argument is irrelevant to whether the government had discretion in its review of DNC's work.

breach, causation, or damages.  Similarly, to determine whether the independent contractor exception applies, the Court need only determine whether the United States actually exercised sufficiently detailed physical control over the concessioner's daily operations that the concessioner employees must be considered government employees for purposes of FTCA liability.  This determination does not require consideration of the government's liability beyond whether the government may be held liable for DNC's conduct.

Thus, there is no basis for the argument that the jurisdictional issues are so intertwined with the merits of the case that the Court must apply the standard applicable to a summary judgment motion under Fed. R. Civ. P. 56.  The proper standard is the standard for resolving a factual attack on jurisdiction under Fed. R. Civ. P. 12(b)(1).  However, even if the Court were to apply the summary judgment standard, there are no issues of material fact that impact the narrow jurisdictional questions raised in the government's motion.  Although the responsive parties' factual arguments are largely immaterial, they cannot be left unaddressed.  Consequently, the United States has attached Appendices B & C to this brief to correct the many mischaracterizations, out-of-context statements, and misrepresentations that Plaintiffs and DNC have made.

## II.    The Discretionary Function Exception Bars Each Claim Against the United States.

The United States does not dispute that the Court must consider each allegedly negligent act separately for purposes of application of the discretionary function exception.  *See* Pl. Br. at 12; DNC Br. at 22, 27.  The parties can only proceed on those claims against the United States that do not challenge the government's policy-based discretion.  Plaintiffs and DNC have failed to rebut the United States' showing that it had policy-based discretion for each of their asserted claims.

### A.   The United States Had Policy-Based Discretion in Its Review of the Insulation of the Tent-Cabins in Curry Village.

Plaintiffs and DNC each argue that the United States had a mandatory duty with respect to the insulation of the tent-cabins (which created what DNC called the "Signature" tent-cabins), but they disagree on the nature of that duty.  Plaintiffs argue that the NPS had to review the

insulation of the tent-cabins for compliance with building codes (Pl. Br. at 12-18); DNC argues that the NPS had to review the insulation of the tent-cabins to "prevent and reduce conditions conducive to pests" (DNC Br. at 22-27).  They each cite different provisions, but none of the provisions specifically circumscribes the government's discretion under the first part of the inquiry.  Further, because they focus on provisions that do not apply to the government's review of the insulation work, neither Plaintiffs nor DNC has rebutted the strong presumption that NPS's discretionary review of DNC's work was policy-based.

> **1.   Provisions Plaintiffs Cite Using "Construction" and Similar Terms Are Not Sufficiently Specific to Remove Discretion With Respect to the Insulation of the Tent-Cabins.**

The government has discretion protected by the discretionary function exception when the challenged conduct "involves *an element* of judgment or choice."  *Berkovitz v. United States*, 486 U.S. 531, 536 (1988) (emphasis added).  When a provision uses general terms, or terms capable of more than one meaning, there is an element of judgment or choice and the government retains discretion.  *See GATX/Airlog v. United States*, 286 F.3d 1168, 1175 (9th Cir. 2002) ("pertinent technical data" too general to remove discretion); *Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir. 1995) ("special hazards" too general to remove discretion).  The provisions that Plaintiffs cite using such general terms as "construction" do not remove the government's discretion to determine whether particular projects qualify as construction projects. There is still an element of discretion.

For example, Plaintiffs cite provisions from the contract and an NPS directive concerning the need to review "construction" plans to ensure compliance with various building codes. Plaintiffs focus on the mandatory nature of these provisions but ignore the requirement that a provision be sufficiently specific in application to leave no room for government discretion. Merriam-Webster defines "construction" as "the act or process of building something (such as a house or road)."[2]  The NPS could determine that the insulation of the tent-cabins was not construction because it did not involve building something, such as a cabin or shelter.  It is

---

[2] http://www.merriam-webster.com/dictionary/construction

undisputed that the insulation of the tent-cabins did not change their exterior appearance at all. *See* Ex. 21 at 75:16-21 (Don Coffman Dep).  Indeed, the request for proposal that DNC submitted to potential contractors did not describe the work as "construction," but as "select carpentry repairs."  Ex. 27 at 1; *see also* Ex. 25 at 441:3-24 (Vicki McMichael Dep.).  Further, Superintendent Neubacher testified that he did not consider the insulation of the tent-cabins to be construction.  *See* Ex. 22 at 38:23-39:5 (Don Neubacher Dep.).  Most relevant, however, the use of the term "construction" is not sufficiently specific to remove the government's discretion with respect to its application to the insulation work on the tent cabins.  For the same reason, the provisions that Plaintiffs cite regarding "new improvements," "[p]lans and specifications for buildings and other structures to be erected by the concessioner," and "design and construction projects" are not sufficiently specific in their application to the insulation work that they defeat the discretionary function exception.

Aside from the fact that none of the provisions Plaintiffs cite were specifically applicable to the insulation work, the extent of the government's review was impacted by the fact that the work was being done in the tent-cabins, which were DNC's personal property.  For example, the Federal Acquisition Regulations specifically exclude work on personal property from its definition of construction.  *See* 48 C.F.R. § 2.101 (2015).  Vicki McMichael, DNC's 30(b)(6) witness, repeatedly confirmed that the tent-cabins were DNC's assets and that insulation work was accomplished using DNC's own capital funds.  Ex. 25 at 423:15-21, 439:24-440:12; *see also id.* at 94:22-95:12.  Because DNC was not working on government assets assigned to DNC under the contract – such as the hard-sided cabins or the Ahwanhee Hotel[3] – the work was not funded through the contractually-required "capital improvement fund," and the government was not required to review the work for compliance with certain environmental and historic standards. *Id.* at 418:13-424:18.  Indeed, in the "operations proposal" for the insulation work that DNC submitted to the NPS, DNC represented that the insulation work did not involve "any changes to

---

[3] The tent-cabins are specifically excluded from the list of government improvements assigned to the contractor in the contract.  The listing of government improvements assigned to the contractor states, "This list does not include canvas structures (primarily guest and employee cabins)."  Pl. Ex. 4 at NPS-2_00302.  *See also* Ex. 25 at 421:11-422:21.

structures assigned under the contract" which would require a specific compliance review.  Ex. 28 at 2; *see also* Ex. 25 at 426:12-429:20.  With such an operations proposal that did not involve work on assigned structures, Ms. McMichael agreed that the NPS "has discretion in determining the level of review they need to do of that project before giving [DNC] their approval."  Ex. 25 at 432:11-15; *See generally id.* 428:20-432:15.

**2. The Provision DNC Cites Regarding Preventing and Reducing Conditions Conducive to Pests Does Not Apply to the NPS's Review of DNC's Insulation of the Tent-Cabins and Is Not Sufficiently Specific to Remove Discretion.**

DNC does not cite any of the provisions that Plaintiffs claim removed government discretion, likely because DNC itself did not consider the tent-cabin insulation project to constitute a "construction" project and did not conduct its own building code inspection.  Instead, DNC cites a provision from a Department of Interior Manual on "Pesticides" that states it is the Department of Interior's policy to "[d]esign and maintain the stability of structures, developed landscapes, and natural areas to prevent and reduce conditions conducive to pests" (DNC Br. at 24).  Though this provision was discussed at Superintendent Neubacher's deposition (Ex. 22 at 344:6-348:3), Plaintiffs have not referenced it in their response.  The reason is clear:  the provision is not applicable to the NPS's review of the insulation project.  NPS did not design the insulated tent-cabins or maintain them; that was DNC's job.  The NPS merely exercised its discretionary review of the work that DNC was proposing for its own personal assets on park property.  The NPS did not review the work to determine whether it would create conditions attractive to deer mice, and there was no specific and mandatory requirement that it do so.

Even if the provision were applicable, it is not sufficiently specific to remove discretion. It does not contain any specific procedures detailing how one designs and maintains structures to prevent and reduce conditions conducive to pests.  The government's discretion is not constrained unless a policy or regulation "specifically prescribes a course of action for an employee to follow" such that the "agency has no lawful option but to adhere to the directive." *Tobar v. United States*, 731 F.3d 938, 946 (9th Cir. 2013) (internal quotations omitted).  In fact, "[a]n agency must exercise judgment or choice where no statute or agency policy dictates the

*precise manner* in which the agency is to complete the challenged task." *Green v. United States*, 630 F.3d 1245, 1250 (9th Cir. 2011) (emphasis added). This means that provisions cannot "eliminate discretion" unless they require that an action be taken "in a specific manner and within a specific period of time." *Bailey*, 623 F.3d at 860-61 (quoting *Miller*, 163 F.3d at 595).

Neither Plaintiffs nor DNC shows a mandatory requirement to provide any specific type of approval for DNC's insulation of the tent-cabins. Indeed, Plaintiffs and DNC do not even agree on whether the NPS approved the project. Plaintiffs argue that the NPS failed to approve the project (Pl. Br. at 14-15), and DNC argues that NPS gave its approval for the project (DNC Br. at 7). Neither party has undermined the government's representation that the NPS did not provide the type of written approval it would give for a project using capital improvement funds (*see* U.S. Br. at 28-29), such as a project involving the erection of a new structure on park property or the modification of a government improvement assigned to the concessioner under the contract. It is undisputed that DNC used its own capital funds to pay for the insulation work on the tent-cabins, which were DNC's personal assets. Ex. 25 at 418:13-424:18. It was not a capital improvement fund project. Because there were no specific and mandatory requirements regarding the government's review of DNC's work on its own personal property, the NPS had discretion to determine what type of evaluation was important from the NPS perspective. Ex. 25 at 428:20-432:15; DN Decl. ¶ 11. Thus, the NPS fire marshal evaluated the proposal for fire safety and recommended a modification that he determined would improve fire safety, namely the use of drywall (greenboard) in place of plywood. Pl. Ex. 22; Ex. 21 at 11:15-21, 27:17-21, 75:6-15, 79:21-80:14. DNC made that change in the scope of work that it subsequently submitted to the fire marshal. Ex. 17. Based on DNC's satisfaction of the fire marshal's recommendation, DNC proceeded with the project. Significantly, after a detailed review, the OIG found that the NPS provided oversight of the project consistent with government policies. Ex. 9.

> **3.  Neither Plaintiff nor DNC Has Rebutted the United States' Showing that NPS's Review of DNC's Insulation of the Tent-Cabins Was Susceptible to Policy Analysis.**

Plaintiffs and DNC each argue that the United States has failed to show a protected

public policy basis for what they claim is the relevant government conduct.  For Plaintiffs this is the government's ignoring "engineering principles and building code compliance" for the insulation work (Pl. Br. at 21), and for DNC this is the government's "failing to consider pests" in approving the work on the tent-cabins (DNC Br. at 26).  These arguments are predicated on the incorrect assumption that the government had these obligations.  The government's conduct in reviewing the insulation work was not governed by the provisions that Plaintiffs and DNC cite, which did not apply.  The NPS did not draft the scope of work for the insulation project or perform any of the work itself.  Nor did it review the work to determine compliance with all applicable building codes or to evaluate whether the work would create an environment conducive to pests.  As shown above, there was no requirement that it do so.  Instead, NPS exercised its discretionary review of DNC's proposed work on DNC's personal property in light of the policies underlying the NPS's operation of a national park and its use of concessioners to provide accommodations.

Plaintiffs also mistakenly argue that because they are challenging a construction project that involves matters of scientific and professional judgment, the conduct they are challenging does not implicate the type of policy judgment that the discretionary function exception was meant to shield (Pl. Br. at 21).  That argument might be at least somewhat tenable if the NPS were performing the work.  But the work was being performed by DNC through its contractor, Yosemite Construction, Inc.  The NPS was exercising its discretionary review of the concessioner DNC's work; this is conduct that courts have consistently found implicates protected public policies.  *See*, *e.g.*, *In re Consol. U.S. Atmos. Testing Litig.*, 820 F.2d 982, 995-96 (9th Cir. 1987); *Kirchmann v. United States*, 8 F.3d 1273, 1277 (8th Cir. 1993).  By contrast, in the cases that Plaintiffs cite, the government was not reviewing the work of a government contractor, but performing the work itself.  *See Kennewick v. Irr. Dist. v. United States*, 880 F.2d 1018, 1020-21 (9th Cir. 1989) (United States Bureau of Reclamation's design and construction of a canal); *Whisnant v. United States*, 400 F.3d 1177, 1183 (9th Cir. 2005) (United States' maintenance of a government grocery store).

Here, because the NPS was exercising its discretionary authority to review the work of its

concessioner, the NPS was guided by the provisions that the United States cited in its Opening Brief – the Organic Act for the NPS, the National Park Service Concessions Management Improvement Act of 1998 (CMIA), Director's Order #50C (Public Risk Management), and Director's Order #83 (Public Health) – which show the competing policy interests that the NPS must weigh in evaluating a contractor's operations.  These policies include the need to preserve park resources, the need to rely on experienced contractors to provide public accommodations, and the need to protect public health and safety.  Neither Plaintiffs nor DNC has rebutted the "strong presumption" that the United States' discretionary review of DNC's work was grounded in these policies.  *See United States v. Gaubert*, 499 U.S. 315, 324 (1991).  Indeed, the record shows how the NPS could balance the competing policies in its review.  NPS could determine, as it did, that the most important park interest for its evaluation – namely fire safety – and consider other policy factors including the expertise of the concessioner, the need to replace accommodations lost as a result of the rockfall, the desire to supply affordable rustic lodging, and the potential impact to the park's natural, historical, and cultural resources – including the historical features of Curry Village – in determining how to evaluate the proposal.

**B.  The United States Had Policy-Based Discretion in its Evaluations of DNC's Operations and Facilities.**

Plaintiffs and DNC each argue that the NPS had a mandatory duty to inspect DNC's operations and facilities, but they differ on the number of inspections that should have been performed and the scope of those inspections.  Significantly, neither can show that the document they rely upon is the type of mandatory document that can remove government discretion or that the provisions in the document have any direct relationship to the alleged harm.  Further, as with the government's particular review of DNC's insulation project, the government's annual review of DNC's operations and facilities is necessarily policy-based.

**1.  NPS-48 Is Not a Mandatory Document that Removes Government Discretion.**

In arguing that the NPS violated a mandatory requirement to conduct a certain number of inspections of Curry Village in the years prior to the Hantavirus outbreak, Plaintiffs and DNC

rely on provisions in NPS-48, which is a guideline intended as a reference source.  Plaintiffs claim that NPS-48 required a minimum of three inspections per year (Pl. Br. at 24).  DNC, at least, acknowledges that a 1995 memorandum reduced the number of evaluations from three to two (DNC Br. at 16).  However, neither Plaintiffs nor DNC shows that NPS-48 is a mandatory document that imposes binding requirements on the NPS at Yosemite.  Plaintiffs and DNC each cite *Navarette v. United States*, 500 F.3d 914, 917 (9th Cir. 2007) to argue that prefatory language in a document cannot trump specific requirements.  The Ninth Circuit, however, interpreted the particular prefatory language in the *Navarette* document to mean *only* that a checklist in the document was not necessarily final and complete, rather than showing that the checklist items were discretionary.  *Id.*  Here, the introduction to NPS-48, stating it is a "reference source" and a "Guideline," is reinforced throughout the entire document.  In fact, the word "Guideline" appears at the top of every page.[4]

In determining whether a document is mandatory or discretionary the Court should consider the underlying purpose of the document.  In the discretionary function exception context, the Ninth Circuit has consistently reiterated that "the presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations."  *Sabow v. United States*, 93 F.3d 1445, 1453 (9th Cir. 1996); *see also Dichter-Mad Family Partners, LLP v. United States*, 709 F.3d 749, 751 (9th Cir. 2013); *Terbush v. United States*, 516 F.3d 1125, 1138 (9th Cir. 2008).

The United States does not just rely upon these cases; the Ninth Circuit has specifically considered whether NPS-48 is mandatory and binding on the NPS and found that it is not, describing NPS-48 as "an agency staff manual . . . rather than a statement of substantive rules or policy."  *Lake Mohave Boat Owners Ass'n v. National Park Service*, 78 F.3d 1360, 1368 (9th

---

[4] Plaintiffs' reference to a provision in the concessions contract which states that "*operation* of accommodations, facilities and services authorized by the Contract will conform to the evaluation standards set forth in [NPS-48]" (Pl. Br. at 24 citing Pl. Ex. 4 at NPS-2_00511 (emphasis added)) cannot change the character of the manual with respect to the nature of the *government's* responsibilities.  This contractual provision is imposing an obligation on the *concessioner* who is performing the *operations* under the contract, not on the NPS which evaluates the concessioner using NPS-48.

Cir. 1996).  The court found that the manual fell within the category of agency documents that "guide agency personnel in the exercise of discretionary authority."  *See id.* at 1369.  Following *Lake Mohave*, a district court found that two other NPS manuals, NPS-2 and NPS-12, "like NPS-48" were designed "to assist NPS officials in complying with their discretionary duties arising under various other statutes, regulations, and internal policies."  *Jackson Hole Conservation Alliance v. Babbitt*, 96 F. Supp. 2d 1288, 1297 (D. Wyo. 2000).  Plaintiffs do not acknowledge *Lake Mohave* at all, and DNC cavalierly dismisses it as not involving the discretionary function exception (DNC Br. at 32-33).  However, DNC does not explain why NPS-48 is non-binding in one context yet mandatory in another.  In fact, in the discretionary function context, the Ninth Circuit has noted that another NPS manual in the same series, NPS-50, "vests park officials with considerable discretion" given "the overall nature of the NPS-50 as a broad set of guidelines."  *Terbush*, 516 F.3d at 1137-38.  Further, the court noted that a statement in Chapter 1 of NPS-50 (similar to statements that Plaintiffs and DNC seek to rely upon here) providing that "requirements in this document are mandatory unless otherwise stated," could not turn a guidance document into requirements that defeat the discretionary function exception.  *Id.* at 1138.

These "wide ranging" NPS policy manuals are of "general application," applying to parks as large as Yosemite, one of the largest national parks in the United States, as well as to parks as small as Muir Woods, to cite just one proximate example.  *See id.*  Thus, these manuals provide "individual park managers with broad policy guidelines that the Department of Interior expects them to elaborate with park-specific policies."  *See id.*  Here, given the limitations on staffing and the large range and number of concessioner facilities and services that the NPS needed to evaluate at Yosemite each year, the NPS concessions management office evaluated each facility and service at least once, though the concessions management office had the ultimate planned goal to conduct two annual evaluations.  Ex. 24 at 197:25-198:14, 228:2-232:2 (William Bryan Dep.).  At Curry Village, William Bryan performed a spot-check of visitor accommodations to prioritize the needs of the evaluation process and to fulfill his other required concessions management duties.  *Id.* at 148:21-149:17, 235:17-237:9.  An assessment of the NPS concessions management program at Yosemite that was conducted after the Hantavirus outbreak, noted that

Yosemite operated "a large and complex concession management program to oversee contracts" with concessioners providing "lodging, food and beverage, retail sales and groceries, bus operation and tours, guiding and [other services]." Ex. 29 at 1. The assessment found that the ten percent sampling of visitor accommodations – such as the spot-checking that William Bryan did at Curry Village – was "within Service policy guidelines." *Id.* at 3. The assessment also recognized that the concessions management program was not able to reach one hundred percent of planned evaluations (two annual evaluations of each facility and service) and attributed this inability to a shortfall in staffing. *Id.* at 3, 6.

Plaintiffs even mistakenly characterize the standards that Bryan applied to "rustic lodgings" as a "checklist," though NPS-48 does not designate the standards in that way (Pl. Br. at 25). Rather, it is clear that these are guiding standards for a concessions management specialist, like William Bryan, to apply in performing an evaluation. WB Decl. ¶¶ 7, 10. For example, one standard that Plaintiffs focus upon states that "[d]oors and windows, including screens, are to be sufficiently tight to preclude the entry of rodents and insects." Ex. 16 at NPS-11_00438. It is undeniable that a concessions management specialist would have to use discretion in evaluating compliance with this standard because it applies to a variety of rustic lodgings with different features, including those in Housekeeping Camp which are open to the environment, i.e., do not have four walls. WB Decl. ¶ 10. Further, these standards do not specifically tell the concessions management specialist how to evaluate compliance or mandate what he or she must do when a standard is not met.

### 2. NPS-48 Is Not a Relevant Provision Because There Is an Independent Exercise of Discretion Following an NPS-48 Evaluation.

The Ninth Circuit has repeatedly found that when there is an independent intervening exercise of discretion following the alleged failure to follow a mandatory prescription, the discretionary function exception still applies. For example, in *Dichter-Mad Family Partners, LLP v. United States*, 707 F. Supp. 2d 1016 (C.D. Cal. 2010), *adopted* 709 F.3d 749, 750 (9th Cir. 2013), the court addressed the issue in a case in which investors in the Madoff Ponzi scheme sought damages under the FTCA for the alleged violations by the Securities and Exchange

Commission (SEC) of their own mandatory case management procedures.  The court held that even if there were violations of SEC's specific and mandatory procedures, there was a subsequent independent exercise of discretion in the SEC's determinations whether to pursue an enforcement action against Madoff.  707 F. Supp. 2d at 1049-50.  *See also Gen. Dynamics Corp. v. United States*, 139 F.3d 1280, 1283-85 (9th Cir. 1998).

Thus, another reason that NPS-48 cannot defeat the discretionary function exception is that there is an independent exercise of discretion following an NPS-48 evaluation.  As the Ninth Circuit found in *Lake Mohave*, NPS-48 is a reference manual "that guide[s] agency personnel in the exercise of discretionary authority."  78 F.3d at 1369.  The discretionary authority that the Ninth Circuit is referencing is the authority that the NPS has to evaluate its concessioners.  The NPS does not evaluate rustic lodging operations such as Curry Village using NPS-48 independently and in isolation.  Rather, the NPS-48 operational evaluations are part of an overall annual evaluation of a concessioner's entire performance.  *See* WB Decl. ¶ 6.  At Yosemite, the periodic operational evaluations, including the evaluation of the Curry Village rustic lodgings, are combined with an evaluation of the concessioner's risk management program and its public health program to evaluate the concessioner's operational performance.  *Id.*; Ex. 30 (Form 10-631, 2011).  This operational performance rating is considered along with the concessioner's contract compliance rating to determine an overall annual rating for the concessioner.  *Id.*  Based on the annual rating, the NPS has discretion to identify problems or issues for the concessioner to address or seek to terminate the contract.  Ex. 16 at NPS-11_00278-NPS11_00279.

The NPS uses NPS-48 operational evaluations to inform the annual rating, but otherwise there are no mandatory and specific requirements regarding their use.  At Yosemite, the NPS asked DNC to correct deficiencies that it noted during the evaluations and established deadlines for correction.  But, given that the NPS had to perform spot-checks of accommodations due to resource limitations, it is clear that the purpose of the NPS-48 evaluation was to see how well the concessioner was performing rather than to ensure that each individual accommodation actually met standards.  The NPS-48 evaluations were part of an overall evaluation process that left broad discretionary authority in the NPS regarding what action, if any, to take based upon the results.

### 3. Neither Plaintiff nor DNC Has Rebutted the United States' Showing that NPS's Evaluations of DNC's Operations and Facilities Was Susceptible to Policy Analysis.

Plaintiffs and DNC also differ in their arguments to overcome the "strong presumption" that the NPS's conduct in evaluating DNC's operations and facilities was susceptible to policy analyses given the policies underlying the relevant statutes and Director's Orders. Plaintiffs argue that once "safety measures" are "undertaken" there can be no protected policy balancing (Pl. Br. at 27). DNC claims that "staffing or budgetary" considerations are not sufficient policy justifications for application of the discretionary function exception (DNC Br. at 33). The cases that Plaintiffs and DNC cite stand for the proposition that implementation of a safety policy *by itself* or consideration of economic factors *by itself* does not support application of the discretionary function exception. But, the different arguments of Plaintiffs and DNC prove the point that NPS's evaluation of DNC's operations and facilities could involve balancing of competing policy considerations (i.e., safety *and* economic considerations), which is just the type of conduct that Congress sought to protect through the discretionary function exception.

As Concessions Specialist William Bryan attested, in evaluating the visitor accommodations at Curry Village, he could weigh priorities in evaluating the quality, safety, and sanitation of the accommodations within limitations on staffing and funding in the Concessions Management Branch. WB Decl. ¶ 11. Bryan could also consider DNC's expertise in hospitality and concessions with respect to their daily operations in determining the degree of review necessary of visitor accommodations. *Id.* Thus, contrary to the argument of Plaintiffs and DNC, the NPS's evaluation does not involve safety or economic policy in isolation, but a balancing of multiple competing policies. The NPS could balance social policy considerations (visitor enjoyment and safety, conservation of park resources) with economic considerations (need to provide affordable visitor accommodations, limits on NPS staffing and funding) against the backdrop of the political determination of Congress, as reflected most recently in the CMIA, that the NPS rely upon concessioners who are experts in hospitality to provide lodgings and services.

Plaintiffs try to discount the Supreme Court's *Varig Airlines* decision, which involved a spot-checking program that was similar to the type of evaluations that William Bryan performed

of the Curry Village tent-cabins.  Plaintiffs argue that *Varig Airlines* is confined to the regulatory context (Pl. Br. at 28 n. 7).  But the Court in *Varig Airlines* did not restrict its holding in that way, and the rationale of the decision is equally applicable here.  The Court found that the discretionary function exception applied because the government had to balance safety and economic considerations in its spot-checking program.  *See* 467 U.S. at 820.  The case that Plaintiffs cite in this context (Pl. Br. at 27), *Camozzi v. Roland/Miller and Hope Consulting*, 866 F.2d 287 (9th Cir. 1989), shows the type of contractor oversight that is not protected:  when the government retains a specific safety responsibility – such as checking all floors for unguarded openings – and it fails to fulfill that responsibility.  *Id.* at 290.  *Camozzi* did not involve spot-checking as part of an evaluation, but rather daily inspections of 35 listed items.  *Id.* at 289. Here, the NPS did not retain any such specific and mandatory responsibilities for inspection of the Curry Village tent cabins.  The NPS's use of the spot-checking program in its evaluation is protected because it clearly reflects policy balancing (*see* U.S. Br. at 31).

### C.  The United States Had Policy-Based Discretion in its Integrated Pest Management Program.

Plaintiffs and DNC each argue that the United States had a mandatory duty with respect to integrated pest management, but again they disagree on the source of that duty.  Significantly, however, neither party can show that there was a mandatory duty that required the government to do something specifically that is relevant to the alleged harm.  Further, neither party gives much attention to the second part of the discretionary function exception analysis because integrated pest management, as part of the park's risk management program, is clearly policy-based.

#### 1.  The NPS Policies Regarding Integrated Pest Management that Plaintiffs Cite Do Not Contain any Specific Requirements Related to Plaintiffs' Injuries.

With respect to integrated pest management, Plaintiffs' response focuses entirely on the mandatory nature of certain provisions while ignoring the requirement that provisions be sufficiently specific to remove discretion.  As one circuit court recently stated, "Without the specificity requirement . . . the discretionary function exception would be a dead letter."  *Sanchez*

*v. United States*, 671 F.3d 86, 97 (1st Cir. 2012) (internal quotation omitted).  Plaintiffs cite the section in NPS "Management Policies" on integrated pest management, which contains only general language that park employees "comply with NPS pest management policies" and states that "each park unit will use an IPM approach to address pest issues" (Pl. Br. at 29).  With respect to NPS-77, the guidance manual on integrated pest management in effect at the relevant time, Plaintiffs include just one quote in a footnote regarding the need for "monitoring" as part of an integrated pest management program.  (Pl. Br. at 31, n.11).  The quote provides a definition of "monitoring" and discusses the need for monitoring of pests generally.  Pl. Ex. 51 at YOSEPROD00122388.  The provision contains no specific requirements for monitoring any specific pests in the park (of which there are a variety), but includes in "monitoring" such general items as "management decisions and practices that could affect the pest or potential pest populations, and weather conditions."  *Id.*

These provisions leave great discretion to the NPS with respect to pest management.  For example "Management Policies" states "Pest issues will be reviewed on a case-by-case basis. Controversial issues, or those that have potential to negatively impact the environment, must be addressed through established planning procedures and be included in an approved park management or IPM plan." Ex. 11 at NPS-11_00743.  Thus, at Yosemite, the NPS had discretion to determine which pest issues were "controversial" or had "potential to negatively impact the environment." *Id.*  The NPS then had discretion to determine whether to address those issues in a park management plan or an integrated pest management plan. *Id.* Superintendent Neubacher testified that Yosemite generally relied upon guidance coming from the national office for its integrated pest management program.  Ex. 22 at 81:25-83:4.  However, Yosemite developed a park-specific plan to address at least one pest issue that Yosemite identified as presenting a potential negative impact to the environment, namely the threat from "invasive species," which Superintendent Neubacher identified as Yosemite's highest priority during this time.  *Id.* Plaintiffs have not identified any provision in Management Policies or in NPS-77 that required Yosemite to have any park-specific Integrated Pest Management Plan, let alone a comprehensive plan to address every pest issue that might arise in Yosemite, including

Hantavirus from deer mice.  Even though there was no requirement to address Hantavirus on a park-specific basis, the NPS issued a series of Hantavirus policies before the outbreak, including an updated Hantavirus Directive for the park as recently as the spring of 2012.  Exs. 5, 6 & 8.

>    **2.    The Contractual Provision Regarding Integrated Pest Management that DNC Cites Does Not Direct the NPS to take any Specific Action Related to Plaintiffs' Injuries.**

Apart from the general integrated pest management provisions that Plaintiffs cite, DNC rests its case on a provision of the 1993 concessions contract under the heading "INTEGRATED PEST MANAGEMENT," which states:

> The control of pests by chemical and other means is subject to park approval. Procedures are outlined in the Park's Integrated Pest Management Plan.  Specific problems can be referred to the park's Integrated Pest Management Coordinator.

Pl. Ex. 4 at NPS-2_00544.  This provision, however, cannot defeat the discretionary function exception because it does not direct the government to do anything.  Instead, it focuses on the concessioner, directing the concessioner to get park approval before using "chemical and other means" to "control" pests.  It then refers the concessioner to two potential sources for procedures and consultation on integrated pest management:  the Park's Integrated Pest Management Plan and the Park's Integrated Pest Management Coordinator.

The provision does not direct Yosemite to develop a park-specific Integrated Pest Management Plan, and, as discussed above, NPS policy only required national parks on a case-by-case basis to develop park-specific written plans where pest management issues were "controversial" or had "a potential to negatively impact the environment."  Ex. 11 at NPS-11_00743.  When confronted with this contractual provision, Superintendent Neubacher maintained that Yosemite was not required to have a park-specific Integrated Pest Management Plan, but relied on national integrated pest management policy and guidance as its plan. [5]  Ex. 22

---

[5] Superintendent Neubacher was the United States' Rule 30(b)(6) witness on integrated pest management.  After Superintendent Neubacher's testimony, DNC's attorney asked another witness, William Bryan, who is not involved in integrated pest management, to interpret this provision.  *See Irving v. United States*, 162 F.3d 154, 166 (1st Cir. 1998) ("To determine what is agency policy, courts customarily defer to the statements of the official policymaker, not others, even though the others may occupy important agency positions.")

at 247:14-250:25.  At the relevant time, this guidance told the concessioner how to gain NPS approval to use chemicals and other means to control pests.  *See* Ex. 14 at 2.  Further, the fact that Yosemite subsequently developed a comprehensive park-specific IPM plan after the outbreak does not show that there was a requirement to have one before the outbreak.

Similarly, NPS-77 does not require each park to designate an IPM coordinator.  Instead, it recommends, "In order to provide the degree of oversight and consistency necessary for a successful IPM program, the superintendent *should* designate an IPM coordinator."  Pl. Ex. 51 at YOSEPROD00122400 (emphasis added).  *See In re Glacier Bay*, 71 F.3d 1447, 1452 (9th Cir. 1995) (stating for purposes of the discretionary function exception "should" is suggestive and not mandatory).  Superintendent Neubacher understood that he should have an IPM coordinator, and different people held that position at different times.  Ex. 22 at 251:4-253:24.  In fact, DNC's statement that there was no IPM coordinator (DNC Br. at 29) is directly contradicted by Plaintiffs' representation that Joe Meyer was the "Yosemite IPM Coordinator" (Pl. Br. at 30).  However, this dispute is irrelevant for purposes of the discretionary function exception because there is no NPS provision mandating that Yosemite have an IPM coordinator, and, even if there were, there are no specific enumerated duties for an IPM coordinator that any party has cited that might be relevant to this case.

What shows that DNC's argument is a red herring is the fact that the NPS provided substantial integrated pest management resources and support to DNC in the years prior to DNC's insulation work on the tent-cabins in 2008 and the Hantavirus outbreak in 2012, including the NPS's IPM policies and access to the NPS's national IPM coordinator.  *See* Ex. 25 at 510:9-519:20.  For example, in early December 2008, just weeks before DNC built the Signature tent-cabins, the National Park Service put on an IPM workshop for NPS concessioners at Grand Canyon National Park.  Ex. 31 (Workshop Agenda).  Don Gallagher, DNC's IPM coordinator for Yosemite attended along with his assistant Debra Sanches.  Ex. 25 at 510:9-512:13.  Carol DiSalvo, the NPS's national IPM Coordinator, presented the first seminar with the objective that "[p]articipants will be able to recall the basics of NPS policy and IPM philosophy regarding pest management on NPS property" and "[t]hey will know where to obtain the laws

and policies which direct pest management on NPS lands, and the procedures for requesting pest management assistance and proposing pesticide use." Ex. 31 at 1.  A session the next morning was devoted to "Understanding the NPS IPM Program for Concessions Managers."  Ex. 32 (IPM Handout).  Then, for over three hours that afternoon, the NPS provided training to DNC and other concessioners on "rodent management," including on-site training for rodent inspection and exclusion techniques that incorporated the NPS Rodent Exclusion Manual.  Ex. 31 at 3-4. Subsequently, DNC updated its own pest management policy; the stated purpose was to manage pest control in Yosemite according to NPS IPM guidelines.  Ex. 33 at 1 (DNC IPM Policy, November 17, 2011).  DNC's policy included an appendix of "Rodent Control Guidelines."  *Id.* at 3.  Additionally, as Mark Gallagher, the DNC IPM coordinator, states in his declaration, he consulted with Carol DiSalvo, the NPS national IPM coordinator, and Bruce Badzik, an NPS rodent expert and IPM Coordinator in San Francisco.  *See* DNC Ex. 18 ¶ 5; Ex. 31 at 4.

### 3.   Neither Plaintiff nor DNC Has Rebutted the United States' Showing that NPS's Management of Risks at Yosemite Was Susceptible to Policy Analysis.

Plaintiffs and DNC each try to address the second part of the discretionary function exception analysis with respect to integrated pest management, but do so very briefly and with inconsistent arguments.  Plaintiffs claim that IPM was simply a matter of safety that involved professional and scientific judgment (Pl. Br. at 32).  DNC argues that the IPM claims challenge "simple inaction" rather than the exercise of policy judgment (DNC Br. at 29-30).  Neither party appreciates that the challenged conduct need only be "susceptible to a policy analysis;" there is no requirement that it actually be based in policy considerations.  *Gaubert*, 499 U.S. at 325; *Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000).

The NPS's integrated pest management decisions directly implicate the park's management of risks at Yosemite in conjunction with its obligation to preserve the park's natural resources.  For example Director's Order #83 on public health recognizes that policies for "elimination or control of disease agents" in the park must "be tempered by the Organic Act's requirement that the NPS conserve the scenery and natural and historic objects and the wildlife

therein . . . ."  Ex. 13 at 2.  In particular, with respect to pests that may carry disease, "[c]ontrol procedures will reduce risk while minimizing adverse impact on natural and cultural resources." *Id.* at 8-9.  Determining what type of program the NPS would have at Yosemite, including what type of planning documents it would use and how it would coordinate with the concessioner – which had its own IPM program – would also impact economic considerations of staffing and funding.  Thus, the claims regarding integrated pest management at Yosemite go to the heart of the policy balancing reflected in the relevant NPS statutes and orders.

### D.  The United States Had Policy-Based Discretion in Providing Hantavirus Warnings to Visitors at Yosemite.

Plaintiffs and DNC each argue that the discretionary function exception cannot apply to claims alleging a failure to warn of Hantavirus.  Neither Plaintiffs nor DNC can identify a mandatory and specific policy directive that required NPS to warn of Hantavirus.  Plaintiffs do not identify any applicable provision, and the provision that DNC cites is clearly discretionary.  This provision states that "NPS unit managers will reduce the risk of transmission of vector borne and zoonotic diseases to park visitors and employees through education, surveillance, and control efforts *when necessary*" (U.S. Ex. 13 at 8-9) (emphasis added), thus explicitly giving the NPS discretion to determine the necessity of any of these measures.  Even without the qualifying language, the provision is not specific regarding the content of the measures or where and when they are to take place.  DNC acknowledges this, but argues that the NPS cannot "do nothing" regarding Hantavirus in response to this provision, citing cases in which the Ninth Circuit held that the discretionary function exception does not apply when the government "does nothing" to comply with a provision (DNC Br. at 34).  But, in those cases, the government truly did nothing to comply with mandatory provisions focused on the conduct at issue.  Here, the provision DNC cites is not specific to Hantavirus, and even if it were, it is indisputable that the NPS issued Hantavirus policies in years preceding the outbreak as well as addressed Hantavirus and other vector-borne diseases at Yosemite, including arranging for multiple CDPH evaluations pursuant to a cooperative agreement.  MW Decl. ¶ 5; Exs. 5, 6 & 8; Pl. Ex. 57.  Indeed, DNC acknowledges that NPS addressed Hantavirus by approving the posting of Hantavirus

information in Tuolumne Meadows in 2010 and by providing Hantavirus training to DNC employees (DNC Br. at 34-35). Thus, this is not a case where the NPS "did nothing," and the provision that DNC cites gave the NPS wide discretion to consider the particular risks of various vector-borne diseases in different areas of the park to different groups of individuals (employees or visitors) and determine what education, surveillance and control measures to take.

Plaintiffs and DNC each argue that a failure to warn is not susceptible to policy analysis, citing Ninth Circuit cases holding the discretionary function exception does not apply where a failure to warn "involves considerations of safety, not public policy." The arguments, however, focus exclusively on one line of Ninth Circuit failure to warn cases, while ignoring a separate line of Ninth Circuit failure to warn cases and failing to appreciate the distinction between the two. In the cases that Plaintiffs and DNC cite, *Young*, *Oberson*, *Whisnant*, *Faber,* and *Summers*, the government created or specifically knew of a present hazard, the failure to warn only involved safety considerations, and there was no record supporting the need to consider multiple competing policy factors. These cases are inapplicable to the failure to warn claims here. As the Ninth Circuit recognized in *Terbush*, a case involving a failure to warn at Yosemite, "most [Ninth Circuit] cases in the post-*Gaubert* era have held that fulfilling the NPS's decision to warn the public of hazards in the national parks entails the kind of policy weighing decision protected from judicial review by the discretionary function exception." 516 F.3d at 1135. Incredibly, Plaintiffs fail to cite *Terbush* at all, and DNC makes only one passing reference to it. In *Terbush*, the Ninth Circuit recognized that warning of wilderness risks in a national park, including determining which hazards require a warning, as well as how, when and where a warning should take place "implicates the NPS's broader policy mandates to balance access with conservation and safety." *Id.* at 1137. Here, Plaintiffs and DNC have failed to rebut the record in Superintendent Neubacher's Declaration that these competing policy considerations impacted the NPS's warning decisions, including decisions regarding warning of Hantavirus. DN Decl. ¶ 8.

Plaintiffs and DNC also fail to rebut the United States' showing that the NPS's decisions regarding when to issue public notifications about the Hantavirus outbreak involved protected policy considerations. Plaintiffs and DNC cannot dispute that multiple protected policy-based

factors can impact a decision to provide public notification, and, in fact, did impact the decision in this case.  The fact that one consideration outside of the NPS's control that could have caused some delay was not policy-based (i.e., the vacation schedule of a CDPH employee involved in the investigation) does not negate the important policy factors that can impact the timing and content of such a notification, including the need to avoid undue anxiety, to provide accurate information, and to determine the cost and effectiveness of a warning.  This is not a case, like *In re FEMA Formaldehyde Liab. Litig.*, that DNC cites, where only one unprotected consideration – legal liability concerns – impacted the government's alleged negligent conduct.  Thus, the government's conduct regarding providing public information about Hantavirus, both before and after the outbreak, is protected by the discretionary function exception.[6]

### E.  The United States Had Policy-Based Discretion in Responding to Recommendations of the California Department of Public Health.

Plaintiffs alone argue that the United States had a mandatory duty to implement recommendations of the CDPH.  In support of this argument, Plaintiffs cite a document that the NPS prepared listing recommendations it had received and the actions it had taken or was planning to take in response to those recommendations.  The document was a "draft" document "for deliberation" that was not intended as a complete statement of every action taken at every point in time in response to a recommendation.  Pl. Ex. 57.  As the document itself shows, it is a gross misrepresentation to state that there was a "complete failure to implement the recommendations" and the "NPS failed to implement nearly all of the repeated recommendations."  *See id.*  The NPS, in fact, relied on the CDPH's expertise and implemented most of its recommendations.

But, Plaintiffs' misrepresentation is irrelevant to the motion.  By its very nature, a recommendation by a state agency is not a mandatory requirement that can remove the federal government's discretion.  Nevertheless, Plaintiffs argue that the NPS's failure to implement

---

[6] Because any notification decisions are protected by the discretionary function exception, DNC's arguments regarding the need to obtain NPS approval before providing information to the public are irrelevant.  As shown below, the independent contractor exception immunizes the United States from all other claims related to the alleged negligent conduct of DNC employees.

recommendations cannot be susceptible to policy analysis because the CDPH was sensitive to the NPS's policy constraints when it made its recommendations (Pl. Br. at 33-34).  Other than an unexplained reference to *Whisnant*, Plaintiffs cite no legal support for this argument.  The Court must consider each alleged failure to act in response to a recommendation and determine whether that conduct is susceptible to protected policy analysis.  As the United States demonstrated in its Opening Brief, and has reiterated in response to particular arguments above, the government's conduct in managing the wilderness risks at Yosemite, including the risk of Hantavirus, implicated important competing policy considerations.  The fact that CDPH made a recommendation does not change that or alter the proper application of the discretionary function exception to the claims.

### F.   The Provision that DNC Cites Regarding Rodent Trapping Does Not Defeat the Discretionary Function Exception.

DNC alone cites a provision from Yosemite's Hantavirus Directive No. 9 stating "Place spring loaded rodent traps in *likely areas* of shelter within 100 feet around buildings and use continuously."  DNC Ex. 22 at 7 (emphasis added).  DNC erroneously states that this was NPS's obligation.  This policy applied to DNC as a concessioner at Yosemite.  *Id.* at 2.  As operator of Curry Village, it was DNC's responsibility to perform any necessary rodent control in Curry Village.  Even if it applied to the NPS here, the provision is discretionary because it requires a determination of where likely areas of rodent shelter are and where traps should be placed.  With respect to rodent trapping, DNC decided to trap rodents inside accommodations in response to particular rodent complaints.  As a component of pest management, any decisions NPS could make regarding trapping necessarily implicates policies underlying a pest management program.

### G.   The Provision that DNC Cites Regarding Notification of an Investigation Does Not Defeat the Discretionary Function Exception.

DNC alone cites a provision from Director's Order #83 that states that "The park concession office will be notified when an illness investigation is conducted in a concessioner's facility."  Ex. 13 at 8.  This provision is irrelevant.  First, this provision does not necessarily require *any* notification to DNC because the NPS had its own "park concession office" at

Yosemite where NPS Concessions Specialists, such as William Bryan, worked.  Second, the provision does not set forth any specific time when a notification is to occur.  Third, even if this provision required some notification to DNC, it is unrelated to any claim.  NPS owed no duty to DNC regarding its disease investigation at Yosemite that is subject of this lawsuit.

### III.   Under the Independent Contractor Exception DNC Employees Are Not Employees of the United States for Purposes of FTCA Liability.

In their response, Plaintiffs state that the "contractor exception is inapplicable as Plaintiffs are not seeking to hold the United States vicariously liable for the acts of the concessioner" (Pl. Br. at 39).  Nevertheless, DNC argues that its employees should be considered government employees for purposes of FTCA liability because the United States "tightly" controlled DNC's daily operations (DNC Br. at 38).  In support of their argument, DNC cites the fact that the NPS had contractual authority to supervise DNC's day-to-day activities, that NPS approved some mundane DNC operations, that NPS required DNC to change its rodent control procedures after a 2008 rodent complaint in a hard sided cabin at Curry Village, and that NPS had access to DNC's maintenance work at Yosemite (DNC Br. at 38).  Even if true – and the United States disputes the particulars of many of DNC's representations (*see* attached Appendix C) – these factors do not constitute sufficient detailed physical control of day-to-day operations to render DNC's employees government employees under the FTCA.  (*See* U.S. Br. at 37-38).

There is no dispute that DNC had its own management structure at Yosemite that directed the detailed physical operations of its own employees, including its employees at Curry Village. Ex. 25 at 368:22-371:23.  At Curry Village, DNC had a manager who reported to DNC's vice-president for operations at Yosemite, and to DNC-Yosemite's president, Dan Jensen.  *Id.* at 371:17-372:5.  DNC's Curry Village manager had a "rooms manager" and "housekeeping manager," who have DNC assistant managers who report to them.  *Id.* at 371:17-374:8.  During the summer season these DNC managers were responsible for managing approximately 25 DNC "housekeepers" and several DNC "inspectors" in Curry Village.  *Id.* at 374:9-375:16.  The DNC "housekeeping staff" was responsible on a daily basis for cleaning and inspecting visitor accommodations.  *Id.* at 373:5-376:3.  The DNC managers hired these employees, set their work

schedules, and fired individual employees, when necessary, without any input from NPS.  *Id.* at 375:17-378:17.  The DNC managers were also responsible for training the housekeeping staff in their responsibilities and for evaluating their performance.  *Id.* at 377:8-381:10.  Additionally, DNC had a Director of Facilities, who reported to Dan Jensen and who was responsible for all of the maintenance that occurred in the visitor accommodations that DNC operated.  *Id.* at 369:12-370:20.  Under the DNC Director of Facilities there was a DNC Facilities Manager.  *Id.* at 384:21-387:6.  During the summer season DNC had up to nine maintenance employees (3 maintenance leads and 6 teamsters) who performed maintenance work in Curry Village and reported to the DNC Facilities Manager.  *Id.* at 387:13-389:2.  The DNC Facilities Manager set the schedules for the DNC maintenance staff and, along with the DNC Curry Village managers, assigned, supervised, and evaluated the maintenance work in Curry Village.  *Id.* at 389:23-393:2.  DNC also did its own operational appraisals and stewardship plans for its operations at Yosemite without NPS input.  *Id.* at 393:7-399:5.  An NPS Concessions Specialist was only in Curry Village a few days every year to perform an evaluation of DNC's operation and maintenance of Curry Village.  *Id.* at 382:16-384:14, 412:23-415:10.  This spot-checking was the primary way that the NPS monitored DNC's operations there, and does not consist of the type of detailed physical control of DNC's employees that overcomes the independent contractor exception.

As the United States detailed in its Opening Brief, the NPS can have certain rights and obligations under the concessions contract without turning DNC's employees into government employees (U.S. Br. at 37-38).  The crucial factor is the actual detailed physical control of the contractor employees, which the United States clearly lacked.  Additionally, the fact that the NPS took proactive measures to require corrective action in response to a 2008 complaint of rodents in Curry Village does not change the fundamental nature of the relationship.  Tellingly, DNC failed to address the many cases finding that NPS concessioners in similar circumstances were independent contractors and cannot cite a single case in which an NPS concessioner has been held to be a government agent for purposes of FTCA liability.

## CONCLUSION

For all of the foregoing reasons, the United States' motion to dismiss should be granted.

Dated:  June 19, 2015                        Respectfully submitted,


                                             BENJAMIN C. MIZER
                                             Principal Deputy Assistant Attorney General
                                             Civil Division

                                             MELINDA HAAG
                                             United States Attorney

                                             J. PATRICK GLYNN
                                             Director, Torts Branch

                                             BRIDGET BAILEY LIPSCOMB
                                             Assistant Director

                                                  /s/ Adam Bain
KENNETH C. WARD                              ADAM BAIN
JOHN L. KORTUM                               Senior Trial Counsel
MATTHEW D. BARNETTE                          IN Bar No. 11134-49
Archer Norris                                WAGNER JACKSON
2033 N. Main St., Suite 800                  MICHELE S. GREIF
Walnut Creek, CA 94596                       KERI L. BERMAN
(925) 930-6600                               Trial Attorneys
                                             Civil Division, Torts Branch
JOHN J. SNYDER                               U.S. Department of Justice
TARA NALENCZ                                 P. O. Box 340
MARY ANN CAPRIOTTI                           Washington, D.C. 20044
Rawle & Henderson, LLP                       Telephone: (202) 616-4209
The Widener Building                         FAX: (202) 616-4473
One South Penn Square                        e-mail: adam.bain@usdoj.gov
Philadelphia, PA 19107
(215) 575-4200

Attorneys for the United States

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document, and the supporting exhibits were all served on all counsel of record by operation of the court's electronic filing system and can be accessed through that system.


DATED:  June 19, 2015

　　　　　　　　　　　　　　　　　　　__/s/ Adam Bain__
　　　　　　　　　　　　　　　　　　　ADAM BAIN
　　　　　　　　　　　　　　　　　　　Senior Trial Counsel
　　　　　　　　　　　　　　　　　　　IN Bar No. 11134-49
　　　　　　　　　　　　　　　　　　　United States Department of Justice
　　　　　　　　　　　　　　　　　　　P. O. Box 340
　　　　　　　　　　　　　　　　　　　Washington, D.C.  20044
　　　　　　　　　　　　　　　　　　　Telephone: (202) 616-4209
　　　　　　　　　　　　　　　　　　　FAX: (202) 616-4473
　　　　　　　　　　　　　　　　　　　Email: adam.bain@usdoj.gov