United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   IN RE: YOSEMITE NATIONAL PARK            MDL Docket No. C 14-2532 MMC
     HANTAVIRUS LITIGATION
12   _____   **ORDER GRANTING IN PART AND
                                              DENYING IN PART UNITED STATES'
13                                            MOTION TO DISMISS FOR LACK OF
     THIS DOCUMENT RELATES TO:                SUBJECT MATTER JURISDICTION;
14        ALL CASES                           LIFTING STAY ON DISCOVERY**
15   _____/

16

17       Before the Court is defendant United States' Motion to Dismiss for Lack of Subject

18   Matter Jurisdiction, filed October 31, 2014, pursuant to Rule 12(b)(1) of the Federal Rules

19   of Civil Procedure.  Plaintiffs and the DNC Defendants ("DNC")[1] have separately filed

20   oppositions, to which the United States has filed a single reply.[2]  Having read and

21   considered the parties' respective written submissions, the Court hereby rules as follows.[3]

22   //

23   _____

24       [1]DNC Defendants are Delaware North Companies, Inc., Delaware North Companies
     Park & Resorts, Inc., DNC Parks & Resorts at Yosemite, Inc., and DNC Parks & Resorts
25   Reservations, Inc.

26       [2]Plaintiffs have filed an administrative motion to strike Appendices B and C to the
     United States' reply, and DNC has filed an administrative motion to strike Appendices A, B
27   and C to said reply.  As the Court has not relied on the challenged appendices in reaching
     its decision, the motions are hereby DENIED as moot.
28
         [3]By order filed July 21, 2015, the Court took the matter under submission.

**BACKGROUND**

Plaintiffs' claims are set forth in the Master Consolidated Complaint ("MCC"), filed September 3, 2014, and arise from a "Hantavirus outbreak in Yosemite National Park in the Summer of 2012" (see MCC ¶ 1), which outbreak, plaintiffs allege, resulted in "a total of ten (10) confirmed cases, including at least three (3) fatal cases" (see MCC ¶ 32.  Plaintiffs allege that Hantavirus is a "lethal virus that can infect some by airborne transmission," and that the "risk of infection is increased dramatically when there is a high level of deer mice, deer mice droppings, deer mice urine, and/or deer mice saliva present in an area."  (See MCC ¶ 31.)  Plaintiffs further allege that, in June 2012, each of their families stayed in a "Signature Tent Cabin" ("STC") located within Curry Village in Yosemite National Park ("Yosemite") (see MCC ¶¶ 10, 56-60), where they and/or their decedents were "unknowingly exposed to Hantavirus" (see MCC ¶ 33.  According to plaintiffs, "the interior wall [of the STCs] created a rodent harborage allowing rodent feces, urine and saliva to accumulate undetected."  (See MCC ¶ 88.)

Plaintiffs name as defendants (1) the United States, which "owns" Yosemite and "administers" it through employees of the National Parks Service ("NPS") (see MCC ¶ 11), and which entered into a "concession contract" with DNC, providing that DNC would be the concessioner for "hotel, restaurant and visitor services at Yosemite" (see MCC ¶¶ 35-36); (2) DNC, which is alleged to be "responsible for the management and operation of Curry Village within Yosemite" (see MCC ¶ 5) and which, in 1993, allegedly "purchased" from the previous concessioner the "structures that would ultimately become known as the 'Signature Tent Cabins' in Curry Village" (see MCC ¶ 35); and (3) Yosemite Construction, Inc. ("Yosemite Construction"), which allegedly "buil[t]" the STCs (see MCC ¶ 9).

**LEGAL STANDARD**

A motion to dismiss for lack of subject matter jurisdiction, unlike a motion to dismiss for failure to state a claim under Rule 12(b)(6), "may be made as a speaking motion attacking the existence of subject matter jurisdiction without converting the motion into a motion for summary judgment."  See Trentacosta v. Frontier Pacific Aircraft Indus., 813

1   F.2d 1553, 1558 (9th Cir. 1987) (internal quotation and citation omitted).  In analyzing a

2   motion to dismiss for lack of subject matter jurisdiction, the district court assumes as true

3   the factual allegations in the complaint, see Dreier v. United States, 106 F.3d 844, 847 (9th

4   Cir. 1997), other than factual allegations that bear on jurisdiction, to which "no presumptive

5   truthfulness attaches," see Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983)

6   (internal quotation and citation omitted).  With respect to jurisdictional facts, the district

7   court is "ordinarily free to hear evidence regarding jurisdiction and to rule on that issue prior

8   to trial, resolving factual disputes where necessary."  See id.[4]

9                                    **DISCUSSION**

10       In the MCC, plaintiffs allege nine causes of action against the United States,[5] each

11   of which, as discussed in more detail below, is based on theories of negligence, and each

12   of which is brought pursuant to the Federal Tort Claims Act.  See 28 U.S.C. § 1346(b); 28

13   U.S.C. §§ 2671-2680.

14       DNC, in cross-claims against the United States, brought pursuant to the FTCA and

15   filed in four of the five actions in which DNC has been named as a defendant,[6] alleges that

16

17       [4]This rule is subject to an exception where "the question of jurisdiction is dependent
18   on the resolution of factual issues going to the merits," in which case "the jurisdictional
    determination should await a determination going to the merits or at trial."  See id.  Here,
19   no party has shown such exception is applicable to any issue presented by the instant
    motion.

20       [5]Some of the nine causes of action are brought on behalf of all plaintiffs, such as the
21   Seventh Cause of Action ("Premises Liability") while others are brought on behalf of certain
    plaintiffs only, such as the First Cause of Action ("Wrongful Death").

22       [6]Although DNC does not explicitly allege the statutory basis for its cross-claims
23   against the United States, the basis necessarily is the FTCA.  See 28 U.S.C. § 2679(b)(1)
    ("The remedy against the United States provided by section[ ] 1346(b) . . .  of this title for
24   injury . . . resulting from the negligent or wrongful act or omission of any employee of the
    Government while acting within the scope of his office or employment is exclusive of any
25   other civil action or proceeding for money damages by reason of the same subject matter
    against the employee whose act or omission gave rise to the claim"); Lockheed Aircraft
26   Corp. v. United States, 460 U.S. 190, 198 (1983) ("The Federal Tort Claims Act permits an
    indemnity action against the United States in the same manner and to the same extent that
27   the action would lie against a private individual under like circumstances.") (internal
    quotation and citation omitted); United States v. Yellow Cab Co., 340 U.S. 543, 556-57
28   (1951) (holding "the Federal Tort Claims Act carries the Government's consent to be sued
    for contribution . . . as a third party defendant").

3

if DNC is held "at fault for [p]laintiffs' injuries," the United States "bears all or part of that fault." (See, e.g., Answer With Cross-Claim, filed February 28, 2014, in Garisto v. United States, ¶¶ 305-06 (hereinafter, "Cross-Claim").)[7]

The FTCA was "enacted to waive the Government's sovereign immunity" under limited circumstances.  See Lockheed Aircraft Corp., 460 U.S. at 193-94.  Specifically, under the FTCA, the United States may be sued for claims alleging, inter alia, "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  See 28 U.S.C. § 1346(b)(1); see also United States v. Orleans, 425 U.S. 807, 813 (1976) (referring to FTCA as "a limited waiver of sovereign immunity").  The waiver of sovereign immunity set forth in the FTCA is subject to certain exceptions, one of which is the "discretionary function exception."  See Berkovitz v. United States, 486 U.S. 531, 535-36 (1988).[8]  Under the "discretionary function exception," the provisions of the FTCA do not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  See 28 U.S.C. § 2680(a).

---

[7]As each cross-claim filed by DNC against the United States is, in all material respects, identical, the Court, when referring herein to DNC's allegations, has cited only to the allegations in the cross-claim filed in the Garisto action.

[8]Another exception potentially applicable here is the "independent contractor" exception, under which the United States cannot be held liable for acts or omissions of a contractor.  See Orleans, 425 U.S. at 813-14 (internal quotation and citation omitted).  In its motion, the United States argues that, to the extent plaintiffs seek to impose liability against the United States for acts or omissions of DNC, the claims are subject to dismissal as against the United States.  In their opposition, plaintiffs clarify that they "are not seeking to hold the United States vicariously liable for the acts of [DNC]," but, rather, seek to hold "each defendant individually liable for their own respective acts and omissions."  (See Pls.' Opp. at 39:2-5.)  In light of plaintiffs' clarification, and given that DNC's claims against the United States are based on conduct allegedly committed by the United States and not by any other entity, the Court does not further consider the independent contractor exception herein.

4

Courts apply a "two-part test" to determine whether the discretionary function exception bars a claim.  See Alfrey v. United States, 276 F.3d 557, 561 (9th Cir. 2002).

First, "a court must . . . consider whether the [challenged] action is a matter of choice for the acting employee."  See Berkovitz, 486 U.S. at 536.  "This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice."  Id.  Thus, where a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," see id., or where "the government incorporates specific safety standards in a contract which imposes duties on the government's agent," see Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1026 (9th Cir. 1989), "there is no discretion in the conduct for the discretionary function exception to protect" as "the employee has no rightful option but to adhere to the directive," see Berkovitz, 486 U.S. at 536; see also id. at 542-43 (holding, where regulation provided that federal Department of Biologic Standards could not issue product license for polio vaccines until agency "receive[d] certain data from the manufacturer relating to the product's compliance with regulatory standards," negligence claim based on theory agency issued license "without having received the required test data" was not barred by discretionary function exception).

Second, "assuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield."  Id. at 536.  "The basis for the discretionary function exception was Congress' desire to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  Id. at 536-37 (internal quotation and citation omitted).  "The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy."  Id. at 537.

Before this Court can apply the above-referenced test, it "must first identify [p]laintiffs' specific allegations of agency wrongdoing," see Young v. United States, 769 F.3d 1047, 1053 (9th Cir. 2014) (internal quotation and citation omitted), as "determining

the precise action the government took or failed to take (that is, how it is alleged to have been negligent) is a necessary predicate to determining whether the government had discretion to take that action," see id. at 1054.  Additionally, "each claimed negligent act" must be considered separately to determine whether "each person taking an allegedly negligent action had discretion."  See In re Glacier Bay, 71 F.3d 1447, 1451 (9th Cir. 1995) (internal quotation and citation omitted) (observing, "proper question to ask is not whether the Government as a whole had discretion at any point, but whether its allegedly negligent agents did in each instance").

Lastly, in determining whether the discretionary function exception bars any particular claim, the question of whether the United States was negligent is "irrelevant." See Routh v. United States, 941 F.2d 853, 855 (9th Cir. 1991).  Rather, "[t]he sole question before [the Court] is whether the conduct upon which plaintiffs rely for recovery falls within the discretionary function exception."  See Camozzi v. Roland/Miller & Hope Consulting Group, 866 F2d 287, 288 (9th Cir. 1989).

Accordingly, the Court next considers, in turn, each act or omission on which plaintiffs and/or DNC base their claims against the United States, for the purpose of determining whether the alleged act or omission falls within the discretionary function exception and thus bars the Court from considering the merits of such a claim.

**A. Claims Based on Approval of DNC's Proposal to Renovate Tent Cabins**

In the MCC, plaintiffs allege the STCs were "improperly approved, constructed, [and] installed by the defendants" (see MCC ¶ 50); more specifically, according to plaintiffs, "the design fabrication and assembly of the [STCs] negligently created and/or increased the danger of exposure to mice, rodent, and pest borne diseases by creating a space between the interior and exterior walls of the [STCs], with heat, and the enticement of food within the [STCs], for rodents to nest and hide."  (See MCC ¶ 144.)  In its Cross-Claim, DNC alleges that, to the extent it is held liable for plaintiffs' injuries, the United States "bears all or part of that fault" for the reason that NPS employees "directed and approved" the "design and construction of the [STCs]" (see Cross-Claim ¶ 305), and, in so doing

1    "failed to consider rodent exclusion" in connection therewith (see id. ¶ 306).

2         In its motion to dismiss, the United States interprets such claims as a challenge to

3    the NPS's "review" of the "DNC's winterization of the [STCs]."  (See United States' Mot. to

4    Dismiss ("MTD") at 28:13-15; 29:13-15.)  In their opposition, plaintiffs in essence confirm

5    such interpretation; in particular, plaintiffs clarify that their claims against the United States

6    are based on the assertion that, when DNC sought to "winterize[ ]" the subject cabins by

7    "converting them to 'double-walled' structures" (see Pls.' Opp. at 5:22-24), (1) the

8    Superintendent of Yosemite, an NPS officer, did not give prior approval to DNC to perform

9    the work, and, in particular, did not require DNC to submit for approval "plans and

10   specifications completed by a licensed architect or engineer" (see id. at 15:11-15), (2) no

11   NPS employee "assessed [the STCs] for safety from a rodent exclusion perspective" (see

12   id. at 18:6-8), and (3) an NPS employee failed to determine that the STCs "violated a fire

13   safety provision of the California Building Code" (see id. at 17:8).  In its opposition, DNC

14   confirms that, to the extent its claims against the United States are based on the NPS's

15   review of DNC's proposal, DNC is making the same allegation as made in the third of the

16   above-referenced bases identified by plaintiffs, namely, the NPS's "fail[ure] to consider

17   pests in directing and approving the design."  (See DNC's Opp. at 11:16-17.)[9]

18        **1.  Factual Background**

19        In October 2008, a "large rock fall" caused "significant damage" to a number of

20   "overnight accommodations" in Yosemite (see DNC's App. Ex. 2 ¶ 3), after which Michael

21   J. Tollefson, who was at that time the Superintendent of Yosemite, advised DNC in writing

22   that, as a result of the rock slide, a number of accommodations in Curry Village were to be

23   "closed" (see Shah Decl. Ex. 10).  Among the accommodations to be closed were the

24   accommodations that previously had been used by the "Yosemite Institute," a "non-profit

25

26        [9]The United States' motion to dismiss does not challenge the adequacy of the
     pleadings under Rule 8(a), and was filed prior to the United States' having taken discovery
27   from plaintiffs or DNC to seek, for example, clarification as to the factual bases for the
     claims against it.  Under such circumstances, it would appear that the first opportunity for
28   plaintiffs and the DNC to provide further details as to the claims was in their respective
     oppositions to the instant motion to dismiss.

children's nature education organization whose students stayed in [Yosemite] each winter."
(See DNC's App. Ex. 2 ¶ 3; Shah Decl. Ex. 4 at 52:23 - 53:5.)

In October and November 2008, the NPS and DNC had a number of meetings to discuss the manner in which the accommodations that had been closed would be replaced, in order that the Yosemite Institute students could be accommodated that winter.  (See DNC's App. Ex. 11 ¶ 3; Shah Decl. Ex. 4 at 52:20 - 53:25.)  The NPS "decided to relocate [the] Yosemite Institute students to the Boystown section of Curry Village, a [DNC] employee housing area" that included "canvas tent cabins."  (See DNC's App. Ex. 11 ¶ 3.) At that time, however, the canvas tent cabins were "not suitable for winter use, as they had only a single canvas wall."  (See DNC's App. Ex. 2 ¶ 4.)  DNC proposed replacing the canvas tent cabins with "hard-sided cabins," a proposal the NPS rejected "because, in [the] NPS's view, they would constitute new construction in Yosemite."  (See DNC's App. Ex. 11 ¶¶ 3-4.)  DNC next proposed a "hard-sided cabin draped in canvas," which proposal the NPS rejected "because the canvas would not drape like a typical tent in the historic area of Curry Village."  (See id. ¶ 5.)  Thereafter, DNC proposed insulating the interiors of the tent cabins "to provide warmth without altering the cabins' exterior appearance."  (See id. ¶ 6.) Specifically, on or about November 16, 2008, DNC submitted to the NPS, on a form titled "Operations Proposal" and denominated a "draft," its proposal to convert the tent cabins to "overnight accommodations to house Yosemite Institute [p]articipants and other Park guests," which "conversion [would] include winterizing the tent cabins with insulation."  (See DNC App. Ex. 13.)

On December 17, 2008, Donald K. Coffman ("Coffman"), the NPS's Fire Marshal for Yosemite, met with Don Evans ("Evans"), DNC's Project Manager, at the site of the tent cabins.  (See Dempsey Decl. Ex. 21 at 51:7-15; 89:23-25.)  Evans "described what [DNC was] proposing for the modification of the tent," and Coffman "looked at an existing tent" and "took a look at the interior" (see id. Ex. 21 at 67:2-12; Shah Decl. Ex. 14 at 130:4-13); he also took "photographs of the tents" and of the "rigid insulation material" at the site (see Dempsey Decl. Ex. 21 at 67:20-23).  At the conclusion of the on-site meeting, Coffman

gave his "verbal agreement" to DNC's proceeding with a "winterization method [that would] consist of foam insulation and greenboard (drywall) on the interior of the tents" (see id. Ex. 22), and he and Evans agreed that Evans would submit a "written description of how the construction would take place," which description "would reflect [their] decision . . . to change out the material from plywood to drywall material" (see Bain Decl. II Ex. 21 at 79:21 - 81:1.)  Later that same day, Elexis Mayer ("Mayer"), the NPS's Concessions Management Specialist, who was present at the on-site meeting, sent an email to DNC, in which she confirmed Coffman's "verbal agreement" to the proposed "winterization method," and stated the "[w]ork is expected to resume tomorrow morning."[10]  (See Dempsey Decl. Ex. 22.)

Two days later, on December 19, 2008, DNC emailed to Coffman and Mayer a "description of the work to be performed at [the subject] tents per the agreement reached on Wednesday[,] December 17, 2008" (see Bain Decl. I Ex. 17 at NPS_10306), and attached thereto, inter alia, "a rough sketch of the proposed changes used to convert the interior surfaces of the [subject] tents and the material specifics" (see id. Ex. 17 at NPS_10308).  Coffman received the email and "review[ed] it."  (See Bain Decl. II Ex. 21 at 131:21-24.)[11]

The tents were then "winterized," which work "included the addition of ceiling rafters and wall studs to the structures, as well as ridged foam insulation[12] that was fitted between the wooden structural components."  (See Bain Decl. I Ex. 9 at 2.)  The work was performed by Yosemite Construction and completed in January 2009.  (See Dempsey Decl. Ex 20 at 71:4-20.)  Later, in a letter sent to DNC and dated February 23, 2009, David V. Uberuaga ("Uberuaga"), the then Acting Superintendent of Yosemite, provided written

---

[10]The record is not clear as to when the work began.

[11]Coffman testified that he does not recall taking any further action upon his review of the written description, but stated that if he were to have had any concern with the description, he would have contacted Evans.  (See id. Ex. 21 at 131:25 - 132:13.)

[12]The Court understands "ridged foam insulation" to be a form of "rigid insulation."

1   approval of the work.  Specifically, Uberuaga advised DNC that the NPS was "authorizing

2   DNC to temporarily convert [the tent cabins] for use as visitor accommodation units when

3   not needed for employee housing."  (See id. Ex. 42.)

4       **2.  Claims Based on Fire Inspection**

5       According to Coffman, who, as noted, was the Fire Marshal for Yosemite, the NPS

6   was required to inspect DNC's proposed renovation of the subject cabins under the NPS's

7   "fire prevention safety policy," which policy, Coffman states, provides that "the fire

8   prevention office and fire marshal will review projects for construction alteration" (see id.

9   Ex. 21 at 29:13 - 30:5), and, in particular, will review such alterations to determine whether

10  they comply with the International Building Code (see Bain Decl. II Ex. 21 at 47:24-25).[13]

11      Plaintiffs assert that Coffman negligently failed to identify violations of the California

12  Building Code when he inspected the STCs.  Further, in reliance on an expert whom they

13  intend to offer to establish the merits of their claims, plaintiffs assert that the provisions of

14  the California Building Code that were allegedly violated are "identical" to provisions of the

15  International Building Code.  (See Dempsey Decl. Ex. 43 ¶¶ 10, 20.)[14]  Consequently,

16  plaintiffs argue, to the extent their claims are based on Coffman's inspection, such claims

17  are not barred by the discretionary function exception, as Coffman was required to inspect

18  the proposed alterations to determine if they complied with the building code.

19      The United States argues that when its employees review for safety the work of a

20  contractor, courts have "consistently found" such review "implicates protected public

21  policies."  (See Def.'s Reply at 8:18-21.)  In support thereof, the United States cites

22

23      [13]No party has cited to any exhibit incorporating a copy of said policy, nor has the
24  United States objected to or disagreed with Coffman's description of its contents.

25      [14]As the United States correctly notes, for purposes of the Court's analysis as to the
    discretionary function exception, the opinions of plaintiffs' expert are irrelevant.  See
26  Camozzi, 866 F.2d at 288 (holding, in determining whether plaintiffs' claim is barred by
    discretionary function exception, "the district court [does] not consider the merits of
27  plaintiffs' claims").  The Court has considered the expert's opinions solely for the purpose of
    determining the nature of the "claimed negligent act."  See In re Glacier Bay, 71 F.3d at
28  1451 (holding district court, when considering whether discretionary function exception
    barred claims, must separately examine "each claimed negligent act").

1    Kirchmann v. United States, 8 F.3d 1273 (8th Cir. 1993) and In re Consolidated U.S.

2    Atmospheric Testing Litig., 820 F.2d 982 (9th Cir. 1987).  The cited cases, however, are

3    distinguishable, as the plaintiffs in those cases challenged the United States' decision as to

4    the type of safety review it had directed its employees to conduct.  See Kirchmann, 8 F.3d

5    at 1277 (analyzing claim in which plaintiff alleged government was negligent by "not

6    supervising the day-to-day operations of the contractors" building government facility); In re

7    Consolidated U.S. Atmospheric Testing Litig., 820 F.2d at 995-96 (analyzing claim in which

8    plaintiff alleged government was negligent when it "determine[d] the extent to which it

9    [would] supervise the safety procedures of private individuals" working as government

10   contractors at nuclear test site) (internal quotation and citation omitted).

11        By contrast, where a claim is based on the theory that the United States, when

12   inspecting the work of another, negligently "perform[ed] its retained safety functions,"

13   whether set forth in a statute, regulation, policy or contract, the discretionary function

14   exception does not apply.  See Camozzi, 866 F.2d at 289-90 (holding, where government

15   retained right under contract to inspect construction site for "floor openings," discretionary

16   function exception did not bar claim based on failure to conduct such inspections); see also

17   Bear Medicine v. United States, 241 F.3d 1208, 1215 (9th Cir. 2001) (setting forth general

18   rule that "once the government has undertaken responsibility for the safety of a project, the

19   execution of that responsibility is not subject to the discretionary function exception").  In

20   such cases, the alleged failure to adequately perform an inspection is "simply a failure to

21   effectuate policy choices already made."  See Camozzi, 866 F.2d at 290.

22        Here, the claims based on Coffman's inspection are not barred by the discretionary

23   function exception, as, on the record presently before the Court, the challenged act is an

24   alleged "failure to effectuate [a] policy choice[ ] already made," see id., i.e., the policy

25   choice that the fire marshal would determine whether the proposed alterations complied

26   with the International Building Code, see ARA Leisure Services v. United States, 831 F.2d

27   193, 195 (9th Cir. 1987) (holding, where "challenged governmental activity involves safety

28   considerations under an established policy rather than the balancing of competing public

11

1    policy considerations, the rationale for the [discretionary function] exception falls away")

2    (internal quotation and citation omitted).

3        Accordingly, to the extent plaintiffs' claims are based on Coffman's having

4    conducted a negligent fire inspection, the United States has failed to show such claims are

5    barred by the discretionary function exception.

6        **3.  Claims Based on Manner in Which Approval Was Given**

7        Plaintiffs argue that under the terms of the Concession Contract between the NPS

8    and DNC, the NPS lacked discretion to approve the proposed renovation other than in a

9    writing from the Superintendent issued prior to the date on which the work began, and,

10   further, that the Superintendent lacked discretion to give approval until DNC had submitted

11   a plan prepared by an architect or engineer.  Specifically, plaintiffs rely on language in the

12   Concession Contract providing that the NPS "must approve plans and specifications for all

13   types of construction prior to the start of each project."  (See Dempsey Decl. Ex. 4 at NPS-

14   2_00548.)  Additionally, plaintiffs rely on language in the Concession Contract providing

15   that "[p]lans and specifications must be prepared in accordance with NPS-48, Chapter 17,

16   Design and Construction" (see id.),[15] and on a provision in NPS-48 requiring that "designs,

17   except in the cases of very simple construction (as determined by the Superintendent),

18   must be prepared by a licensed architect or engineer" (see Dempsey Decl. Ex. 6 at NPS-

19   11_00197).

20       As the United States points out, and plaintiffs do not dispute, the language on which

21   plaintiffs rely pertains to "construction."  Although plaintiffs appear to argue that all

22   modifications to existing structures constitute "construction," plaintiffs fail to offer any

23   evidence to show the term "construction," as used in the Concession Contract,

24   encompasses all modifications to existing structures, and, in particular, to alterations of

25   //

26   //

27   _____

28       [15]NPS-48 is a "concession management manual."  See Lake Mohave Boat Owners
Ass'n v. National Park Service, 78 F.3d 1360, 1363 n.3 (9th Cir. 1995).

existing structures owned by DNC.[16]  The United States, by contrast, has submitted a declaration by Don L. Neubacher ("Neubacher"), the current Superintendent of Yosemite, who states that the term "construction," as used in the Concession Contract, is understood by the NPS to refer only to "new construction or significant project work, such as work that would alter real property," and does not encompass "operational work on [DNC's] personal property," such as the subject tent-cabins.  (See Neubacher Decl. ¶ 11.)  There being no contrary evidence, e.g., evidence that the NPS or DNC ever considered the contractual provisions pertaining to "construction" as applying to alterations to DNC's existing personal property, the Court finds the provisions of the Concession Contract on which plaintiffs rely are inapplicable to the subject alterations.

Next, with respect to their claims that NPS should have reviewed DNC's proposal from a rodent-exclusion perspective, plaintiffs and DNC both argue the discretionary function exception is inapplicable because, they contend, the United States was required to conduct such a review.  The Court is not persuaded, as the respective documents on which plaintiffs and DNC rely lack any "mandatory" or "specific" directive to undertake such a review.  See Kennewick Irrigation District, 880 F.2d at 1027 (holding, where plaintiff alleged federal agency negligently designed canal by not including certain features, agency had "discretion to make design decisions regarding the [subject] canal," as "no mandatory, specific statute, regulation, or policy" required agency to include features identified by plaintiff).

Although the Concession Contract, on which plaintiffs rely, provides that "[m]onitoring concession contract compliance includes evaluating all . . . improvements to facilities" (see Dempsey Decl. Ex. 4 at NPS-2_00509), and that DNC "must have prior

---

[16]As plaintiffs acknowledge in the MCC (see MCC ¶ 35), the subject cabins are owned by DNC and not the United States.  (See Dempsey Decl. Ex. 4 at NPS-2_00302 (Concession Contract provision that "canvas structures (primarily guest and employee cabins)" are not among government "assets" assigned by the United States to DNC); Bain Decl. II Ex. 25 at 422:3-21, 423:15-21(testimony of DNC's Rule 30(b)(6) witness agreeing that tent cabins are not "government assets," but, rather, "DNC's assets"); Dempsey Decl. Ex. 39 at 560:19-23 (testimony of DNC's Rule 30(b)(6) witness agreeing that "signature tent cabins are actually a concessionaire facility").)

service approval before implementation of any new improvements" (see id. Ex. 4 at NPS-2_00518), nothing in those provisions, or in any other section of the Concession Contract cited by any party, requires such an evaluation or approval process to include a review from a rodent-exclusion perspective.  Further, although a Department of the Interior Departmental Manual, on which DNC relies, provides that the Department of the Interior has a "policy" to "[d]esign and maintain the stability of structures . . . to prevent and reduce conditions conducive to pests" (see DNC App. Ex. 9 at 3-4),[17] nothing in said policy specifically requires the NPS to review the propriety of a concessionaire's proposal to renovate its existing structures from a rodent-exclusion perspective.

As the NPS had discretion to determine when the Superintendent would consider whether to approve the proposal, to determine what type of plan it would require DNC to submit, and to determine the manner in which it would review the proposal, the Court next considers whether the NPS's exercise of discretion as to such matters is "susceptible to public policy analysis."  See Bailey v. United States, 623 F.3d 855, 860-61 (9th Cir. 2010).

"Public policy has been understood to include decisions grounded in social, economic, or political policy."  Id. at 861 (internal quotation and citation omitted).  "[S]o long as a decision involves even two competing interests, it is 'susceptible' to policy analysis and is thus protected by the discretionary function exception."  See id. at 863.  Moreover, "whether the government employee actually balanced economic, social, and political concerns in reaching his or her decision" is "irrelevant"; the "relevant question . . . is whether the decision is susceptible to policy analysis."  See Kennewick Irrigation Dist., 880 F.2d at 1028.

The United States argues that the challenged decisions are susceptible to public policy analysis, specifically, the policies "underlying the use and selection of concessionaires for the national parks."  (See MTD at 29:18-19.)  As discussed below, the Court agrees.

_____

[17]The NPS is an agency in the Department of the Interior.  See 54 U.S.C. § 100301.

14

In 1916, Congress enacted the Organic Act, in which it directed the NPS to "promote and regulate the use of the Federal Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  See 54 U.S.C. § 100101(a).  Congress subsequently "declare[d]" that "the development of public accommodations, facilities, and services in System units shall be limited to accommodations, facilities, and services that (1) are necessary and appropriate for public use and enjoyment of the System unit in which they are located; and (2) are consistent to the highest practicable degree with the preservation and conservation of the resources and values of the System unit."  See 54 U.S.C. § 101912(b).  Further, Congress has directed the NPS to "utilize concession contracts to authorize a person, corporation, or other entity to provide accommodations, facilities, and services to visitors to System units," see 54 U.S.C. § 101913, and, when determining whether to award a concession contract, to consider, inter alia, "[t]he responsiveness of the proposal to the objectives of protecting, conserving, and preserving resources of the System unit and of providing necessary and appropriate facilities and services to the public at reasonable rates," see 54 U.S.C. § 101913(5)(i).

Read together, the above-quoted statutes establish that, in balancing the interests of preserving national parks and providing for public use and enjoyment of the parks, Congress has determined that the NPS should rely on concessioners to provide public accommodations, in apparent recognition of the fact that the NPS lacks the ability and resources to do so itself.  In conformity with the policies identified by Congress, the Concession Contract between the NPS and DNC states that DNC is to "provide accommodations" to the public in Yosemite (see Bain Decl. I Ex. 1-A at NPS-2_00244), and that DNC "shall maintain and operate the said accommodations . . . to such extent and in such manner as the Secretary may deem satisfactory" (see id. Ex. 1-A at NPS-

1   2_00245).[18]

2       "When established governmental policy, as expressed or implied by statute,

3   regulation, or agency guidelines, allows a Government agent to exercise discretion, it must

4   be presumed that the agent's acts are grounded in policy when exercising that discretion."

5   United States v. Gaubert, 499 U.S. 315, 324 (1991).  To rebut such presumption and

6   "survive a motion to dismiss," the plaintiff must show "the challenged actions are not the

7   kind of conduct that can be said to be grounded in the policy of the regulatory regime."  See

8   id. at 324-25.

9       As discussed above, DNC submitted to the NPS a proposal to renovate existing tent

10  cabins in order that they could be occupied by members of the public, and the NPS

11  reviewed the proposal in two steps.  First, on December 17, 2008, Coffman, the Fire

12  Marshal, verbally approved the proposal after inspecting the site, and Coffman's verbal

13  approval was confirmed in writing later that same date.  Second, on February 23, 2009,

14  after DNC had submitted to the NPS a written description of the proposed work, as DNC

15  had agreed to do during Coffman's inspection, and, after the work had been completed, the

16  Superintendent of Yosemite provided approval to DNC in writing.

17      Neither plaintiffs nor DNC has shown that the NPS's discretionary decisions

18  regarding the manner in which it would review the proposal were not grounded in the

19  policies identified by Congress, specifically, to provide for public accommodations at a

20  reasonable cost and to rely on the expertise of contractors in providing such

21  accommodations.  Consequently, plaintiffs and DNC have failed to rebut the presumption

22  that NPS's discretionary acts were grounded in public policy.  To the extent plaintiffs argue

23  that "[e]nsuring the construction of safe visitor accommodations" is "not a discretionary

24  function" (see Pls.' Opp. at 21:17-18), the Court, given the facts presented in the instant

25  case, disagrees.  The claims here arise from the manner in which the NPS decided to

26

27      [18]The "Secretary" is defined in the Concession Contract as the "Secretary of the
    Interior, through the Director of the National Parks Service."  (See id. Ex. 1 at NPS-
28  2_00243.)

1    review a concessioner's proposal to renovate the interior of cabins the concessioner owned

2    and sought to rent to the public, and "courts have found protected as policy judgments

3    decisions related to the extent to which an agency will supervise the safety procedures of

4    private individuals, because of the impact of those decisions on the feasibility and

5    practicality of a government program with respect to staffing and funding and the efficient

6    allocation of agency resources."  See Kirchmann, 8 F.3d at 1277-78 (internal quotation,

7    alteration and citation omitted) (dismissing, as barred by discretionary function exception,

8    claim alleging Air Force was negligent by not "supervising the day-to-day operations" of

9    contractors building government facility); see also Whisnant v. United States, 400 F.3d

10   1177, 1183 (9th Cir. 2005) (noting any claim that "government was negligent in designing

11   its safety inspection procedures" as to overseeing "commissary on a naval base" would be

12   "barred by the discretionary function exception").

13          Accordingly, to the extent plaintiffs' claims are based on the Superintendent's having

14   approved the project subsequent to the completion of the work and without requiring

15   submission of plans drawn by an architect or engineer, and to the extent plaintiffs and

16   DNC's claims are based on the lack of a review from a rodent-exclusion perspective, such

17   claims are barred by the discretionary function exception.

18   **B.  Claims Based on Oversight of DNC's Operation of STCs**

19          In the MCC, plaintiffs allege that the NPS was negligent by not "conduct[ing]

20   adequate reviews of [DNC]" (see MCC ¶ 91), by conducting "inadequate inspections" of the

21   STCs (see MCC ¶ 90.a.), by "allow[ing] Curry Village/Camp Curry to be in a condition

22   whereby trash, food, and water was not properly contained, allowing deer mice access to

23   [the STCs]'" (see MCC ¶ 90.c.), and by not "[r]egular[ly] checking for new rodent activity" at

24   the STC (see MCC ¶ 90.d.).  In its Cross-Claim, DNC alleges that, if it is held at fault for

25   plaintiffs' injuries, the United States bears "all or some of that fault" because its employees

26   "controlled, directed and approved" DNC's "cleaning, maintenance, inspection and pest

27   management procedures and practices used with respect to the [STCs]."  (See Cross-

28   Claim ¶ 305.)

1   In their opposition, plaintiffs clarify that their negligent oversight claims are based on

2   two theories, first that the NPS did not evaluate the STCs three times a year (see Pls.' Opp.

3   23:24-27, 24:24 - 25:6), and second, that when evaluations were conducted, the inspector

4   failed to "look[ ] for gaps" between "the floor and the interior wall of the [STCs]" (see Pls.'

5   Opp. at 26:4-21).  In its opposition, DNC clarifies that its claim is based on a theory that the

6   NPS did not "inspect the [STCs] twice annually" during the years 2009 and 2011.  (See

7   DNC's Opp. at 31:10-25.)

8       **1.  Factual Background**

9       "Concessions Specialists" employed by the NPS "evaluate periodically concessioner

10   facilities and services."  (See Bryan Decl. ¶ 3.)  During 2010 through 2012, NPS "used a

11   Concessioner Review Program" that included "reviewing [DNC's] operations to determine

12   the quality, safety, and sanitation of visitor services on a periodic basis."  (See id. ¶ 6.)[19]

13   In particular, under said program, a Concessions Specialist would perform a "contract

14   compliance evaluation, which involved identifying, documenting and evaluating those

15   performance elements which affect adherence to contract provisions."  (See id.)

16       During 2010 through 2012, the Concession Specialist assigned to "evaluate [DNC's]

17   canvas tent operations," which operations included the STCs, was William Bryan ("Bryan").

18   (See id. ¶ 4.)  Bryan performed "'spot checks' of the units, rather than evaluating every

19   accommodation."  (See id. ¶ 9.)  In so doing, he evaluated the STCs "under the standards

20   for 'primitive/rustic' lodging" set forth in "NPS-48," a document that, according to Bryan,

21   sets forth the "operational performance standards . . . for review of concessioner

22   operations."  (See id. ¶¶ 7-8.)

23       In 2010, Bryan conducted two evaluations of the STCs (see Dempsey Decl. Ex. 24

24   at 87:1-14), and, in 2011, he conducted one evaluation of the STCs (see id. Ex. 24 at

25   87:12-24).  Additionally, Bryan conducted an evaluation of the STCs in August 2012.

26   //

27   ─────────────

28       [19]No party cites to any evidence regarding who conducted evaluations, if any, in
    2009.

1   (See id. Ex. 24 at 87:20-22.)[20]  With respect to the evaluations of the STCs he conducted

2   prior to August 2012, Bryan testified that a "quarter-inch gap" between the floor and interior

3   wall of an STC would not have "rise[n] to the level of a deficiency," as "during that period of

4   time . . . there were bigger tears or more observable entry points that were noted."  (See id.

5   Ex. 24 at 79:8 - 80:19.)

6          **2.  Claims Based on Adequacy of Evaluations**

7          As noted, plaintiffs base their claims in part on a theory that the NPS negligently

8   evaluated the STCs.

9          Under the terms of the Concession Contract, DNC is required to "conform to the

10  evaluation standards set forth in . . . NPS-48" when it engages in "[t]he operation of

11  accommodations" (see Dempsey Decl. Ex. 4 at NPS-2_00511), and the NPS, through "[t]he

12  Superintendent's representative(s), normally the Concessions Management Specialists,"

13  has the corresponding duty to "conduct periodic inspections of concessioner facilities and

14  services to ensure conformance to operational standards established by NPS-48" (see id.

15  Ex. 4 at NPS-2_00511).  Among the operational standards set forth in NPS-48 applicable to

16  "overnight accommodations" are that "[w]alls . . . must be free of defects such as cracks,

17  breaks, torn coverings, stains, etc." (see id. Ex. 23 at NPS-13_00104), "[g]uest rooms are

18  to be . . . free of insects and rodents or evidence thereof" (see id. Ex. 23 at NPS-

19  13_00105), and "[d]oors and windows including screens are to be sufficiently tight to

20  preclude the entry of rodents and insects" (see id.).  Consequently, the Concession

21  Contract requires DNC to operate STCs that are in conformance with such standards and

22  requires the NPS to periodically inspect the STCs to ensure the STCs and DNC's operation

23  thereof are in conformance therewith.

24         As discussed above, claims based on a theory that the United States negligently

25  "perform[ed] its retained safety functions" are not barred by the discretionary function

26  exception.  See Camozzi, 866 F.2d at 289-90.  This principle was explained by the Ninth

27  _____

28         [20]As noted above, plaintiffs allege they were exposed to Hantavirus in June 2012,
       while they were staying in STCs.

Circuit in <u>Bear Medicine</u> as follows:

> We have held that a general statutory duty to promote safety would not be sufficient to meet the <u>Berkovitz</u> requirement for specific regulations setting out a clear duty.  However, we have also held that a failure to effectuate policy choices already made will not be protected under the discretionary function exception. . . .
>
> While each case requires individual analysis, we have generally held that once the Government has undertaken responsibility for the safety of a project, the execution of that responsibility is not subject to the discretionary function exception.  The decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not. . . .
>
> The Government cannot claim that both the decision to take safety measures and the negligent implementation of those measures are protected policy decisions.  This argument would essentially allow the Government to administratively immunize itself from tort liability under applicable state law as a matter of policy.

<u>See</u> <u>Bear Medicine</u>, 241 F.3d at 1215 (internal quotations, citations, and alteration omitted).

Applying the above reasoning, the Ninth Circuit found a claim alleging the Bureau of Indian Affairs ("BIA") was "negligent in supervising and managing the safety aspects of [a logging company's] logging operations and ensuring [the company] utilized appropriate safety precautions" was not barred by the discretionary function exception, in light of contractual terms that required the company "to comply with 'prescribed safety practices and Federal Law'" and "retained for the BIA the power to suspend the contract should [the company] fail to comply with any of its provisions," and, further, in light of a provision in the BIA's "operating manual" that required it to "routinely inspect [the company's] operations." <u>See</u> <u>id.</u> at 1214-17.

Here, the United States fails to show why the general rule set forth in <u>Bear Medicine</u> is inapplicable to plaintiffs' claim that the NPS conducted negligent evaluations of the STCs.  Although the United States asserts that it engaged in "policy balancing" when it determined that a Concession Specialist would use a "spot-checking program" when evaluating overnight accommodations (<u>see</u> United States' Reply at 15:12-13), plaintiffs do not assert that the NPS's decision to evaluate only some of the STCs was negligent.

20

Rather, the claim is that as to those STCs that were evaluated, the NPS negligently failed to determine whether they complied with the operational standards set forth in NPS-48.

Accordingly, as plaintiffs' claims that the STCs were negligently evaluated are claims asserting "a failure to effectuate policy choices already made and incorporated in [a] contract[ ]," see Camozzi, 866 F.2d at 290, such claims are not barred by the discretionary function exception.

### 3. Claims Challenging Number of Evaluations

Plaintiffs assert the NPS was negligent in that it failed to evaluate the STCs three times a year, while DNC asserts the NPS was negligent in not conducting two such evaluations each year.[21]

The Court first considers whether the NPS had a mandatory duty to conduct a certain number of evaluations of the STCs each year.  In that respect, plaintiffs and DNC rely on language in NPS-48.

In particular, the "Introduction" section of NPS-48 states that said document "is a comprehensive reference source in that, to the extent possible, it contains all laws, regulations and policies in one place, thereby enabling [the NPS] to eliminate all prior memorandums issued regarding policy or procedure."  (See Bain I Ex. 16 at NPS-11_00016.)  Thereafter, Chapter 20 of NPS-48, titled "Concessioner Review Program - Operational Performance," states said chapter "establishes operational standards for facilities and services afforded the public [and] a systematic method for determining their performance level on a periodic and annual basis, through comprehensive evaluations of each facility/service[,] and permits concessioners the opportunity to correct deficiencies without being unfairly penalized."  (See Dempsey Decl. Ex. 8 at 1.)

With respect to "year-round operations,"[22] Chapter 20 of the 1986 version of NPS-48 provided as follows:  "In addition to the pre-season evaluations, a minimum of three (3)

---

[21]The Court understands plaintiffs' claim to be based, in the alternative, on the NPS's failure to conduct two evaluations each year.

[22]The STCs were "used year-round."  (See Bain Decl. II Ex. 22 at 365:14-24.)

periodic evaluations are to be conducted for all year-round operations." (See Dempsey Decl. Ex. 8 at 5.)  In 1995, however, the provision was modified, in a "Memorandum" written by the Chief of the NPS's Concession Program Division, to "[e]liminate the requirement for all pre-season evaluations" (see Bain Decl. II Ex. 34 at 1), and, with respect to the requisite number of evaluations, provided as follows:  "Parks will have the option to conduct two evaluations for year-round operations, or three or more evaluations of an entire operation, or specific parts of it, if problems exist and are not corrected" (see id. Ex. 34 at 2).

The above-referenced provisions in NPS-48, as modified by the memorandum written in 1995, give NPS the "option" to conduct, each year, three evaluations of year-round operations, but includes no requirement that three evaluations be conducted.

Under such circumstances, the Court finds the NPS had discretion to determine whether it would conduct three evaluations each year.  The above-quoted language in NPS-48, as modified by the memorandum written in 1995, does, however, require the NPS to conduct, each year, a minimum of two evaluations of year-round operations.  The United States nonetheless asserts the language on which plaintiffs and DNC rely does not deprive its inspectors of the discretion to evaluate on a less frequent basis.  The Court disagrees.

First, the Court finds unpersuasive the United States' citation to Lake Mohave Boat Owners Association, in which the Ninth Circuit addressed whether, for purposes of the Freedom of Information Act ("FOIA"), the NPS was required to publish NPS-48 in the Federal Register.  In said decision, the Ninth Circuit found NPS-48 is not "a generally applicable rule, regulation or procedure," which is the type of document that must be published in the Federal Register under FOIA, and instead is an "administrative staff manual[ ]" that, for purposes of FOIA, need only be made "available for public inspection and copying."  See Lake Mohave Boat Owners Ass'n, 78 F.3d at 1368.  Although the United States contends the opinion should be understood as finding that NPS-48 does not include any mandatory and specific directives to NPS employees, the decision does not address that issue, as no such issue was presented in the case.  Moreover, to the extent

the United States may be suggesting that administrative staff manuals, as a categorical matter, may never contain specific directives to staff, the United States cites no authority to support such assertion.

Second, the Court is unpersuaded by the United States' argument that, because the upper right-hand corner of each page of NPS-48 includes the word "Guideline," the entirety of NPS-48 is discretionary irrespective of the actual language employed therein.  As the Ninth Circuit has concluded, "prefatory language introducing flexibility into the government's duties does not trump the government's imposition of specific duties on itself."  See Navarette v. United States, 500 F.3d 914, 917 (9th Cir. 2007).  Rather, the issue to be decided is whether the language in a policy document on which a plaintiff relies is "sufficiently specific and mandatory to create clear duties incumbent upon the governmental actors."  See id. at 918 (internal quotation and citation omitted).[23]

Here, as discussed above, Chapter 20 of NPS-48, as modified by the memorandum issued in 2005, requires the Superintendent of each park, or his/her designated representative, to conduct, annually, at least two evaluations of accommodations available to the public on a year-round basis.  The United States points to no language in NPS-48, or in any other document that might shed light on such language, indicating that the Superintendent nonetheless has discretion to direct his staff to conduct less than two such evaluations each year.

---

[23]In its reply, the United States makes an additional argument, specifically, that an "independent intervening exercise of discretion" occurs after Concessions Specialists conduct evaluations.  (See United States' Reply at 12:23.)  In support of this argument, the United States relies on a case in which a plaintiff corporation asserted it had been unfairly prosecuted, but, rather than alleging the negligent act was the prosecutor's decision to pursue the case, relied on a theory that an investigator had "negligently prepared" a report for the prosecutor.  See General Dynamics Corp. v. United States, 139 F.3d 1280, 1283-84 (9th Cir. 1998).  Under such circumstances, the Ninth Circuit held the claim was barred, as "the purpose of the discretionary function exception would be severely undercut if a plaintiff could adopt the simple expedient of attacking one or more of the people who supplied information to the decision maker."  See id. at 1284 (observing that "the exercise of prosecutorial judgment will usually insulate investigating officers from liability").  Here, the Court, at the pleading stage, cannot find that a negligence claim based on the Concessions Specialist's failure to conduct two evaluations is, in actuality, a challenge to a discretionary decision made at some later point.

23

Accordingly, to the extent plaintiffs' and DNC's claims are based on the NPS's alleged failure to conduct each year two evaluations of the STCs, the Court finds such claims are not barred by the discretionary function exception.

With respect to plaintiffs' alternative claim that the NPS was negligent under the theory that it should have conducted three evaluations each year, the Court finds, for the reasons stated above with respect to the claims challenging the manner in which the NPS approved DNC's proposal to renovate the STCs, the decision not to conduct three evaluations of the STCs each year is susceptible to a public policy analysis. In particular, plaintiffs have failed to show the NPS's decision was not grounded in the policies identified by Congress in 54 U.S.C. § 101912 and 54 U.S.C. § 101913, specifically, to provide for public accommodations at a reasonable cost and to rely on the expertise of contractors in providing such accommodations. Additionally, as explained by the Superintendent of Yosemite, NPS's "actions in managing risks at Yosemite are necessarily constrained by limitations on [NPS's] budget and staffing." (See Neubacher Decl. ¶ 7); see also United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 820 (1984) (holding claim challenging manner in which Federal Aviation Administration decided to inspect private aircraft was barred by discretionary function exception; finding "such decisions require the agency to establish priorities for the accomplishment of its policy goals by balancing the objectives sought to be obtained against such practical considerations as staffing and funding").

Accordingly, the Court finds that, to the extent plaintiffs' claims are based on the NPS's failure to conduct three evaluations of the STCs each year, such claims are barred by the discretionary function exception.

## C. Claims Based on the NPS's Pest Management Practices

In the MCC, plaintiffs allege the NPS "did not ensure that Yosemite National Park had an adequate Integrated Pest Management Program providing for the control of deer mice and the Hantavirus" (see MCC ¶ 89) and that the Superintendent "did not ensure the implementation of Yosemite National Park's Hantavirus Risk Reduction Program" (see

24

1  MCC ¶ 92).  In its Cross-Claim, DNC alleges that NPS "failed to follow mandatory policies

2  and authorities regarding hantavirus" and "failed to establish required pest management

3  positions, manuals, procedures and practices."  (See Cross-Claim ¶ 306.)

4      In their opposition, plaintiffs clarify that the basis for their claims regarding pest

5  management practices is that the NPS allegedly failed to implement "an Integrated Pest

6  Management Plan ('IPM') at Yosemite."  (See Pls.' Opp. at 28:19-20; 32:25-27.)  In its

7  opposition, DNC clarifies that its claims pertaining to pest management practices are based

8  on the theories that (1) the NPS did not have an "IPM plan at Yosemite" that was "written"

9  (see DNC's Opp. at 27:13-14, 28:1-3), (2) the NPS did not have an "IPM coordinator at

10  Yosemite between 2009 and August 2012" (see id. at 28:24-25, 29:13-14), and (3) the NPS

11  did not "place spring-loaded rodent traps in likely areas of rodent shelter within 100 feet

12  around buildings" (see id. at 30:14-19).

13      **1. Factual Background**

14      The 2012 Hantavirus outbreak in Curry Village "was caused by the SNV strain of

15  Hantavirus, which is carried by wild deer mice and contracted by exposure to their feces,

16  urine or saliva."  (See Weinburke Decl. ¶¶ 3, 8.)  Specifically, nine persons who contracted

17  Hantavirus "stayed in [STCs] between June and mid-July of 2012."  (See id. ¶ 8.)

18      Prior to the 2012 outbreak, "there had only been two documented cases of

19  Hantavirus linked to Yosemite," one in July 2000 and the other in September 2010, and

20  "both involved potential exposures at tent-cabins (guest lodging), located in the High Sierra

21  region of Yosemite."  (See id. ¶¶ 4, 6.)  After the July 2000 incident, "NPS, in conjunction

22  with the CDPH [California Department of Public Health] and local health authorities, began

23  investigating the Hantavirus risk at High Sierra camps."  (See id. ¶ 5.)  Thereafter, in July

24  2002, the Superintendent of Yosemite issued a document titled "Hantavirus Program

25  Policy," which, inter alia, identifies the "symptoms of exposure," sets forth "common signs

26  of rodent infestation," and lists "steps that should be taken to rodent-proof buildings," such

27  as using "steel wool" or "wire mesh" to "seal, screen, or otherwise cover all openings into

28  [a] home which have a diameter of > 1/4 inch."  (See Bain Decl. I Ex. 5.)  In September

2007, "NPS and the CDPH performed additional vector-borne disease evaluations and surveillance in Tuolumne Meadows and in other High Sierra locations."  (<u>See</u> Weinburke Decl. ¶ 5.)

After the September 2010 incident in the High Sierra region, "[t]he NPS and the CDPH once again investigated the Hantavirus risk at Tuolumne Meadows."  (<u>See</u> <u>id.</u> at ¶ 6.)  The NPS and the CDPH then worked with DNC "to develop Hantavirus prevention measures," and, as a result, DNC's "standard operating procedures for daily housekeeping and for mitigating light and heavy mouse infestations" were "revised" (<u>see</u> <u>id.</u>); specifically, said revisions were set forth in a written "Hantavirus Policy" submitted by DNC to the NPS in December 2010 (<u>see</u> Bain Decl. I Ex. 7).  Thereafter, on April 25, 2012, the Superintendent of Yosemite issued a document titled "Yosemite National Park Directive #9: Hantavirus Risk Reduction Program" (<u>see</u> <u>id.</u> Ex. 8), which directive states its purpose is to "protect all Yosemite . . . employees, volunteers . . . , concessioners, and visitors from all hazards associated with hantavirus exposure" (<u>see</u> <u>id.</u> Ex. 8 at 1), and which sets forth a number of "Responsibilities" (<u>see</u> id. Ex. 8 at 2-3), "Procedures" (<u>see</u> <u>id.</u> Ex 8 at 3-5), and "Program Requirements" (<u>see</u> <u>id.</u> Ex. 8 at 5-8), one of which is "plac[ing] spring-loaded rodent traps" in "likely areas of rodent shelter within 100 feet around buildings" (<u>see</u> <u>id.</u> Ex. 8 at 6).

Additionally, at various times, deer mice in Yosemite have been "trapped and sampled" to determine if they had the virus that causes Hantavirus.  (<u>See</u> Bain Decl. II Ex. 23 at 46:7-20.)  In 2012, "when the outbreak occurred," deer mice that were "tested, trapped, and sampled at Curry Village" had a "seroprevalence rate [of] 13.9 percent."  (<u>See</u> <u>id.</u> Ex. 23 at 46:21 - 47:10.)

Prior to the 2012 Hantavirus outbreak, the NPS did not have an "integrated pest management plan" that was "specific" to Yosemite.  (<u>See</u> Dempsey Decl. Ex. 25 at 82:4:14, 83:12-17.)   Rather, according to the Superintendent, Yosemite had an "integrated pest management program" using "overall guidance from [the NPS]," including the "strategy" set //

forth in "NPS 77"[24] and in "other documents," such as a "rodent exclusion manual."  (See

Dempsey Decl. Ex. 25 at 83:9-17; Shah Decl. Ex 1 at 249:6-12, 250:13-21.)

### 2.  Claims Challenging Lack of IPM Plan at Yosemite and Lack of Integrated Pest Management Coordinator

As noted, plaintiffs and DNC both assert that the NPS did not implement an IPM

plan specific to Yosemite.[25]  Given the absence thereof, plaintiffs and DNC argue, the

discretionary function exception is inapplicable because, they contend, the NPS was

required to implement an IPM plan specific to Yosemite.  Further, with respect to its claim

that the NPS did not have an Integrated Pest Management Coordinator employed at

Yosemite during certain periods of time, DNC argues that the NPS was required to hire

such a person.  The Court is not persuaded, as the respective documents on which

plaintiffs and DNC rely lack a mandatory and specific directive to implement an IPM plan

specific to Yosemite or to hire an Integrated Pest Management Coordinator to work in

Yosemite.

First, plaintiffs rely on an NPS document titled "Management Policies 2006," and,

specifically, on language therein providing that "[a]ll park employees . . . will comply with

NPS pest Management Policies," that "[t]he [NPS] and each park unit will use an IPM

approach to address pest issues," and that "[p]roposed pest management activities must

be conducted according to the IPM process described in Director's Order #77-7: Integrated

Pest Management."  (See Dempsey Decl. Ex. 5 at NPS-11_00743.)  As the United States

points out, however, such language, does not include a mandatory and specific directive

requiring the NPS to implement a written IPM plan specific to each park.  Consequently,

although Management Policies 2006 does require the NPS to "use an IPM approach to

---

[24]"NPS-77" is a reference to an NPS document titled "Natural Resources Management NPS-77," which document includes a chapter titled "Integrated Pest Management."  (See DNC App. Ex. 19.)

[25]It would appear that plaintiffs and DNC are taking the position that the July 2002 "Hantavirus Program Policy," authored by the Superintendent of Yosemite, and the April 2012 "Yosemite National Park Directive #9: Hantavirus Risk Reduction Program" are not the functional equivalent of an IPM plan specific to Yosemite.

1   address pest issues" (see id.), it does not divest NPS employees at Yosemite of the

2   discretion to do so in a manner that does not involve having a written IPM plan specific to

3   Yosemite.[26]

Next, DNC relies on the following language in the Concession Contract:

The control of pests by chemical and other means is subject to park approval.
Procedures are outlined in the Park's Integrated Pest Management Plan.
Specific problems can be referred to the park's Integrated Pest Management
Coordinator.

(See DNC App. Ex. 3, Operating Plan at 41.)  The first sentence of the above-quoted

provision is a directive that DNC must obtain approval from the NPS to control pests, and

the second and third sentences are instructions to DNC as to how to seek such approval.

None of the quoted sentences, however, contains a specific and mandatory obligation on

the part of the NPS to implement a written IPM plan specific to Yosemite or to hire an

Integrated Pest Management Coordinator to work in Yosemite.

Lastly, DNC relies on language in NPS-77 stating that "[i]n order to provide the

degree of oversight and consistency necessary for a successful IPM program, the

superintendent should designate a park IPM coordinator."  (See id. Ex. 19 at RFTM

0003996.)  The Court, however, finds the quoted language affords the superintendent of

any particular park discretion to decide whether to designate an employee as an IPM

coordinator.  See In re Glacier Bay, 71 F.3d at 1452 (holding language in agency manual

stating hydrographers "should" take certain action "[c]learly . . . invest[ed] the [agency]

hydrographer with discretion"); Weissich v. United States, 4 F.3d 810, 813-14 (9th Cir.

1993) (holding agency guideline was "suggestive, not mandatory," where guideline stated

that "circumstances of all persons under probation supervision should be reviewed

periodically to determine whether they might pose a reasonably foreseeable danger to a

third person") (emphasis added).

Because the Superintendent of Yosemite had discretion to decide whether to have

_____

[26]As noted, Management Policies 2006 refers to "Director's Order #77-7: Integrated
Pest Management."  (See id.)  Plaintiffs do not argue that any provision therein requires a
written IPM plan specific to each park.

an integrated pest management program that was based on documents other than a park-specific IPM plan and, additionally, had discretion to decide whether to designate an employee as an IPM Coordinator, the Court next considers whether such exercises of discretion are susceptible to a public policy analysis.

The risks inherent in national parks are numerous.  (See Neubacher Decl. ¶ 6.)  In Yosemite, visitors are subject to risks posed by a large number of animals, ranging from bears to deer mice, to risks posed by natural events such as wild fires, and to risks inherent in terrain that includes waterfalls and steep cliffs.  (See id.; Bain Decl. II Ex. 22 at 57:20-21, 73:20-25, 129:18-25, 146:9-10; Dempsey Decl. Ex. 25:18-20.)  As discussed above, Congress has charged the NPS with the responsibility of "conserv[ing] the scenery, natural and historic objects, and wild life" in national parks, while at the time directing the NPS to "provide for the enjoyment" thereof by the public.  See 54 U.S.C. § 100101(a).  In managing the risks in national parks, park superintendents must balance the obligations identified by Congress in light of limitations imposed by budgetary constraints.  (See Bain Decl. I Ex. 12 at NPS-2_02579 (order by Director of the NPS providing superintendents must "seek to identify risks within their jurisdiction and to mitigate [those] risks within the limits of available resources without compromising the integrity of the environments they are charged to protect" and "must make discretionary decisions that balance public recreation and safety with preservation of the protected natural, historic, or cultural setting").)

In the instant case, discretionary decisions as to how to manage risks in Yosemite, and, more specifically, the risk of contracting Hantavirus, "must be presumed" to be "grounded in" the above-referenced policies, see Gaubert, 499 U.S. at 324, and neither plaintiffs nor DNC have shown "the challenged actions are not the kind of conduct that can be said to be grounded in [those] polic[ies]," see id. at 324-25.

Accordingly, to the extent plaintiffs and DNC's claims are based on the lack of an IPM plan specific to Yosemite and to the extent DNC's claim is based on the lack of an Integrated Pest Management Coordinator, such claims are barred by the discretionary

1    function exception.

2        **3.  DNC's Claim Based on Failure to Place Rodent Traps**

3        DNC argues that its claim based on the NPS's alleged failure to use spring-loaded

4    traps to catch rodents in the vicinity of the STCs is not barred by the discretionary function

5    exception, in light of certain language in the Yosemite National Park Directive #9:

6    Hantavirus Risk Reduction Program.

7        As noted above, the directive on which DNC relies was issued by the

8    Superintendent of Yosemite on April 25, 2012.  The directive includes five "Program

9    Requirements," one of which is "Reduce Rodent Shelter and Food Sources Within 100 Feet

10   of Homes."  (See DNC App. Ex. 22 at 6-8.)  Under said "Program Requirement," the

11   directive sets forth the following responsibility:  "Place spring-loaded rodent traps in likely

12   areas of rodent shelter within 100 feet around buildings, and use continuously."  (See id.

13   Ex. 22 at 7.)

14       DNC argues the above-quoted language is a specific and mandatory directive

15   addressed to the NPS.  The Court agrees, and finds unpersuasive the United States

16   arguments to the contrary.

17       The United States first argues that the subject obligation was that of DNC, not the

18   NPS.  The United States, however, cites no language in the directive stating the obligation

19   was placed on DNC.  Nor has the United States offered any evidence to support a finding

20   that the parties understood that the directive was interpreted by the NPS in such a manner.

21   Indeed, to the extent any evidence as to how the NPS understood the directive has been

22   offered, it support's DNC's position.  Specifically, DNC offers evidence, undisputed by the

23   United States, that before the Hantavirus outbreak, the NPS "would not allow [DNC] to trap

24   mice outdoors in Yosemite" (see DNC's App. Ex. 18 ¶ 7), which undisputed evidence is

25   inconsistent with the NPS's having understood the above-quoted language in the directive

26   to require DNC, as opposed to the NPS, to place rodent traps "in likely areas of rodent

27   shelter within 100 feet around buildings" (see DNC App. Ex. 22 at 7) (emphasis added).

28       The United States also argues that if the NPS had the obligation, the NPS had

30

1    discretion to determine "where likely areas of rodent shelter are and where traps should be

2    placed."  (See United States' Reply at 23:18-19.)  Such argument might be persuasive if

3    DNC based its claim on the theory that the NPS did place traps, but put them in locations

4    that were not likely areas of rodent shelter; DNC's claim, however, is that the NPS failed to

5    comply with the directive at all.  In other words, the claim being made does not challenge a

6    discretionary decision with respect to the particular placement of traps.[27]

7        Accordingly, to the extent DNC's claim is based on the NPS's alleged failure to place

8    rodent traps, the United States has not shown such claim is barred by the discretionary

9    function exception.

10   **D.  Claims Based on Alleged Failure to Implement State Agency Recommendations**

11       In the MCC, plaintiffs allege that "[a]s early as September 2000," CDPH, a California

12   state agency, "issued various recommendations to [the] NPS and DNC as a means of

13   reducing the risk of transmission of Hantavirus to humans in Yosemite" (see MCC ¶ 39),

14   and that, on seven other occasions, the first in October 2000 and the last in October 2011,

15   the NPS received "[r]ecommendations and warnings . . . about the need for improved pest

16   management and Hantavirus risk" (see MCC ¶ 46).  Plaintiffs further allege that the NPS

17   nonetheless "fail[ed] to properly investigate and take remedial action."  (See MCC ¶ 87.)  In

18   its Cross-Claim, DNC similarly alleges that the NPS "failed to implement public health

19   recommendations regarding hantavirus and failed to relay such recommendations to DNC."

20   (See Cross-Claim ¶ 306.)

21       Neither plaintiffs nor DNC cites a statute, regulation, policy or other document that

22   required the NPS to implement the recommendations it received from the CDPH.  Further,

23   as the alleged recommendations pertain to the manner in which the NPS should address

24

25       [27]In its reply, the United States asserts that it "decided to place traps inside
26   accommodations."  (See id. at 23:20.)  To the extent the United States is arguing the
     phrase "within 100 feet around buildings" should be interpreted to include the interior of
27   such structures, the argument goes to the merits of DNC's claim, and, consequently, is not
     appropriate for consideration under Rule 12(b)(1).  See Whisnant, 400 F.3d at 1185
28   (holding "the question of whether the United States was negligent is irrelevant to the
     applicability of the discretionary function exception").

the risk of transmission of Hantavirus, the Court finds that the NPS's alleged decisions not

to implement the recommendations offered by the CDPH are susceptible to policy analysis

for the reasons stated above with respect to the claims based on the NPS's alleged failure

to implement a written IPM plan specific to Yosemite.[28]

Accordingly, to the extent plaintiffs and DNC's claims are based on the NPS's

alleged failure to implement recommendations offered by the CDPH, such claims are

barred by the discretionary function exception.

**E. Claims Based on Failure to Warn Visitors to Curry Village of Risk of Contracting Hantavirus Prior to 2012 Outbreak**

In the MCC, plaintiffs allege that the NPS "knew, or should have known, the

presence of Hantavirus existed on the property, and the circumstances causing an increase

in the danger of the transmission of the virus, but failed to warn the decedents and the

plaintiffs of the risk of contracting the deadly virus." (See MCC ¶ 133; see also MCC ¶ 147

(alleging NPS "failed to provide adequate warning of the existence of [the] risk" presented

by "existence of Hantavirus").) Although DNC, in its Cross-Claim, does not expressly

allege a claim based on a failure to warn the decedents and plaintiffs, DNC, in its

opposition, asserts that its claims are based in part on a theory that the NPS allegedly

"fail[ed] to educate visitors about the risk of [H]antavirus before the outbreak." (See DNC's

Opp. at 2:11-12.) Additionally, in their respective oppositions, plaintiffs and DNC both

assert that the NPS did provide warnings about the risk of Hantavirus to persons visiting

areas in Yosemite other than Curry Village, specifically, persons visiting Tuolumne

Meadows and High Sierra Camp. (See Pls.' Opp. at 38:5-11; DNC's Opp. at 34:17-20.)

Accordingly, the precise action being challenged by plaintiffs and DNC is the NPS's

decision to warn visitors to some parts of Yosemite of the risk of contracting Hantavirus,

---

[28]In their opposition, plaintiffs assert their claim is also based on a theory that "NPS failed to implement nearly all of the repeated recommendations from . . . OPH." (See Pls.' Opp. at 33:13.) "OPH" is the "Office of Public Health," a department within the NPS. (See Dempsey Decl. Ex. 1.) To the extent plaintiffs may be asserting that employees in the OPH advised other NPS employees to implement recommendations made by the CDPH, and that their advice was not taken, such claim is merely a restatement of plaintiffs' claim that the NPS failed to implement the recommendations made by CDPH.

1    but not visitors to Curry Village.

2         Neither plaintiffs nor DNC cite a statute, regulation, policy, or other document

3    mandating that the NPS provide visitors with a warning that they risked contracting

4    Hantavirus while visiting Curry Village or Yosemite in general.  Although, as DNC points

5    out, one section of a document titled "Director's Order #83: Public Health" provides that

6    "NPS unit managers will reduce the risk of transmission of vector-borne and zoonotic

7    diseases to park visitors and employees through education, surveillance, and control

8    efforts when necessary" (see DNC App. Ex. 27 at 8-9), such provision does not mandate

9    that NPS unit managers "educate" by giving warnings to all visitors about all possible

10   vector-borne and zoonotic diseases, and thus leaves NPS unit managers with discretion to

11   determine what type of "education" to provide.  Consequently, as the NPS had discretion to

12   determine whether to provide a warning to visitors regarding the risk that they might be

13   exposed to Hantavirus while visiting Curry Village, the Court next considers whether the

14   NPS's alleged decision not to provide such a warning is susceptible to a public policy

15   analysis.

16        In Faber v. United States, 56 F.3d 1122 (9th Cir. 1995), in which the Ninth Circuit

17   considered a claim against the Forest Service for failure to warn of a hazardous condition,

18   the Ninth Circuit held that "in cases where the government has allegedly failed to warn, the

19   use of the discretionary function exception must be limited to those unusual situations

20   where the government was required to engage in broad, policy-making activities or to

21   consider unique social, economic, and political circumstances in the course of making

22   judgments related to safety."  See id. at 1125.  The Ninth Circuit then cited Childers v.

23   United States, 56 F.3d 1122 (9th Cir. 1995), as a case in which such a unique

24   circumstance was presented, specifically, that, in considering what type of warning to give

25   visitors with respect to hazards on a trail in Yosemite, the NPS's discretion "was guided

26   only by general operating procedures which required the [NPS] to 'weigh public access

27   against visitor safety.'"  See Faber, 56 F.3d at 1127 (quoting Childers, 40 F.3d at 974).  As

28   explained in Childers, the discretion given the NPS stems from the Organic Act, by which

33

1   Congress has directed the NPS to "balance preservation and public access, forcing it to

2   exercise judgment and choice about what sorts of facilities and safety features, if any, to

3   provide."  See Childers, 40 F.3d at 974 (internal quotation and citation omitted).

4        More recently, the Ninth Circuit, in Terbush v. United States, 516 U.S. 1125 (9th Cir.

5   2008), again considered the NPS's discretion to provide warnings to the public with respect

6   to hazards visitors might encounter while visiting national parks, explaining that the Ninth

7   Circuit has consistently "interpreted the broad mandate of the Organic Act . . . to call upon

8   the NPS to balance access with safety, and take into account conservation and resources

9   in designing area plans, in determining the safety of particular areas, and choosing the

10  precise manner in which to warn the public of any hazards," and further stating that "such

11  decisions are precisely the kind the discretionary function exception was intended to

12  immunize from suit."  See id. at 1135 (internal quotation and citation omitted).

13        In Terbush, the plaintiffs' son was killed by a rockslide in Yosemite.  See id. at 1128.

14  The plaintiffs alleged that the NPS had constructed a "wastewater management system"

15  that "exacerbated the natural exfoliation of the rockface, creating a dangerous condition

16  that led to the rockfall that killed their son," and that NPS "failed to warn of the dangerous

17  condition it had created, which was an unnatural and unseen hazard to visitors."  See id.

18  The Ninth Circuit found such failure to warn claim was barred by the discretionary function

19  exception in light of the policies identified in the Organic Act.  See id. at 1136-40.  In

20  particular, the Ninth Circuit reasoned that "the decision cannot be boiled down to a simple

21  recognition of the existence of some hazard"; rather, "[t]he entire process, including

22  identifying hazards, determining which hazards require a warning, and determining how

23  and when and where the warning should proceed involves discretion."  See id. at 1137.  In

24  sum, the Ninth Circuit concluded that "this process of identifying and responding to hazards

25  in the wild implicates the NPS's broader policy mandates to balance access with

26  conservation and safety."  See id.

27        Here, as in Terbush, discretionary decisions regarding whether to warn visitors of

28  the risk of exposure to Hantavirus while visiting Yosemite were made in the context of an

34

overall process of identifying and responding to a number of hazards in the wild.  The

Superintendent of Yosemite explained as follows:

> In managing risks at Yosemite, we must allocate our resources to managing all of the various wilderness risks at Yosemite, considering the prevalence of the risk, the severity of the risk, and the location of the risk as important factors.  And, . . . in determining how to manage the risk, conservation of the park's natural, historical, and cultural resources is a significant concern.  Thus, in managing the Hantavirus risk and other natural risks at Yosemite, we not only consider the type of risk in comparison with other risks in the park, but also how managing the risk might impact Yosemite's natural, historical, and cultural resources, as well as our ability to provide a low-impact and rustic lodging alternative for visitors.  Finally, our actions in managing risks at Yosemite are necessarily constrained by limitations on our budget and staffing.

(See Neubacher Decl. ¶ 7.)

More specifically, with respect to the decision not to provide a warning to Curry

Village visitors while providing such warnings to visitors to other areas in Yosemite, the

record contains the requisite support to show the decision is susceptible to policy analysis,

specifically, the declaration of the Superintendent of Yosemite, which sets forth the

following reasoning:

> Prior to the 2012 Hantavirus outbreak at Yosemite, the risk of Hantavirus was just one of a number of naturally occurring risks that the park had to manage.  Figures regarding the number of accidents at the park demonstrate that the greatest risks at Yosemite were deaths from drowning or waterfall accident, motor vehicle fatalities, climber deaths and deaths from other falls.  On average there are only eleven fatalities per year at Yosemite, which is a very low number of deaths considering that there are approximately 4 million visitors to the park every year.  Before the 2012 outbreak [in Curry Village], there had never been a known death from Hantavirus at Yosemite, and the only two prior incidents of Hantavirus had been associated with the Tuolumne Meadows tent-cabins (8,775 feet in elevation) and the High Sierra region.
>
> . . . .
>
> We must determine which risks in which areas of the park are great enough to justify a warning.  The more warnings we provide, the less likely it becomes that any particular warning will have an impact.  Warnings can detract from the aesthetics of the park, and can also potentially create undue anxiety, affecting the number of visitors to the park, with social and economic consequences.

(See Neubacher Decl. ¶¶ 6, 8.)

The Court finds, in light of the record presented and the above-cited case authority,

the "course of action taken was susceptible to a policy analysis," and, consequently, the

1   NPS's decision "determining the scope of hazards and the appropriate means to alert the

2   public to the danger" is "protect[ed] from judicial review."  See Terbush, 516 U.S. at 1139;

3   see also id. at 1134 (holding United States entitled to dismissal where there is "some

4   support in the record that the decisions taken [were] 'susceptible' to policy analysis").  The

5   authorities on which plaintiffs and DNC rely are readily distinguishable.

6        Some of the cases cited by plaintiffs and/or DNC involve a federal agency's alleged

7   failure to comply with a mandatory directive to provide visitors with a warning as to a

8   particular type of dangerous condition to which the visitors might be exposed.  See, e.g.,

9   Navarette, 500 F.3d at 918 (holding claim alleging Army Corps failed to warn persons who

10   used path at campground of a "dangerous drop off" was not barred by discretionary

11   function exception, where Army Corps' "Safety Plan" provided that "dangerous terrain

12   conditions [at the campground], such as drop-offs, etc., will be properly marked or fenced");

13   Faber, 56 F.3d at 1126 (holding claim alleging Forest Service failed to warn of danger

14   posed by diving from particular location was not barred by discretionary function exception,

15   where Forest Service's "management plan" required it to "develop a sign plan, formulate an

16   on-going media program to inform the public, and provide a presence at [the location] to

17   verbally warn the public" of risk of "diving accidents"; finding "the challenged conduct was in

18   direct contravention of a specifically prescribed federal policy," i.e, the Forest Service "had

19   no choice but to follow [its] management plan").  Here, as discussed above, no statute,

20   regulation, policy, or other document mandated that the NPS provide visitors to Curry

21   Village with a warning regarding the danger of Hantavirus.

22        The remainder of the cases cited by plaintiffs and DNC involve situations in which

23   the federal agency had discretion to determine whether to give a warning to visitors, but

24   failed to show that the decision not to warn was "grounded in social, economic, or political

25   policy."  See Oberson v. U.S. Dep't of Agriculture, 514 F.3d 989, 995, 998 (9th Cir. 2008)

26   (holding claim that Forest Service failed to warn of "sudden and steep drop" on path used

27   by snowmobiles was not barred by discretionary function exception; finding that, although

28   Forest Service's actions were not "mandated by regulation or statute," Forest Service failed

to show that its "failure to post a warning or remedy the hazard was the product of a policy choice"); see also, e.g., Young, 769 F.3d at 1051, 1058 (holding claim that NPS failed to warn of danger posed by transformer hidden under thin layer of snow and located near heavily traveled visitor center was not barred by discretionary function exception, as NPS failed to show its choice not to warn was "susceptible to considerations of any social, economic, or political policy").  Here, by contrast, the United States, as set forth above, has shown that the NPS's decision was susceptible to a public policy analysis.

Accordingly, to the extent plaintiffs and DNC's claims are based on the NPS's failure, prior to the 2012 outbreak, to warn visitors to Curry Village of the risk of exposure to Hantavirus, such claims are barred by the discretionary function exception.

## F. Claims Based on Delayed Disclosure of Possible Hantavirus Exposure and Investigation

In the MCC, plaintiffs allege that "[d]espite the confirmed presence of a Hantavirus exposure, in light of concern for impacting profits from travel revenue, [d]efendants delayed until August 28, 2012 to initiate contact with Curry Village guests to alert them."  (See MCC ¶ 66.)  In their opposition, plaintiffs clarify that, to the extent said claim is asserted against the United States, plaintiff's theory is that the NPS was aware "[b]y July 19, 2012," of a "confirmed" case of Hantavirus involving a visitor who had stayed in Curry Village at an STC, but did not warn plaintiffs about their "potential exposure" to Hantavirus until August 27, 2012.  (See Pls.' Opp. at 38:16-19; Pls.' Ex. 36.)[29]  In its Cross-Claim, DNC alleges that NPS "employees failed to disclose the existence of a case(s) of hantavirus and the investigation into the same" (see Cross-Claim ¶ 306), which claim it clarifies in its opposition is based on the theory that the NPS delayed disclosing to DNC the "confirmed" hantavirus case until July 30, 2012, and delayed disclosing to DNC, until a date not stated by DNC, that the NPS was investigating whether the "Curry Village structures" were the

---

[29]The United States appears to deny there was any delay in notification.  (See Neubacher Decl. ¶ 15 (stating "investigations revealed deer mice infestation in the insulation of several [STCs]" in "late August").)  As discussed above, however, whether the United States in fact delayed providing notification is not relevant to the Court's analysis with respect to whether the discretionary function exception applies.

location in which the exposure occurred (see DNC's Opp. at 35:10-16).[30]

In its motion, the United States asserts that the NPS has discretion to decide "whether, when, and how to provide . . . information warnings to park guests after their stay has ended" and that exercising such discretion "can involve considerations of policy." (See MTD at 33:25-27.)  Given the claims raised here, the issue is not "whether" or "how," but, rather, "when" the subject notices were given.  In particular, with respect to plaintiffs' claims, given plaintiffs' allegation in the MCC that they did receive from the NPS notice of their possible exposure to Hantavirus, and as plaintiffs do not challenge the content of the information they did receive, the issue presented is whether, after the NPS became aware of a hantavirus case, its alleged decision to delay giving plaintiffs notice thereof is susceptible to a public policy analysis.  Similarly, with respect to DNC's claim, because DNC acknowledges that it did receive notice of the confirmed Hantavirus case and did receive notice that the NPS was investigating the STCs, the issue presented is whether, after the NPS became aware of a hantavirus case and instituted an investigation into the STCs as a cause, its alleged decision to delay giving DNC notice thereof is susceptible to a public policy analysis.

## 1. Plaintiffs' Claims Based on Delayed Notification

Plaintiffs do not identify a statute, regulation, policy or other written document addressing, as to a visitor who has left Yosemite, the time at which such individual is to be given notice that, during a prior visit, he/she might have been exposed to a disease. Consequently, as the NPS had discretion to determine when it would notify plaintiffs of their possible exposure to Hantavirus, the Court next considers whether the alleged decision to delay providing plaintiffs with such notice for approximately forty days is a decision susceptible to a public policy analysis.

---

[30]In its reply, the United States asserts that a delay in notification to DNC "is unrelated to any claim."  (See United States' Reply at 24:2-3.)  DNC, however, expressly bases its Cross-Claim in part on such allegation (see Cross-Claim ¶ 306), and, as the United States has not moved to dismiss the Cross-Claim for failure to state a claim, the Court does not further consider herein whether the NPS's alleged delay in notifying DNC of the investigation could support a claim for contribution or indemnification.

As discussed above, the United States has shown that the NPS's exercise of discretion with respect to determining whether to warn current visitors to Curry Village of a risk of contagion, prior to its discovery of a Hantavirus case at that location, is susceptible to a public policy analysis.  The United States has not shown, however, that the NPS's alleged decision to delay notifying persons who stayed in the same type of lodging in which a person with a confirmed case of Hantavirus had stayed implicates those, or different, public policies.

Although the United States argues that the "decisions regarding what information to provide about Hantavirus at Yosemite . . . involve safety considerations balanced with considerations of access, conservation, and resources" (see MTD at 34:2-4), the United States has not explained why the NPS employees who allegedly decided to delay notification might have balanced safety considerations with "access" and "conservation" considerations, given that the notification, in this instance, would be given to persons who had already visited and left Curry Village.  Nor has the United States explained how the NPS employees who allegedly decided to delay notification might have balanced safety with "resources."  Moreover, to the extent the United States' reference to "resources" is meant to refer to budgetary limitations, a discretionary decision susceptible to a balancing of safety considerations and budgetary considerations is protected by the discretionary function exception only if a statute, regulation or policy "requires the government to balance expense against other desiderata," see National Union Fire Ins. v. United States, 115 F.3d 1415, 1421-22 (9th Cir. 1997), and the United States has not identified any such statute, regulation or policy.

To the extent the United States argues that a letter written by a Mariposa County Supervisor to the Department of the Interior constitutes the requisite "support in the record that the decisions are susceptible to policy analysis," see Terbush, 516 F.3d at 1134, the Court is not persuaded.  The Supervisor, after noting that the persons who had been infected with hantavirus had stayed in "tent cabins," opined that, in the absence of there being a "reason to believe that anyone in the other overnight accommodations [had] ever

been infected with Hantavirus[,] it would seem an extreme overreaction, and a disservice to both the public and the economic stability of the region to create an unnecessary hysteria" that could result from giving notice to all Yosemite visitors.  (See Bain Decl. I Ex. 18.)[31] Plaintiffs' claim, however, does not challenge any decision the NPS may have made regarding if and when notification should have been given to persons who stayed in facilities other than the STCs.  Consequently, whether NPS employees might have balanced safety with economic and political considerations when deciding if and when to notify all visitors to Yosemite is not relevant to plaintiffs' claim.[32]  With respect to the claim plaintiffs are making, the letter, if anything, supports a finding that a decision to delay notification to visitors who stayed in STCs is not susceptible to a public policy analysis, given the Supervisor's statement that "it is vitally important to notify anyone who stayed in the affected tent cabins."  (See id.)

Lastly, the Court finds unpersuasive the United States' reliance on cases in which the military's decision not to warn soldiers, contractors, or others that they had been exposed to a hazard was found to be a decision not reviewable by a court.  The exercise of discretion in those cases involved consideration of policies implicating matters of national security, such as the "risk [of] alerting the enemy about war preparations," see Minns v. United States, 155 F.3d 445, 452 (4th Cir. 1998) (considering claim that, during Persian Gulf War, Army had "inoculated [soldiers] with drugs and exposed [them] to pesticides . . . in anticipation of possible biological and chemical attacks by Iraq" and failed to warn soldiers of possible serious side-effects), or "sensitive questions concerning [a warning's] impact on on-going and future tests" of nuclear weapons, see In re Consolidated United

---

[31]Portions of Yosemite are located in Mariposa County.  See Collins v. Yosemite Park & Curry Co., 304 U.S. 518, 523 n.7 (1938).

[32]The Supervisor's letter is dated September 9, 2012, a date after the date on which plaintiffs allege they received notice from the NPS, and, consequently, the letter could not have been considered by the NPS employees who allegedly decided to delay such notification.  The Court understands the United States to be arguing that any policy-based concerns stated in the letter were concerns that the NPS employees who allegedly decided to delay providing notice to plaintiffs might have considered.

States Atmospheric Testing Litig., 820 F.2d at 997-98 (noting courts "cannot be considered qualified to evaluate [decisions regarding warnings at nuclear test sites] and any attempt to do so is likely to interfere with important government activities").

Accordingly, to the extent plaintiffs' claims are based on the alleged delay in notifying them of their possible exposure to Hantavirus, the United States has not shown such claims are barred by the discretionary function exception.

### 2. DNC's Claims Based on Delayed Notification

DNC argues that its claims that the NPS delayed giving it notice of the outbreak and notice of the NPS's investigation into the STCs' connection therewith are not barred by the discretionary function exception, for the asserted reason that the NPS had a mandatory duty to provide such notice.  In support of its argument, DNC relies on the following language in "Director's Order #83: Public Health":  "The park's concession office will be notified when an illness investigation is conducted in a concessioner's facility."  (See DNC App. Ex. 27 at 8.)  As the United States points out, however, the above-quoted provision does not pertain to notice to a concessioner; rather, the notice is to be given to the "park's concession office," i.e., an office staffed by "park" employees such as, presumably, Concessions Specialists.  Although it would appear that one purpose for such notification requirement is to enable the NPS employees in the concession office to, in turn, notify the concessioner of the investigation, nothing in Director's Order #83 requires NPS to so notify the concessioner within a specified period of time.  Consequently, as the NPS had discretion to determine when to notify DNC, the Court next considers whether the alleged decision to delay for eleven days providing DNC with notice of the confirmed Hantavirus case, as well as its alleged decision to delay, for a time period unspecified by DNC, providing DNC with notice that the NPS had begun an investigation into the STCs, are decisions susceptible to a public policy analysis.

In that regard, the United States has failed to point to anything in the record suggesting why the alleged decisions to delay notifying DNC of the confirmed case and the investigation are susceptible to a public policy analysis.  Although there could be situations

41

1    in which the government may decide not to disclose the existence of an investigation for

2    public policy reasons, such as where the investigation could result in the pursuit of criminal

3    charges or imposition of civil penalties against the target, the United States does not

4    contend such a situation exists here, nor has it identified any other social, economic or

5    political policy implicated by its exercise of discretion in delaying notification to DNC.

6         Accordingly, to the extent DNC's claims are based on the alleged delays in notifying

7    it of the confirmed Hantavirus case and the NPS's investigation, the United States has not

8    shown such claims are barred by the discretionary function exception.

9                              **CONCLUSION**

10        For the reasons stated above, the United States' motion to dismiss is hereby

11   GRANTED in part and DENIED in part, as follows:

12        1.  To the extent the claims in plaintiffs' Master Consolidated Complaint and/or the

13   claims in DNC's Cross-Claim are based on the following alleged acts or omissions, the

14   motion is hereby GRANTED and such claims are hereby DISMISSED for lack of subject

15   matter jurisdiction:

16            (a) the Superintendent of Yosemite's approval of the winterizing project after

17   that work had been completed;

18            (b) the NPS's failure to require DNC to submit plans drawn by an architect or

19   engineer;

20            (c) the NPS's failure to review the winterizing project from a rodent-exclusion

21   perspective;

22            (d) the NPS's failure to conduct three evaluations of the STCs each year;

23            (e) the NPS's failure to have an IPM plan specific to Yosemite;

24            (f) the NPS's failure to have an Integrated Pest Management Coordinator

25   working in Yosemite;

26            (g) the NPS's failure to implement recommendations offered by the CDPH;

27   and

28            (h) the NPS's failure to warn visitors to Curry Village, prior to the 2012

                                        42

1    outbreak, of the risk of exposure to Hantavirus.

2           2.  In all other respects, the motion is DENIED.

3           Lastly, the stay of discovery on issues not pertaining to jurisdiction is hereby

4    LIFTED, said stay having been imposed only for the period of time during which the instant

5    motion was pending.

6           **IT IS SO ORDERED.**

7

8    Dated:  February 26, 2016

                                                            MAXINE M. CHESNEY
9                                                           United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28