UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE YOSEMITE NATIONAL PARK HANTAVIRUS LITIGATION | Case No. 14-md-02532-MMC (KAW)<br><br>**ORDER REGARDING DISCOVERY LETTER**<br><br>Re: Dkt. No. 228 |

On June 23, 2017, Plaintiffs Carolyn Garisto and Estate of Bruno Garisto ("Garisto Plaintiffs") and Defendants Delaware North Companies, Inc., Delaware North Companies Parks & Resorts, Inc., DNC Parks & Resorts at Yosemite, Inc., and DNC Parks & Resorts Reservations, Inc. (collectively, the "DNC Defendants") filed a joint discovery letter, regarding a dispute over the Garisto Plaintiffs' proposed depositions of Mr. Kevin Kelly and Mr. Lou Jacobs. (Discovery Letter, Dkt. No. 228.) Mr. Kelly was the President of Delaware North Companies Park & Resorts during the 2012 Hantavirus outbreak, while Mr. Jacobs was a Principal of two Delaware North companies at the time of the outbreak. (*Id.* at 2.) The Court deems the matter suitable for disposition without hearing pursuant to Civil Local Rule 7-1(b). Having reviewed the papers filed by the parties and the relevant legal authority, the Court DENIES Plaintiff's requests to depose Mr. Kelly and Mr. Jacobs.[1]

**I. BACKGROUND**

The Garisto Plaintiffs; Rupal Badani, Estate of Amit Jha, M.J., and K.J. ("Badani

---

[1] The filed letter was fifteen pages long and included over twelve pages of deposition testimony, in violation of the Court's standing order. While the Court will accept the letter in this instance, in the future the parties must seek relief from the page limit *prior* to filing, pursuant to Civil Local Rule 7-11.

1  Plaintiffs"); Cathy Carrillo; Roger Mann and Sherrie Mann ("Mann Plaintiffs"); and Christopher
2  Harrison and Felicia Tornabene ("Harrison/Tornabene Plaintiffs") bring the instant suit against the
3  DNC Defendants; Yosemite Construction, Inc. and Bradley Popp (collectively "Yosemite
4  Construction"); and the United States of America.

5  Hantavirus is a lethal virus that is transmitted through the air, and there is an increased risk
6  of infection when there is a high level of deer mice and their feces, urine, and saliva in an area.
7  (Consolidated Compl. ¶ 31, Dkt. No. 139.) The instant case concerns an outbreak of Hantavirus in
8  Yosemite National Park in the summer of 2012, which infected ten people and resulted in three
9  fatalities. (Consolidated Compl. ¶ 32.) Nine of these ten people, including Plaintiffs, contracted
10 Hantavirus in the "Signature Tent Cabins" in Yosemite's Curry Village. (Consolidated Compl. ¶¶
11 69-73, 81.) The Signature Tents used a double-wall design, even after a prototype double-walled
12 tent was allegedly found to be "infested with mice" and constituted a "health hazard."
13 (Consolidated Compl. ¶¶ 48, 50.) Despite that, Defendants approved the use of the double-walled
14 design for the Signature Tent Cabins, which were built in 2009. (Consolidated Compl. ¶ 51.)
15 Prior to the summer of 2012, there were also several reports and complaints about rodent
16 infestations at Curry Village. (Consolidated Compl. ¶¶ 58, 60-63.) Additionally, in June and July
17 2012, the California Department of Public Health assessed studies revealing a significant density
18 of Hantavirus-infected rodents in Yosemite, and recommended that educational brochures be
19 posted throughout Yosemite. (Consolidated Compl. ¶¶ 59.) Despite these reports, Defendants did
20 not take corrective measures, such as developing a comprehensive Hantavirus policy or following
21 rodent control and abatement plans. (Consolidated Compl. ¶¶ 63-67.)

22 On April 13, 2016, Plaintiffs filed the operative Master Consolidated Complaint, alleging
23 the following causes of action: (1) wrongful death (Garisto and Badani Plaintiffs), (2) survival
24 (Garisto and Badani Plaintiffs), (3) negligence, (4) strict product liability, (5) violations of the
25 California Consumer Legal Remedies Act (Mann Plaintiffs), (6) fraud and concealment, (7)
26 premises liability, (8) loss of consortium (Garisto Plaintiffs, Plaintiff Sherrie Mann, Plaintiff
27 Felicia Tornabene), (9) breach of warranty, (10) failure to warn, (11) negligent infliction of
28 emotional distress (Garisto Plaintiffs), and (12) civil conspiracy (Garisto Plaintiffs).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 30(a)(1) provides that, subject to certain limitations, "[a] party may, by oral questions, depose any person, including a party, without leave of court . . . ." Per Rule 26(c)(1), however, "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." The party seeking the protective order has the burden of showing good cause by "demonstrating harm or prejudice that will result from the discovery." *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1063 (9th Cir. 2004).

"When a party seeks the deposition of a high-level executive (a so-called 'apex' deposition), the court may exercise its discretion under the federal rules to limit discovery." *Affinity Labs of Tex. v. Apple, Inc.*, No. C 09-4436 CW, 2011 WL 1753982, at *15 (N.D. Cal. May 9, 2011); *see also Apple Inc. v. Samsung Elecs. Co.*, 282 F.R.D. 259, 263 (N.D. Cal. 2012). Such discretion may be warranted because "such discovery creates a tremendous potential for abuse or harassment." *Apple Inc.*, 282 F.R.D. at 263 (internal quotation omitted). In deciding whether an apex deposition may proceed, courts consider: (1) whether the deponent has unique, first-hand, non-repetitive knowledge of the facts at issue in the case, and (2) whether the party seeking the deposition has exhausted less intrusive discovery methods. *Id.* Thus, "[w]here a high-level decision maker removed from the daily subjects of the litigation has no unique personal knowledge of the facts at issue, a deposition of the official is improper." *Groupion, LLC v. Groupon, Inc.*, No. 11-870 MEJ, 2012 WL 359699, at *2 (N.D. Cal. Feb. 2, 2012) (internal quotation omitted). This is especially the case where the information sought can be obtained through less intrusive discovery methods, such as by interrogatory or depositions of lower-level employees with more direct knowledge of the facts at issue. *Id.* Courts in this district have, however, reiterated that "it is very unusual for a court to prohibit the taking of a deposition altogether absent extraordinary circumstances. When a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition." *Apple Inc.*, 282 F.R.D. at 263 (internal quotation omitted); *see also Powertech Tech., Inc. v. Tessera, Inc.*, No. C 11-6121 CW, 2013 WL 3884254, at *1 (N.D. Cal. July 26, 2013).

3

## III. DISCUSSION

### A. Kevin Kelly

The Garisto Plaintiffs seek to depose Mr. Kelly, who was the President of Delaware North Companies' Park & Resorts division. (Discovery Letter at 3.) The Garisto Plaintiffs argue that Mr. Kelly approved the Signature Tent Cabins, including reviewing the construction plans and approving funding. (*Id.*) Further, the Garisto Plaintiffs argue that Mr. Kelly was "a key player in causing and responding to the hantavirus outbreak." (*Id.* at 6.) In support of the latter, the Garisto Plaintiffs point to: (a) Mr. Kelly personally touring Curry Village in June 2011, July 2012, and August 2012; (b) his receipt of a "detailed email update" about drafting a press release about hantavirus; (c) testimony by Mr. Dan Jensen, the DNC Parks & Resorts at Yosemite, Inc. president, that Mr. Jensen had immediately informed Mr. Kelly about the hantavirus outbreak; (d) his receipt of an update of guest cancellations due to fears of hantavirus; (e) Mr. Kelly's August 29, 2012 e-mail to Mr. Jensen about "keep[ing] an eye on business," to which Mr. Jensen had responded with a lengthy e-mail about the company's response to the hantavirus outbreak and its effect on the business; (f) Mr. Kelly's receipt of an e-mail from the Director of Risk Management for advice on what to review for his trip to Yosemite to collect information on hantavirus; (g) his travel to Washington, D.C. to brief the National Park Service director on the hantavirus issue; (h) deposition testimony by Mr. Thomas Barney that he and Mr. Kelly were the two individuals in the Parks & Resorts division who made the decision about how and when to inform customers of the hantavirus outbreak; (i) his request for information about mouse infestations from an Australia branch; (j) his presentation on "Managing Rodent-Related Diseases in Parks"; (k) his September 2012 visit to Yosemite; and (l) his travel to Washington D.C. to meet with Congress regarding hantavirus. (Discovery Letter at 4-5.)

The Court finds that Mr. Kelly does not have unique first-hand knowledge of issues relevant to this case. First, with respect to Mr. Kelly's approval of the Signature Tent Cabins, there is no showing that Mr. Kelly's approval affected the design or implementation of the Signature Tent Cabins, or was anything other than a formality. The DNC Defendants argue that Mr. Kelly was simply involved in funding, but exercised no oversight beyond that, and that Mr.

4

Kelly's approval was required as a matter of corporate formality due to the scope of the capital project. (Discovery Letter at 12-13; *see also* Discovery Letter, Exh. 1 at 457:14-17.) The Garisto Plaintiffs do not dispute this point. Indeed, the evidence supports the DNC Defendants' position; for example, Mr. Jensen testified that while the project required Mr. Kelly's approval, "[t]he initiative to actually get all that done was actually in Yosemite." (Discovery Letter, Exh. 1 at 456:2-4.) In response to a question of whether Mr. Kelly was fairly detail-oriented with respect to oversight of projects performed by Mr. Jensen, Mr. Jensen replied that Mr. Kelly was not, and that Mr. Jensen would provide periodic updates. (*Id.* at 457:6-12.) Thus, Mr. Kelly's involvement in the approval process appears to be limited and *pro forma*, such that his decision to approve the project has little bearing on the design and implementation of the Signature Tent Cabins. This is particularly the case where Plaintiffs have taken depositions of Mr. Jensen, as well as two other individuals who were directly involved in the design and implementation of the Signature Tent Cabins.

Second, the Court does not agree that Mr. Kelly was a "key player" in responding to the hantavirus outbreak, as the Garisto Plaintiffs argue. For example, the Garisto Plaintiffs argue that Mr. Barney "testified that he and Kevin Kelly were the two individuals who made the decision about how and when to inform Curry Village customers of the hantavirus outbreak." (Discovery Letter at 5.) The Garisto Plaintiffs also point to Mr. Barney's testimony that his own involvement was "very little," and argue that this implies Mr. Kelly was the primary decision-maker. (*Id.*) The Court finds this argument unpersuasive. First, the Garisto Plaintiff's contention that Mr. Barney and Mr. Kelly were the two individuals who made the decision about the response is not accurate; Mr. Barney testified that he and Mr. Kelly were *involved* in the decision-making, but did not state that they were the only individuals at the DNC. (Discovery Letter, Exh. 3 at 179:3-8.) In fact, when asked about this further, Mr. Barney explained that Mr. Jensen, the legal department, and the public relations department were all involved in the decision making process, and identified Mr. Jensen as the person at the DNC who had "ultimate control" over communications to customers. (*Id.* at 179:14-180:3, 180:12-19.) More importantly, while Mr. Barney stated that his involvement was "very little," he immediately went on to explain that "[t]he National Park Service was

5

absolutely the lead on any communications relating to the hantavirus," and also stated that the National Park Service had "ultimate control over the communications sent by [DNC] to customers who had stayed in Curry Village . . . ." (*Id.* at 179:10-13, 180:12-16.) Finally, when asked about the decision to send notice of the hantavirus outbreak, Mr. Barney explained that "[i]t wasn't [his] decision to approve," and that the decision was made by the National Park Service and Mr. Jensen. (*Id.* at 182:11-183:1.) In short, Mr. Barney's testimony that he had "very little" involvement in the response process does not suggest that Mr. Kelly was the principal; instead, Mr. Barney clearly identified the National Park Service and Mr. Jensen as the key decision makers who had "ultimate control" over the communications to customers.

The other evidence cited by the Garisto Plaintiffs is not particularly persuasive that Mr. Kelly was a "key player" who would have unique, first-hand knowledge of the hantavirus response. For example, the fact that Mr. Jensen immediately informed Mr. Kelly about the outbreak does not automatically suggest that Mr. Kelly was a key player in the response. Further, Plaintiffs appear to suggest that Mr. Kelly's receipt of an e-mail update about drafting a press release resulted in a delay in notification to Bruno Garisto, who died on August 10, 2012 without knowledge that he suffered from hantavirus. (Discovery Letter at 4.) It is not clear how Mr. Kelly's receipt of an e-mail on August **14**, 2012, after Mr. Garisto's death, could be relevant to a delay that affected Mr. Garisto's passing. Similarly, evidence about Mr. Kelly keeping abreast of the hantavirus issue, whether by requesting information about mice infestations from an Australia branch, his giving a presentation about rodent-related diseases, or his briefing of Congress and the National Parks Service director on the hantavirus issue, only demonstrate that he was involved, not that he was a "key player." Instead, the "key players" in responding to the hantavirus outbreak were Mr. Jensen and the National Park Service. The Court, therefore, DENIES the Garisto Plaintiffs' request to depose Mr. Kelly.

### B. Lou Jacobs

Next, the Garisto Plaintiffs seek to depose Mr. Jacobs, who was a Principal of two Delaware North companies at the time of the outbreak. In addition to Mr. Jacobs's visit to Yosemite and Washington, D.C. in September 2012, the Garisto Plaintiffs point to an e-mail from

Mr. Jacobs's father, "The Chairman," stating: "What is happening at Yosemite with the hantavirus cases is alarming and outside our specialty of experience. It is important that you assume responsibility for the direction needed in this regard." (Discovery Letter at 6.) Finally, the Garisto Plaintiffs point to Mr. Jacobs's comments about the DNC's Guestpath system, which established standards for housekeepers in Curry Village, specifically that the "greatest thing" about the system was that "it's data-driven" and that Mr. Jacobs loved "having the ability to sit down with a client and say, 'let's look at our scores'" and talk about their role as collaborators. (*Id.* at 7.)

The Court finds that this is insufficient evidence that Mr. Jacobs has first-hand knowledge of the relevant facts in this case. While Mr. Jacobs may have visited Yosemite and Washington, D.C. during the hantavirus event, there is no showing that he had any involvement in formulating a response. Further, while the Garisto Plaintiffs assume from "The Chairman's" e-mail that Mr. Jacobs needed to assume responsibility, as the DNC Defendants point out, there is no evidence that Mr. Jacobs did, in fact, take responsibility. (*See id.* at 14.) Finally, Mr. Jacobs's comments about the DNC's Guestpath system do not indicate that Mr. Jacobs has any specific knowledge of how the system worked as it relates to the instant case. Instead, the DNC Defendants contend -- and the Garisto Plaintiffs do not dispute -- that Mr. Joe Rabon, a director of human resources, managed the Guestpath program in Yosemite; there is no evidence Mr. Jacobs has unique first-hand, non-repetitive knowledge of the program at Yosemite. (*Id.*) Accordingly, Plaintiffs have failed to meet their burden, and the Court DENIES the Garisto Plaintiffs' request to depose Mr. Jacobs.

## IV. CONCLUSION

For the reasons stated above, the Court DENIES the Garisto Plaintiffs' request to depose Mr. Kelly and Mr. Jacobs.

IT IS SO ORDERED.

Dated: July 5, 2017

_____
KANDIS A. WESTMORE
United States Magistrate Judge